## I.    PROCEDURAL HISTORY

**<u>Introduction</u>**

1.      Petitioner was convicted of murder in the death of Neil Wilkinson.  Around the

time of this trial, Petitioner appeared as a defendant in four other trials.  Two of the other trials

took place before the trial in this case.  Both of those trials resulted in mistrials.  The retrials each

took place following the conviction in this case.  Because some of the evidence of each trial was

admitted or was sought to be admitted in this case and because the Superior Court made

reference to decisions of the Supreme Court regarding the other proceedings, Petitioner has

addressed the procedural history of this case by taking into account the history of the other cases.

2.      In addition, Petitioner was tried with a co defendant, Kevin Bowman, (hereinafter,

Bowman) in the instant matter.  Because the Superior Court opinions and the trial court opinions

make reference to their respective opinions in Bowman's case, Petitioner has addressed the

procedural history of this case by taking into account the history of Bowman's case.

### A. <u>Procedural History of the Instant Case</u>

3.      Petitioner was convicted of murder and related offenses in the Court of Common

Pleas for Philadelphia County in April 1990.  He was sentenced to life without parole.  (Hon.

John J. Poserina, Jr.).  The Pennsylvania Superior Court affirmed the sentence and conviction on

October 17, 1993; a Petition for Allocatur was denied by the Pennsylvania Supreme Court on

March 22, 1994.

4.      On December 12, 1996, Petitioner filed a pro se PCRA petition in the

Philadelphia Court of Common Pleas.  Counsel was appointed and filed an amended PCRA

petition. The petition was denied without a hearing on December 5, 2001.  The Superior Court

denied Petitioner's appeal on July 21, 2003;  the Pennsylvania Supreme Court denied his petition

for review on March 4, 2004.

5.      On July 1, 2004, Petitioner filed a *pro se Petition for Writ of Habeas Corpus*.

6.      On July 30, 2004, The Honorable Robert F. Kelly appointed undersigned counsel

to represent Petitioner in this proceeding.

        B.      **Procedural History of Petitioner's other convictions**

7.      On or about July 11, 1988,  Mark Lisby died of gunshot wounds. Petitioner was

tried in the Philadelphia Court of Common Pleas in December 1989.  The jury returned a verdict

on only one charge and was unable to reach a verdict on the remaining charges, including the

charge of first degree murder.  A second trial was held in December 1990 into January of 1991,

at which Petitioner was convicted and sentenced to death.  The Pennsylvania Supreme Court

affirmed the conviction and sentence on May 24, 1994.  Commonwealth v. Reid, 642 A 2d 453

(Pa. 1994).  Mr. Reid's PCRA is still pending in the trial court.

8.      On March 7, 1988, Michael Waters died of gunshot wounds.  Petitioner was tried

in the Philadelphia Court of Common Pleas in February 1990 and the jury was unable to reach a

verdict.  At that trial, evidence of the instant matter was admitted.  The case was retried in

August of 1990 and Petitioner was convicted of first degree murder and sentenced to death.  The

Pennsylvania Supreme Court affirmed the conviction and sentence on May 27, 1993,

Commonwealth v. Reid, 626 A.2d.118 (Pa. 1993).  The PCRA is still pending in the trial court.

## II. INTRODUCTORY STATEMENT ON EXHAUSTION

## ALL OF PETITIONER'S CLAIMS ARE EXHAUSTED.

9.      All of Petitioner's claims are exhausted.  This section describes several general

principles of exhaustion.  Under these  principles, all of Petitioner's claims were fairly presented

and exhausted in the manner described in the *Petition* with respect to the individual claims.

10.      A claim is exhausted if it was "fairly presented" in state court.  Picard v. Connor,

404 U.S. 270, 275 (1971).  "Fair presentation" means that the claim raised in federal court is the

"substantial equivalent" of the state court claim.  Evans v. Court of Common Pleas, 959 F.2d

1227, 1231 (3d Cir. 1992).  This does not mean that the claim presented in state court must be

repeated in federal court in the exact same words.  What is significant is "the substance of the

claim presented in the state courts, rather than its technical designation."  Id. at 1231.  Thus, for

example, if the substance of the claim was fairly presented in state court, the facts presented in

support of the claim may be supplemented in federal court,[1] and the fact that the claim is given a

different label or designation in federal court is insignificant.[2]

11.      Applying these general principles to Petitioner's claims, Mr. Reid exhausted all of

his claims on direct appeal (Commonwealth v. Reid, No. 00399 Philadelphia 1993, filed October

---

[1]Vasquez v. Hillery, 474 U.S. 254, 257-60 (1986) (supplemental facts presented in support of grand jury discrimination claim "did not fundamentally alter the legal claim already considered by the state courts"); Blanco v. Singletary, 943 F.2d 1477, 1506 (11th Cir. 1991) (approving district court's holding of federal evidentiary hearing to supplement state court record); Cave v. Singletary, 971 F.2d 1513, 1516-17 (11th Cir. 1992) (same).

[2]Evans, 959 F.2d at 1231-33.

14, 1993), or in the state post-conviction proceedings (Commonwealth v. Reid, No. 689 Eastern

District Appeal 2002, filed July 21, 2001).[3]  The manner in which exhaustion occurred is

identified in the body of each claim.


## STANDARD OF REVIEW

12.     Petitioner is entitled to relief under the Anti-Terrorism and Effective Death

Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which states:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of that claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

13.     Recent Supreme Court decisions, such as Wiggins v. Smith, 539 U.S. 510 (2003)

and Miller-El v. Cockrell, 537 U.S. 322 (2003), confirm that habeas review remains robust under

AEDPA, and that any "deference" required by AEDPA "does not imply abandonment or

abdication of [federal] judicial review."  Miller-El, 537 U.S. at 340; see also Jacobs v. Horn, 395

F.3d 92, 107 (3d Cir. 2005) (finding that "the Pennsylvania Supreme Court's decision involved

an unreasonable application of Strickland"); Holloway v. Horn, 355 F.3d 707, 729-30 (3d Cir.

2004) (finding Pennsylvania Supreme Court decision to be contrary to and an unreasonable

---

[3]These opinions will be cited, respectively, as Reid I and II, and are attached in *Appendix
A*, which includes all prior state court opinions.

application of <u>Batson</u>).

14.     In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000) the Supreme Court described the standard of review required by section 2254(d)(1).  The Court explained that, for claims to which section 2254(d)(1) applies, the "threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established" at "the time of the relevant state-court decision." , <u>id.</u> at 390.  The claim raised in <u>Williams</u> was that trial counsel had been ineffective, in violation of the Sixth Amendment right to effective assistance of counsel.  For such claims, the Court explained, "[i]t is past question that the rule set forth in <u>Strickland [v. Washington</u>, 466 U.S. 668 (1984)] qualifies as "clearly established Federal law, as determined by the Supreme Court of the United States." <u>Williams</u>, at 391.  Thus, <u>Strickland</u> provides "clearly established law" governing all of Petitioner's ineffective assistance of counsel claims.

15.     Moreover, the Supreme Court indicated that <u>Strickland</u> is just one example of the type of broadly applicable rule of law that can provide "clearly established" law to which the habeas courts look under AEDPA.  As the Court explained:

> That the <u>Strickland</u> test "of necessity requires a case-by-case examination of the evidence" obviates neither the clarity of the rule nor the extent to which the rule must be seen as "established" by this Court.

<u>Williams</u>, at 391 (quoting <u>Wright v. West</u>, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring)). Similarly, other "framework" Supreme Court cases – <u>i.e.</u>, Supreme Court cases that "are 'general' in the sense that they erect a framework specifically intended for application to variant factual situations," <u>O'Brien v. Dubois</u>, 145 F.3d 16,25 (1st Cir. 1998), also merit classification as "clearly established" law.

16.     Once the relevant "clearly established" law has been identified, the Supreme

Court explained that the statutory language of both the "contrary to" clause and the

"unreasonable application" clause of section 2254(d)(1) must be given effect.  Thus, a federal

habeas court should grant the Writ:

> if one of the following two conditions is satisfied – the state-court adjudication
> resulted in a decision that (1) "was contrary to ... clearly established Federal law,
> as determined by the Supreme Court of the United States," <u>or</u> (2) "involved an
> unreasonable application of ... clearly established Federal law, as determined by
> the Supreme Court of the United States."

<u>Williams</u>, at 404-05.[4]

17.     Relief should be granted under the "contrary to" clause "if the state court arrives

at a conclusion opposite to that reached by this Court on a question of law or if the state court

decides a case differently than this Court has on a set of materially indistinguishable facts."

<u>Terry Williams</u>, <u>id.</u> at 405.

18.     Relief should be granted under the "unreasonable application" clause "if the state

court identifies the correct governing legal principle from this Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case.  <u>id.</u> at 409.  "[A] federal habeas court

making the 'unreasonable application' inquiry should ask whether the state court's application of

clearly established federal law was <u>objectively unreasonable</u>."  <u>Id.</u>[5]

19.     Petitioner's claims are based upon United States Supreme Court law that was

---

[4]All emphasis herein is supplied unless otherwise indicated.

[5]The standard of review described by <u>Terry Williams</u> under the "unreasonable application" clause is thus identical to that previously described by the Third Circuit in <u>Matteo v. Superintendent</u>, 171 F.3d 877, 889-90 (3d Cir. 1999) (en banc) (claims evaluated under the "unreasonable application" clause are reviewed to determine "whether the state court's application of Supreme Court precedent was objectively unreasonable").  <u>See</u> <u>Hull v. Kyler</u>, 190 F.3d 88 (3d Cir. 1999) (finding state court decision on <u>Strickland</u> claim to be an unreasonable application of <u>Strickland</u> and granting habeas relief under AEDPA).

"clearly established" at the time of the relevant state court "decisions." The relevant state court decisions were contrary to and/or an unreasonable application of this clearly established Supreme Court law for the reasons stated herein.

20.     While <u>Williams</u> describes the standard of review for federal habeas claims to which section 2254(d)(1) applies, some claims are not subject to section 2254(d)(1) at all. By its plain language, section 2254(d) applies to a claim only when the state court has issued a "decision" showing that the claim "was adjudicated on the merits." When the state court has not issued a "decision" regarding the merits of Petitioner's actual federal claim, or has issued a decision that did not "adjudicate[] [the federal claim] on the merits," then the AEDPA standards do not apply and Petitioner is entitled to *de novo* review.

21.     There are two ways in which the state courts can fail to issue a qualifying decision under AEDPA. First, if the state court fails to adjudicate the **merits** of a claim at all, but instead disposes of a federal claim by the application of a state procedural rule, then AEDPA's standard of review does not apply and this Court must review the claim *de novo*.[6] Second, the AEDPA

_____

[6]<u>See</u>, <u>e.g.</u>, <u>Weeks v. Angelone</u>, 176 F.3d 249, 258 (4th Cir. 1999), <u>aff'd</u>, 528 U.S. 225 (2000); <u>Grandison v. Corcoran</u>, 225 F.3d 654, 2000 WL 1012953 *13 (4th Cir. July 24, 2000) (unpublished disposition, text available on Westlaw) (when state court denies a claim on procedural ground there is no disposition on the merits, AEDPA's standard of review does not apply and the court's review is *de novo*); <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1264, 1269-70 (10th Cir. 1999) (reviewing claim <u>de novo</u> where state court denied claim on basis of procedural rule that was not "adequate"); <u>Moore v. Parke</u>, 148 F.3d 705, 708-10 (7th Cir. 1998) (same); <u>Liegakos v. Cooke</u>, 106 F.3d 1381, 1385 (7th Cir. 1997) (same); <u>Hooks v. Ward</u>, 184 F.3d 1206, 1223, 1238 (10th Cir. 1999) (reviewing claims <u>de novo</u> where state court denied claims on basis of procedural rule but respondents "never asserted procedural bar as a defense on federal habeas"); <u>Fisher v. Texas</u>, 169 F.3d 295, 299-300 (5th Cir. 1999) (same); <u>Smith v. Smith</u>, 166 F.3d 1215, 1998 WL 764761, *2 (6th Cir. Oct. 19, 1998) (unpublished disposition, text available on Westlaw) (claims <u>de novo</u> where state court denied them "on procedural grounds").

standard does not apply if the state court fails to appreciate the actual federal claim presented and instead decides a claim different then the one presented. Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002) ("if an examination of the opinions of the state courts show that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply").

### III. CLAIMS FOR RELIEF

**CLAIM I      PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE OF THE PROSECUTOR'S IMPROPER ARGUMENTS AND STATEMENTS.[7]**

### A.      Introduction

22.      At Petitioner's trial, the prosecutor called  fifteen witnesses were called by the prosecutor and proffered two witnesses who were not called to the stand.  By the time that closing arguments began, there had been **at least** forty -six times when the trial court had to instruct the jury to disregard some question, answer, or intemperate display by the prosecutor. There had been twenty-one motions for mistrial.  There had been at least five occasions when the trial court ordered the court reporter to "stop typing," and there had been at least as many occasions when the court opted to hustle the lawyers out of the courtroom because the sidebar had long since ceased to be a place where legal issues were discussed out fo the hearing of the jury.

23.      As a result of the chaos that reigned in Courtroom 253 during Petitioner's trial, he was denied his status as one who is presumed innocent, and his trial by jury was rendered unfair.

---

[7] This claim was raised on direct appeal when Petitioner's direct appeal.  Reid I, Appellant's Brief at 17.

The prosecutor's actions in this case "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637 (1974). When the record of the entire proceeding is examined, it is plain that the impact of the prosecutor's conduct took this trial beyond the outer limits of the due process clause. See Hennon v. Cooper, 109 F.3d. 330 (7th Cir. 1997).

24.     It has long been established that a prosecuting attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78 (1935).

25.     Likewise, the trial judge has been required to "maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.'" United States v. Young, 470 U.S. 1 (1985), citing Quercia v. United States, 289 U.S. 466 (1933).

26.     The permissible range of prosecutorial misconduct is further described by norms, guidelines and rules developed by the American Bar Association, among others. For instance, ABA Model Code of Professional Responsibility DR 7-106(C)(1980) provides:  "In appearing in his professional capacity before a tribunal, a lawyer shall not:..(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness."   Also, ABA Standard for Criminal Justice 3-5.8 (2nd. ed. 1980) provides:

 (a)...[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw...(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.  (d) The prosecutor should refrain

from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

27.     In this case, the record makes clear that the conduct of the Assistant District Attorney was improper and the impact on the jury was substantial.  The sheer quantity and the sensitive subject matter of the improper questions were highly prejudicial.  The corrective measures of the trial court were of no use, as evidenced by the persistent and regular occurrence of the misconduct from the start of the trial to its conclusion.  Indeed, the "corrective measures" of the trial court were frequently so hard to understand, imprecise, and garrulous that they likely further misled and confused the jury.  Finally, the evidence against Petitioner was weak, magnifying the effect of the misconduct.

**B.     Factual Background : Charting the trial court's rulings and their application in Petitioner's trial**

     **Pre trial rulings**

          a.     *Trial Court Rulings prior to the opening statements of counsel with regard to the evidence of "other crime" and the "JBM"*

28.     One of the major areas of prosecutorial misconduct involved exploitation of pre-trial rulings for impermissible purposes.  The trial court made pre-trial rulings allowing several crucial and highly sensitive types of evidence to be admitted for limited purposes.  Once the trial started, the prosecutor embarked on a consistent and apparently deliberate campaign of abusing the trial court's pre-trial rulings in such a way that the purportedly "limited" purpose for which

the evidence was admitted became lost in the smoke of battle, so that the evidence became a focus of the trial and the jury was in fact permitted to consider the evidence in ways that were effectively unlimited and highly prejudicial.

29.     The trial in this case was a shocking example of coarse lawyering, so much that the trial was fundamentally unfair.  Trial court rulings morphed inexplicably, theories of admissibility shifted regularly and  rulings were disregarded plainly.  Two areas of prime confusion were the body of fact and law related to the admission of the "other crime" evidence and evidence pertaining to the Junior Black Mafia.

30.     The record memorializes certain of the court's pre-trial rulings made *in limine* at the time that the case was called for trial and when the parties were ready to begin selecting the jury.  The docket sheet  shows that certain motions were filed by trial counsel well in advance of trial.  However, there is no indication in the record.  The record shows that with regard to the significant evidentiary issues raised by this case – reference to the Junior Black Mafia and its membership, the admission of "other crimes" evidence and the treatment of the prior statements and legal posturing of Darryl Woods – the rulings were made at the last minute, leaving no time to incorporate the judge's rulings into the strategy of the case. As the docket sheet in this case shows, trial counsel's motion to preclude references to the JBM was filed on October 17, 1989, but neither litigated nor decided until March 28, 1990.

    b.     *Initial Ruling on the admissibility of "other crime" evidence.*

31.     Evidence of a prior homicide committed by Petitioner was ruled admissible for the **limited** purpose of  establishing either identity or access to a specific weapon, the record is

-11-

not clear.  The ruling was that " for evidence of the ballistics evidence plus the fact of possession

of a weapon or gun" NT 4/5/1990 at 31.  Trial counsel made no efforts whatsoever to challenge

the nexus between the ballistics in the Waters case and the ballistics in this case.[8]  Knowing that

the Commonwealth's own expert was only able to speculate as to when the casings were

deposited at the scene of the Waters case, counsel's inaction is inexcusable.  In addition to taking

the practical step of seeking an independent analysis of the physical evidence, counsel had ready

made a powerful ground for excluding the evidence of the "other crime" from this case.


    c.    *The pretrial rulings on the admissibility of references to the JBM* .

32.    The basis of the initial ruling regarding the invocation of the name of the Junior

Black Mafia was similarly confused and incomplete.  At the start of jury selection, the court ruled

"Okay, Then there is no need for it and it is not relevant." NT 3/28/1990 at 3.  The prosecutor

continued on, however, "so the record is clear," to contend that the JBM was important to

establish conspiracy and motive for the crime.  The judge then invited the prosecutor, "[i]f you

have evidence of relevance, I will listen to it." Id. at 4.

33.    The prosecutor declined the invitation to approach the trial court with additional

---

    [8] Notes of testimony of proceedings in the state court will be cited as "NT," followed by
the relevant date and page number.  Orders or opinions emanating from the state trial court will
be cited as "TCO" followed by the relevant date and page number.  The nexus between the two
cases was alleged to be the shell casings coupled with the presence of a man identified as
Petitioner.  The evidence showed that the casings found at the Waters scene were fired from the
same gun as those in the instant case.  The ballistics evidence in Waters, however, also showed
that the casings found there could have been there for as long as twenty-four hours before they
were found.  NT 8/7/90 (Waters) at 768-69.  (attached as Appendix B).  The Waters evidence
also allegedly showed that Petitioner was one of four occupants of a car from which bullets were
fired.  The inference that Petitioner possessed the gun because he was present is so weak that the
nexus should have been challenged by effective counsel.

evidence to establish relevance.  Nevertheless,  without any further discussion outside the
presence of the panel,  and after making the representation that "I am not going to make any
reference to the JBM", the prosecutor immediately began questioning the panel about the JBM.
During the voir dire of the first juror who was not quickly dismissed by agreement, the
prosecutor asked " [a]nd there will be some — maybe some testimony involved — the case is
drug related and may involve an organization known as the JBM.  Do you know anything or have
you heard anything about that organization which may in any way interfere with your being a fair
and impartial juror?" NT 3/28/90 at 53.  Co defendant's counsel joined in flaunting the court's
ruling, asking  "[d]uring the course of this trial, the Commonwealth may allege that the
defendants or some people connected with this case have something to do with an organization
called the JBM or the Junior Black Mafia.  Have you read or heard anything about this so called
organization?" Id. at 63.

34.     At this point, the court sub silencio abandoned its prior ruling excluding
references to the JBM.  After defense counsel's question, the prosecutor objected for some
unstated reason.  The Court then not only restated the question but prompted the voir dire
regarding the JBM to continue with this venireman for the next five pages.  Id. at 64-68.  This
sequence was an ominous harbinger of the future.  The next nine persons presented for voir dire
were asked in varying amounts of detail about the JBM without any further legal discussion with
the court.  The next discussion with the judge about references to the JBM during the course of
the trial was an *ex parte* presentation to the trial court regarding the issuance of "protective
orders" for two putative witnesses who would be offered by the Commonwealth to explain an
alleged  relationship between Petitioner and the co defendant within the JBM and the general

-13-

functioning of the JBM.  The court issued the orders and indicated it would entertain requests for

offers of proof from defense counsel prior to the testimony of the witnesses being taken.

35.     Jury selection in this case continued from March 28, 1990 through April 3, 1990.

Each person was asked in turn about their knowledge of the JBM.  Indeed,  at the moment before

the Assistant District Attorney was to give his opening statement, the court further confused its

own ruling by responding to a concern over the day's press about the JBM:

Members of the jury, I explained to you once when two people are on trial, there is no such thing
as guilt by association.  Also in the trial you might hear the words Junior Black Mafia mentioned.
Again, if somebody belongs to a particular organization, if in fact there is such an organization,
that does not prove anything other than the **limited reason** for which the evidence might be
introduced.  If you hear the words in this case, it is for the **limited purpose** of showing whatever
the **limited amount of evidence** that comes to you about that association is going to be for.  The
Commonwealth has alleged that it had something to do with the motive in the case.  Now, that is
all I am going to tell you about that.  But the last three or four days in the newspaper there have
been articles about JBM...." NT 4/5/1990 at 54[9]

### 3.     Application of the rulings during petitioner's trial

#### a .    THE OPENING STATEMENT OF THE ASSISTANT DISTRICT ATTORNEY

36.     The opening remarks by the District Attorney were made to the jury on April 5

1990.  By the close of his remarks there were **10 objections** by defense counsel, **4 curative**

**instructions** by the judge and **7 motions for mistrial**.  Every objection was sustained.  Each

curative instruction was insufficient to redirect the jury from the prosecutor's flagrant disregard

of the most basic rules of trial advocacy.  Every motion for mistrial was denied.  This pattern was

---

[9] Petitioner's PCRA raised a claim alleging that the pre-trial publicity about the JBM and
Petitioner, in particular, would deprive the Petitioner of a fair trial.  It was claimed that there
were a hundred articles in the Philadelphia Inquirer and the Philadelphia Daily News regarding
same.  While the articles were not attached to the PCRA or the appeal from its dismissal, the
articles are reproduced for this court at Appendix C..  They have relevance to Petitioner's habeas
proceedings because of prosecutor's exploitation of the strong and negative language of the
popular press.

repeated throughout the days of this trial.[10]   In what follows, Petitioner shows the way in which the prosecutor opened the trial, the "progression" of the court's rulings, and the examinations of two of the civilian witnesses.  These actions foretold the complete failure of the court and all counsel to manage the evidence in Petitioner's case and the trial process properly.  The prosecutorial misconduct is extreme, the jury was hopelessly diverted;  the conviction should be reversed.

37.   Prosecutor's first remarks regarding the purpose of opening statements

"...The purpose of giving this address before we proceed with the evidence is to give you a kind of table of contents, to tell you what we intend to prove because it is very important sometimes that you have this table of contents as a sort of mental reference as you go through the evidence because sometimes if you don't know in what direction you are proceeding, you don't know what the point of something is, you sort of flounder around...Now, normally in opening speeches some think it to be quite short.  However in this case, it is somewhat complex in terms of the different kinds of evidence that are involved and **the limited purposes** for which they are going to be introduced so it is a little bit intricate..."                                                 4/5/1990 at 56-57.

38.   Initial remarks regarding the "limited purpose" of the JBM references: [11]

"...There is going to be introduced in this case evidence, as his Honor pointed out for a very **limited purpose**, evidence regarding certain parties, including these defendants with respect to whether or not they are involved in a certain organization known as the *JBM or Junior Black Mafia, involved in drug trade and violence* in the city.  This is not going to be **offered for the purpose** of saying, well these are bad guys, you should convict them just because they are bad guys.  It is going to be offered for a **very limited purpose** and for a relevant, important purpose in the case.  **Two very relevant and important purposes**..."                                                                                       Id. at 57-58

---

[10]Read in toto, the transcript in this case demonstrates conclusively that the trial in this case was fundamentally unfair.  For example, during the prosecutor's closing argument there were  **19 objections**, **13 instructions** from the judge and **6 motions for mistrial**.

[11]At this point, there had been no ruling from the trial court admitting this evidence for any purpose.

39.  <u>Initial remarks regarding the "limited purpose" of the "other crime"</u>
     <u>evidence:</u>

"You are going to hear evidence in this case of another offense that was committed and
again this applies to only one of these defendants. Mr. Reid.  It is again going to be
offered for a **limited purpose**, not for the purpose of saying well, Mr. Reid may have
committed another crime, therefore he is a bad guy you should convict him of this crime.
No.  And you should not consider it as such.  We are going to offer it for a **limited
purpose** and we will explain that to show that one of the murder weapons that was used
to my recollection namely, the 10 millimeter pistol, was used by Mr.Reid in this case, was
also used a week before in another case.   We are going to show he was the possessor of
the gun. "                                                                <u>Id</u>. at 58.

40.  <u>Initial remarks regarding prior inconsistent statements received as</u>
     <u>"substantive evidence":</u>

"...We are also going to offer evidence — these are three complex areas, I ask you to bear
with me.  Evidence of what we call substantive evidence through prior statements.  In
Pennsylvania we have a rule of law that says when we —"

        MR. SEAY: Objection, Your Honor, it is beyond the scope of an opening

statement.

        THE COURT: I think what counsel is doing is attempting to outline the evidence

that he expects to call and as to what the law is, I will explain it to the jury.

        MR CAMPOLONGO: At any rate, we are going to introduce evidence of prior

statements of a witness who is now turned out to be a hostile witness.  And it is going to be our

position that under Pennsylvania — <u>Id</u>. at 59.

41.  <u>Second remarks regarding the "**limited** purpose" of the JBM references:</u>

 "...This has something to do with the JBM because we believe the evidence will show
that this evidence of their various relationships and the parties being members of this
Junior Black Mafia, this drug dealing ring, the ring that is involved in violence and

-16-

murder... You will hear reference to a house at 657 Creighton Street... This is what they call a club house, it is not a house where drugs are sold out of, it is a house which is a sort of a safe house for JBM members to stay when they have weapons..." I__ d. at 60-61.

42.   Third remarks regarding the "**limited purpose**" of the JBM references:

"...Kevin Bowman was known as Black or Black K.  He is one of these defendants.  He was and is the JBM boss of the North Philadelphia area.  He is a big man in that organization.  Mr. Reid, Anthony Reid, the co-defendant was his associate, his number two man, his body guard/hit man...
      Mr Woods knew that this was common practice for one section of the JBM from one part of town to request the JBM from another part of town to do some service for the organization, which would merely strong arm work (sic), collect money or just threats and have some person tow the line or could be to kill and murder a human life....                      Id. at 63.

43.   Assistant District Attorney speculates and assumes the "first person"

 "...Mr. Woods is just twenty years old.  If fact, the deceased in this case, Neil Wilkinson, was eighteen years old.  They were just getting started in this sort of thing, they were getting in the wrong things.  The detectives told them, you don't have much of a record, you are getting involved with these people, you have a case that is opened now, why don't you cooperate with us, give us some information about this organization.  We want to know about Bucky and Frog.  And after much conversation, he said he knew, alright.  I work for Bucky and I work for Frog.  I sell drugs for them on the corner.  And I will tell you that but I have been here almost a whole day.  If I stay here any longer, they are going to get suspicious that I am talking, let me go now and I will come back...." Id. at 64-65.

44.   Assistant District Attorney begins to describe the taking of Woods's statements.

 "...After much assurance if the police that he would be alright, he said – he tells what happened.  He says, I got in a car with two guys and he claims he didn't know who they were, afraid to say who they were, and he said they did the shooting, they had guns and the whole thing but he was holding back because of fear."

          MR. SANTAGUIDA: Can we see you for a moment?

          THE COURT: Yes.

                (Whereupon, a discussion was held on the record at sidebar)

-17-

MR. SANTAGUIDA: I very rarely object to any counsel in their opening or closing and what I think Mr. Campolongo is doing is to tell the jury there are conflicting statements, to go through each statement, what was said.

MR. CAMPOLONGO: I am not going to go through each statement.

(Whereupon, the discussion on the record at sidebar was concluded)

"Without getting into a lot of detail, basically what happened is this, when he first spoke with the detective he claimed that he didn't know who these people were but he said that two people came with guns, picked them up, they were going, they thought something was improper about it and so forth, going over there but he was afraid to mention their names... Finally there is a detective that comes in and you will hear from him ... he comes in there and says look, why don't you tell us the truth.  What happened?  He tells Detective McGlotten my family, I am terrified for my family... He was afraid his family would be killed and murdered while he was in the hospital.  Detective McGlotten assured, spoke to him, look, you have got to tell the truth, you can't let these people get away with this sort of thing..."

MR. SANTAGUIDA: Objection.

THE COURT: Excuse me.  Excuse me.  Mr. Campolongo, <u>you are supposed to outline, you are not supposed to testify.</u>

"That is what we will establish, that is what we will prove.  Finally, he said to Detective McGlotin, yes, I know them, it is Tone and Black, they are members of the JBM.  They came and picked us up, they had the guns, they went in there and they shot me, shot me in the stomach.  Black shot me in the stomach, shot me in the leg.  Tone, who is Mr. Reid, had the 10 millimeter,

-18-

shot me in the shoulder, he shot –"

    MR SANTAGUIDA: Objection.

    THE COURT: Excuse me, Excuse me.

    MR. SEAY: He's been over this five times.

    THE COURT: Mr. Campolongo —

    MR CAMPOLONGO: This is what —

    THE COURT: Hold it.  When there is an objection, wait for the court to rule.  The

court is ruling that you must outline to the jury and not give them verbatim what the testimony

will be because you are not testifying.  Members of the jury, what the District Attorney is saying

is not evidence. Id. at 74-75.

   45.  <u>Assistant District Attorney continues with the content of the statements and his</u>
      <u>"testimony" to the jury</u>

   "...They went through the whole thing again, explained what happened how the shooting
   occurred, picked out the picture of this defendant Kevin Bowman saying before I said I
   wasn't sure but he is the one, that is Kevin Bowman, that is Black, that is the one... They
   showed him a group of photographs, immediately picked out the photograph of Mr. Reid
   and said that is Tone, that is the one that shot me, that's the one that shot Neil.   Because
   you remember that gun shot in the back of the head was —"

    MR. SEAY: Objection.

    THE COURT: Mr. Campolongo, you are directed to outline to the jury and not

testify. Id. at 77.

   46.  <u>Assistant District Attorney raises the issue of the 5th amendment</u>

   "If Your Honor please, what happened after all that is, the Mr. Woods — the case was
   set up for what we call a preliminary hearing for these two defendants.  Mr. Woods
   appeared one day with an attorney who had previously represented —"

-19-

MR. SANTAGUIDA: Objection, ask for a mistrial.

MR. SEAY: See you at sidebar, Your Honor.

THE COURT: Yes, absolutely.

MR. CAMPOLONGO: I ask you to bear with me, this is somewhat complex.

THE COURT: Mr. Camplongo, go on the record, you are directed to outline to the jury what the evidence will produce, you are not making a summation speech and you are not giving evidence.

MR. CAMPOLONGO: Thank you Your Honor, I am trying to outline.

THE COURT: Please do so.

MR. CAMPOLONGO: What happened to put it very bluntly is Mr. Woods appeared at the preliminary hearing with an attorney and claimed Fifth Amendment.

MR. SANTAGUIDA: Objection, ask for a mistrial.

MR. SEAY: See you at sidebar.

THE COURT: When are you going to learn?

(Whereupon, a discussion was held on the record at sidebar)

MR. SANTAGUIDA: Your Honor already told Mr. Campolongo that you didn't want the witness to say anything about the Fifth Amendment in front of the jury, so what is he doing?

MR. CAMPOLONGO: He has a right to say that, I have a right to bring that out.

MR. SEAY: No.

THE COURT: Absolutely not.  I made a ruling pre trial that that was not an issue.

-20-

MR. SEAY: We did it on the record, I move for a mistrial respectfully.

THE COURT: Mistrial is denied.  I will give a curative instruction.

(Whereupon, the discussion on the record at sidebar was concluded)

THE COURT: Members of the jury, there are certain pre trial motions that were filed in this case and I ruled upon them already.... So I am not going to remind you what they [previous two statements by the District Attorney] were...Id. at 77-79.

47.     Assistant District Attorney continues to raise the issue of the 5th Amendment

MR. CAMPOLONGO: Well, what happened is that this witness was compelled by an order of the court to testify.

MR. SANTAGUIDA: Objection....

MR. SEAY: May we go on the record again outside of the presence of the jury?

MR. CAMPOLONGO? What is wrong with that?

THE COURT: Jury, legal arguments concerning whether or not argument can come in, I ruled on them already, it is not for you to consider.  Why I did it?  In accordance with the United States Constitution and Pennsylvania Constitution I make rulings and both — all lawyers are bound by those rulings, including Mr. Campolongo.  Now either pay attention to the rulings and do so or there will be a mistrial.  Id. at 79.

48.     Assistant District Attorney returns to the admission of the "other crimes" evidence.

"Now, we never recovered it, the 10 millimeter but just a week before this event on 29[th]

-21-

and Tasker Mr. Reid was riding in a car and two other persons and Mr. Bowman was not involved at the time.  And he was driving along Tasker Street near 29th when his car was pelted by snowballs by young teenagers.  He stops the car, gets out, two other people who are in the car, they stand up and remain by the car.  He goes over to a couple of young men who are standing there on the corner."

   MR. SANTAGUIDA: Objection, Judge, that is not proper opening.

   THE COURT: Yes, the details of the other incident, prior criminal activity I ruled pretrial is not admissible.  It comes in for a **limited purpose** to identify a weapon period. "...We are offering evidence in this other case as I indicated not to show that Mr. Reid is involved in that but to show his identity, that when the witness Woods said in his original statement that it was Reid that had a gun ....We have evidence of prior statements of an uncooperative witness...."

   THE COURT: Don't make legal judgments, outline the evidence.... Id. at 81-84.

   b. **ADDITIONAL COURT RULINGS PRIOR TO DEFENSE OPENING STATEMENTS**

  49. Prior to the defense opening statements, defense counsel again raised the issue of the court's ruling about the admissibility of the other crimes evidence.  The court reiterated its confused and conditional rulings.  See NT 4/5/90 at 99 ( " My ruling is that the facts of the other killing cannot come into evidence other than the possession of a weapon and the control of or possession of the cartridges.  Now, if the Commonwealth cannot produce it, then nothing comes in." ); id at 104, ("I am not going to let the facts of the other case be produced."); id. at 107, ( "I am going to permit the circumstantial evidence and argument to come in unless you can show me

some case to the contrary.") However,  the ADA had already "opened" with this evidence and the

Judge's efforts to "limit" its admission were fruitless in light of the prosecutor's wilful

misconduct.

      c.   **D**IRECT **E**XAMINATION OF **D**ARRYL **W**OODS **4/5/90**

50.    ADA improperly "requests" that the trial court find that his proposed witness is "hostile" in front of the jury:

Q: You were speaking to Mr. Santaguida in the hallway —

MR. SANTAGUIDA: Objection, there is nothing wrong with that.

THE COURT: Members of the jury, understand at the outset when a person calls a

witness to the stand, the rules of evidence are that you are supposed to ask questions and the

witness answers.... If a witness is declared to be a hostile witness, sometimes the court upon

motion will permit leading questions....

MR. CAMPOLONGO: I would ask leave to ask questions which will show to the

jury that this is indeed a hostile witness to us and therefore I must proceed on cross examination.

THE COURT: You see, it is not for the jury to decide hostile and it is for me and I

made the judgment at sidebar and you know it.  So proceed in accordance with that.

MR. CAMPOLONGO: I am asking questions to show hostility.  NT 4/5/90 at

127.

51.    ADA makes additional comments on "hostility":

MR. SANTAGUIDA: Why is he so cross, so angry?

MR. CAMPOLONGO: Because the witness is hostile.

THE COURT: Come on, we don't need that kind of comment before the

-23-

jury. ... <u>Id.</u> at 137.

52.   <u>ADA challenges the credibility of the witness</u>:

Q: You weren't selling drugs on the corner?

A: No, sir.

Q: Are you working now?

A: No.

Q: You have retained a lawyer to represent you, I take it?

MR. SANTAGUIDA: Objection.

MR. SEAY: That is objected to.

THE COURT: He —under the parameters that questions alone does not mean anything.  What is the next question?...

MR. CAMPOLONGO: I was wondering how he paid for the lawyer....

THE COURT: ...Jury disregard these remarks.... <u>Id.</u> at 139-140.

53.   <u>ADA begins his impeachment of Darryl Woods</u>:

MR. CAMPOLONGO: I am going to ask him the questions that I think are proper questions.

MR. SANTAGUIDA: The Court will rule if they are proper.

THE COURT: Let's go back to square one.  If you want to show a witness' statement and ask him whether or not he gave the statement, you may show it to him.  If he says he did not and you are going to have somebody else contradict it, you are going to have to bring

-24-

that person under oath... <u>Id.</u> at 151.

      54.    <u>ADA continues his impeachment after marking a document C-1 and without any authentication, the ADA **reads the document out aloud.**</u><u>Id.</u> at 155-156.[12]

      55.    <u>ADA invokes defense counsel as a part of his question and speculates with the witness:</u>

Q: You told them the names right in front, is that what you are saying?

A: I never told them that I went with strangers.

Q: You never told them that?

A: No, Sir.

Q: Well, I thought that Mr. Santaguida said that —

THE COURT: Hold it, you are not supposed to testify what Mr. Santaguida said.

The jury is instructed at this point in time that the question purported to be a question was a question, it is not evidence.  <u>Id</u>. at 156-157.

      56.    <u>ADA continues his impeachment with the unauthenticated and unidentified document:</u>

Q: Look at page two, this question, the third question down.

[ADA reads] "Question: what happened when Neil knocked on the door?

Answer: Neil didn't, I knocked on the door at least three times, the guys at the bottom shot me, then Neil."  Is that what is says there?

_____

[12]Alarmingly, there was no objection by defense counsel.

-25-

A: That is what it says.

Q: So this statement seems to say that the two guys that you went with, whose names you didn't know, closed the door behind you and they shot you and Neil?...

THE COURT: Sustained.  Did you make that statement to the police?

THE WITNESS: No, Sir.

MR. CAMPOLONGO: That is something they made up?...

THE COURT: ...there is going to be penalties assess by the Court if you keep voluntarily breaking the rules ... you are doing things to a jury that is going to cause a mistrial. Id. at 159-160.


57.    ADA continues to speculate with the witness:

Q: I am saying, Sir, you said you did not give this description here, is that right?

A: Yes, Sir.

Q: A person wouldn't be ----...

THE COURT: No hypothetical.  Ask the witness....

MR. CAMPOLONGO: Is it not correct that you did not give this description, according to your testimony, even though it is written there because there is not need for you because you knew who they were?

THE COURT: Objection sustained....


58.    ADA continues impeachment with a document that has yet to be authenticated, compound questions and loose language:

-26-

Q: Before they start with this, didn't they come in there, you were in the hospital

bed and didn't you tell them that you were afraid for your family, afraid that your

family would be killed by these characters?  Didn't you tell them that?

MR. SANTAGUIDA: Objection, Your Honor.  Can we see you at sidebar?

MR. CAMPOLONGO: Did you tell them that?

THE COURT: Hold it.  Objection sustained..... Id. at 164-165.


59.     ADA continues his impeachment of the witness with a second unauthenticated
        document:

        Q: Now, when they were there at 6:00 showing you the pictures, do you recall

them taking another statement from you, Sir?

        A: No, I don't.

        Q: I would ask that this statement of 6:00 p.m. be marked as the next

Commonwealth exhibit.

        THE COURT: There is no testimony that any statement was taken at 6:00p.m. so

your illusion to that is disregarded by the jury....Id. at 167.


60.     ADA continues to try and impeach the witness with the unauthenticated second
        document:

        Q: But now look at the bottom of page two.

        A: Which one?

        Q: Bottom of page two of "C-2".  Now, did you ever tell the police with respect to

the photograph of Kevin Bowman that you couldn't possibly identify him?

A: Say that again, Sir.

Q: Did you ever tell the police that you couldn't possibly identify Kevin
Bowman?

A: No, I don't recall, No.

Q: That says that on the statement, though, doesn't it?

MR. SEAY: Objection.

THE COURT: He denies it is his statement so therefore the question is improper
and incorporates a fact that is not in evidence.

MR. CAMPOLONGO: Does it say there, just to make the record clear on page
three, no positive identification at this time.  Is that what it says there?

MR. SEAY: Objection, that is not a question.

THE COURT: The statement speaks for itself, until it is verified that is
somebody's statement it is not before this jury.  Id. at 175-176.

61.    ADA continues his questioning of the witness:

[ The prosecutor continued to ask numerous objcetionable questions,

meeting frequent objections. ]

THE COURT: Stop.  Members of the jury, our recorded record is just typewritten
and it doesn't show reflections in voice and when counsel believes it is objectionable as to the
manner of asking the question...When you heard the raising of voices, that is what you heard but
the record is now clear that the objection was to the manner of asking the question.  Objection
sustained.  Ask the question again... Id at 178.

-28-

### d.   ADDITIONAL COURT RULINGS, 4/6/90 AT 4-16

62      The ADA sought to question Darryl Woods about his "bias" because he was "hostile."  The ADA wanted to question the witness about the fact that he asserted his 5th Amendment privilege and that he was observed speaking to defense counsel.  The ADA wanted to be able to argue that it was "fear" that caused the witness's behavior even if he won't admit it. The ADA also said that he had other evidence from which he could draw this conclusion

63.     . The court rules that "It is too far remote.  I'm not permitting it, No." 4/6/90 at 14.

### e.   DIRECT EXAMINATION OF DARRYL WOODS II, 4/6/90 AT 16-111

64.     ADA continues his impeachment with the third document:

        Q: So in other words if I understand this, you never saw this Detective McGlotten, you never said any of these things, it is just something he wrote up and made up?

        MR. SEAY: Objection.

        MR. SANTAGUIDA: Objection.

        THE COURT: Objection.  Sustain it.  NT 4/6/90 at 21.

65.     ADA continues his argumentative questioning of the witness:

        Q: In other words, they are going to stay some place far away and you're going to go in and knock on the door and pay a visit?

        MR. SANTAGUIDA: Objection, argumentative.

        THE COURT: When you hear the word objection, that is my order, because that lawyer is talking afterwards.  What was the nature of your objection?

-29-

MR. SANTAGUIDA: The objection is Judge, that his question is an argument, it is not a question.  And you mean to tell me –

MR. CAMPOLONGO: He doesn't like the way the witness is testifyng.

MR. SANTAGUIDA: I don't like the way you're asking the questions.

MR. CAMPOLONGO: I am asking the question based on his objection...

THE COURT: ...Objection sustained.  Id at 28-29.

66.     ADA continues to "impeach" the witness, this time with notes from a preliminary hearing:

Q: Sir, my question is, your testimony last time you testified when asked by Mr. Santaguida was the only people that you saw were outside and they were a few apartments down. Do you recall testifying that way?

MR. SANTAGUIDA: Objection, it is for the jury to determine whether or not he is changing his testimony.

THE COURT: Sir, the question had two facets to it.  Now, you can break it down or ask the witness to adopt it.  Explaining it or reject it but don't try to mislead the witness.  Id. at 33.

67.     ADA continues his sarcastic speculative examination:

Q: [while referencing an unauthenticated or even identified document] This is just a work of fiction, something that –

MR. SANTAGUIDA: Objection, Judge, how many times has he done that?

THE COURT: Sustained.  Objection sustained.  Jury, disregard the question.  Id.

at 35.

68.     ADA begins to question the witness about the JBM using the unidentified and
        unauthenticated document:

        Q: You don't recall.  Now, this last question in this part here.  Is Black and Tone a

part of the JBM? Answer. Yes.  Now, did you tell Detective McGlotten on October the 2nd – I'm

sorry, March the 2nd, 1989, that these two Defendants, Black and Tone were a part of the JBM?

        A: No, I didn't, Sir....

        Q: You didn't know of course that the man that you were living with on Crayton

(sic) Street, Bucky Davis, that he was the boss of the whole Southwest Philadelphia for the

JBM?...

        THE COURT: At sidebar you have made argument as to the limited nature of the

JBM, the jury already knows that.  We don't have guilt by association in America, that is the

fundamentals that I am applying. Id. at 43.

69.     ADA continues to "impeach" Darryl Woods with an unauthenticated document:

        Q: My question is a very simple one.  Do you recall saying the following.  That is

the question and I am reading – if he recalls and –

        THE COURT: Show it to him and let him –

        MR. CAMPOLONGO: I will do that at the proper time, I am first –

        MR. SANTAGUIDA: Objection, he is telling you when the proper time is. Id. at

48.

        [The court then attempted to cure the ADA's continued compound questioning by

breaking the questions into smaller pieces.  The questions as the trial court truncated them,

-31-

however, werestill improper] See, id. at 48-50.

> Q: [by Mr. Campolongo]: Neal gave them to Reid, Neal give them to him and Black.  Neal gave them to him and Black told us which apartment door to knowck on.  I went in first and when I got to the top of the steps, I knocked on the door for about four or five minutes. I turned to look downstairs and saw the bottom door was closed?

> A: I heard –

> MR. SANTAGUIDA: Objection, I heard.

> THE COURT: Sustained.  I am not going to keep instructing.  Id. at 51.

70.    ADA is noted on the record to be "gesturing" and "angry" in front of the jury as he continues the line of questioning noted above:

> MR. SEAY: With his gesturing and his comments, banging on the table like a fourth grade student.

> MR. CAMPOLONGO: You have –

> THE COURT: Hold it.  You're supposed to be professionals.  The way you are carrying on is a disgrace.

> MR. SEAY: I apologize.  May we see you at sidebar?

> THE COURT: Yes.  It is understandable that sometimes in the heat of argument, sometimes lawyers go off the deep end.  You have just witnessed a disgraceful performance by the district attorney and a disgraceful performance by defense counsel here. Id. at 52-53.

[At sidebar, the court threatened that the ADA will "pay the piper" if he violates the court rulings again, or "it is going to be a mistrial and you're going to be assessed the costs of the entire trial, including my salary." Id. at 53.  This was an empty threat: no sanctions were ever

levied against the ADA and, obviously, a mistrial was never declared.  During this discussion,  it
is further noted that "after there was an objection by Mr. Seay, Mr. Campolongo jumped up in
the presence of the jury and said you know he said it and you're trying to keep it away from this
jury..." Id. at 53.

71.   ADA continues his examination of Darryl Woods using the same unauthenticated
documents and some photo arrays:

There were many objections during this portion of the transcript that were variously
sustained and overruled with no consistent evidentiary basis.  The obviously troublesome
questions included : 1) challenging the witness to give an opinion as to the difference between a
signature he recognizes as his own and another; the leading form of the questions; impeachment
with paraphrased language or a "summary" (i.e. not the words of the witness); compound
questions; repetitive questions;  and argumentative questions.  See id. at 64-106.

72.   ADA returns to the witness's previous assertion of his 5th Amendment rights:

Q: After talking to these two defendants, is it true that after you talked to these
two defendants on June whatever, it was the third or the fourth that you appeared in Court –
courtroom 675 on June 8th, 1989 in front of the Honorable George Andier (sic) that you refused
to testify?

MR. SANTAGUIDA: Objection.  Ask for a mistrial.

THE COURT: Mistrial is denied.

MR. SEAY: Sidebar, Your Honor.

THE COURT: Sure.

-33-

The sidebar discussion careened around the ideas that: 1) this was something that had already been decided and the violation was, therefore, willful; and 2) that, as a result of the question, the jury was left with the impression that threats, not advice from counsel, were the reason that the witness insisted on immunity.  The court acknowledged that the ADA had exceeded the bounds of his ruling and told him "I am going to have to send a letter to your superiors saying you're incompetent to try cases before me because ... you won't keep your mouth shut when I am speaking. " Id. at  109.  The court decided to give a "curative"  instruction to the jury, but failed to meaningfully negate the prejudicial effect of the prosecutor's misconduct.  Id. at 109-110.

73.    ADA conducts redirect examination of the witness:

The redirect examination consisted of  a series of questions and objections related to the documents that were neither adopted nor authenticated by the witness.  Id. at 147-172.  There were twenty-seven objections sustained during this redirect examination and five objections were overruled.  A few examples are noted below:

Q: And you say that looks like one of them but you're not sure is that right?

MR. SANTAGUIDA: Objection, he didn't say that.

THE COURT: Objection sustained.  What is the question, what the statement said or the alleged statement said or what this witness told the police?  Id. at 149.

****

Q: So in those two statements, the police didn't write what you would call – which you're claiming is a work of fiction – Id. at 153.

****

-34-

Q: Isn't it a fact that you wrote down exactly – you didn't mention the name of the people that did the shooting and you were afraid of them?   —Id. at 153

****

Q: Didn't you say yesterday that you don't know who shot you, these defendants could have shot you or — Id. at 157.

****

Q: Did you not testify – he didn't answer this question.  Did you not testify yesterday that you don't know who shot you, it might be these defendants, it might be –

MR. SEAY: Objection

THE COURT: Objection sustained.  Who it might be is not evidence.  How many times do I have to make a ruling?...

MR. CAMPOLONGO: Judge, let me ask you then— Id. at 158.

****

Q: But you know that this project is the turf of these two individuals over there, don't you , sir?  Id. at 161.

****

Q: Did you ever hear anything in the City of Philadelphia that certain people in certain areas, if they do things, nobody says anything about it?   Id. at 161.

****

Q: [while asking about a nurse at the hospital where the witness was treated] You don't remember Jane?

A:No.

Q: Sir, take a look at these forms and I ask you if the notation that is made there –...

_____ THE COURT: ....sir, take the paper back, it is meaningless at this point.  You want the nurse to come in and say what she observed, bring her.

MR. CAMPOLONGO: We intend to do that, I am asking in advance... I am giving you an opportunity, sir, to change your mind, if you.... Id. at 163-164.

****

Q: All right.  So you're saying that if the hospital records indicate anything to the contrary

MR. SEAY: Objection.

THE COURT: Objection sustained.  Don't ask for a possibility, bring in the testimony.

MR. CAMPOLONGO: I intend to.

THE COURT: This is not the way to prove a case and you know it.

MR. SANTAGUIDA: That is the day he is going to die.

MR. CAMPOLONGO: Do we have to have comments of counsel?

THE COURT: No, we don't.  We have to have appropriate questions from counsel and I will make ruling...

MR. CAMPOLONGO: By the way, the detective didn't tell you you were going to die, he – they said you might still die, thinking that if you thought that was true, you might tell the truth...

THE COURT: Sustained.  That is all guesswork.  Come on, get to the evidence.

-36-

MR. CAMPOLONGO: I am just responding...<u>Id</u>. at 168- 69.

j.    **ADDITIONAL COURT RULING, 4/11/90 AT 34-65**

74.    Defense counsel filed a *motion in limine* as a request for an offer of proof regarding the proposed testimony of Randall Lisby.

75.    Randall Lisby was a witness against Petitioner in another case involving the death of his brother, Mark Lisby.  At the time of this trial the case had been tried once.  In that trial, a mistrial resulted when the jury could not reach a verdict on the murder charge.

76.    The Commonwealth sought to have Randall Lisby testify about the JBM, his "knowledge" of Petitioner's role in the JBM and his "knowledge" of Kevin Bowman's role in the JBM.  Despite the protestations of the ADA, the court  ruled that the witness would not be permitted to testify because, under oath *in camera*, he admitted that his information came "from the street" and that he had falsified his previous statement to a Detective because Petitioner "killed [his] brother."  <u>Id</u>. at 65.

k.    **ADDITIONAL COURT RULING, 4/12/90 AT 2-35**

77.    The trial day began  with the assigned ADA introducing "Donna Zucker, the Acting Chief of Appeals," to the trial court.  She was presented as someone who "would like to bring the authorities to the Court's attention at this time.  And if the Court allows, or sees fit, she would like at some later date to present a legal memorandum to the Court on these issues." NT 4/12/90 at 3.

78.    Before Ms. Zucker addressed the court, the Judge indicated that he had reviewed

-37-

"the book that was published by the Pennsylvania Bar Institute" and he was satisfied that he made the correct ruling with regard to the "hypothetical question" that arose the last time the case was in court.

79.     The court further declard that he was comfortable with his decision as to Randall Lisby's testimony because Lisby's statement is based on"hearsay."

80.     Although, as Petitioner's trial counsel pointed out, the Commonwealth knew Lisby's statement was false, ADA Campolongo argued that the "prior statement may be offered for the truth of the matter asserted therein.  That is substantive evidence.  And changed all the prior law in that record.  The only requirement, and there is no requirement of surprise or anything by the way ..." Id. at 5.


81.     Immediately after spelling her name for the record, Ms. Zucker said  "I came over today prepared to talk about the different issues that I understood were in question in the case.  One of which was the admission of this expert testimony.  As I do understand it"

Despite the court's prior rulings, see ¶¶ 83 and 86, supra, the court permitted the testimony.

82.     On the issue of other witnesses being able to testify "from their own knowledge, and as to the Defendants association in the organization, Junior Back Mafia," the Court ruled, "We'll hold an in camera hearing upon request, and if the witnesses say they know it of their own knowledge, no problem with the relevancy.

83.     Petitioner's counsel then attempted to readdress the issue of the admission of the other crime evidence.  Following two short recitations of the facts of the "other matter", the court

asked "what does that have to do with the issue of possession of a gun to indicate identity of the same person in two events. That is the issue before me." The Court then ruled: "There is no gun. There is no testimony coming in about a previous criminal activity. It's <u>limited in the scope</u> to coming in to prove a specific element and that is possession of a weapon on a prior occasion to infer possession on this occasion. This is it."

84.     Ms. Zucker argued for the admission of the testimony, defense counsel argued that there was no testimony that Reid ever had a 10mm gun in his hand at the scene of the "other crime" on 3/7/90 and that distinguishes the case. He added that the witness in this case, Darryl Woods, said that Reid had a .357 <u>and</u> that the murder weapon in the "other case" was a .38.

85.     Although the predicate for the Court's earlier ruling on the ballistics evidence was that if could be admitted to show possession of the 10mm pistol, see 4/5/90 at 31,58, the Court stated that he [had] to read <u>Cocchioletti</u> before I make up my mind. <u>Id</u> at 28. Still , the court also permitted each side to submit a memorandum of law on the issue, commenting: "I wrote the book on how to try a homicide case... The law I do understand. I want to see if there is a nuance that I'm missing ... Proof of a prior crime is not admissible except if it proves one of four elements, identity being one. I do understand the law." <u>Id</u> at 30-35

      l.     **ADDITIONAL COURT RULING, 4/12/90 AT 49-59**

86.     The ADA proffered that Detective Bethea would testify that Darryl Woods was with him on March 8, 1989 and that Mr. Woods was going to return on March 13, 1989 to provide "information to the Police regarding JBM." He argued that it was relevant because, "In the statement of Mr. Woods, Mr. Woods states that he was a week before in the custody of the police, and that he was questioned by Bucky and Frog, the person for whom he worked and

-39-

identified as being JBM members, and they questioned him concerning whether or not was talking to the police. . . . [i]t was his belief that Bucky and Frog were responsible for this one section of the JBM helps another section from the city ...  motive for killing of this individual was that they thought he was giving information to the Police."

87.     After argument at sidebar on the issues of relevance and motive, the ADA advised that the Detective will "testify that he was speaking.  They were investigating matters concerning the JBM, this investigation - -

> THE COURT: That is not admissible.
>
> MR. CAMPOLONGO: I'm trying the facts.
>
> THE COURT: You tell me about what you are offering it for.
>
> MR. SEAY: The jury is listening.  We might as well do it at the bar and the court.
>
> Id.  at 102.

88.     In chambers, the ADA offered two bases for admitting the testimony of Detective Bethea regarding the investigation of the JBM: 1) to help the jury decide whether a prior statement of Mr. Woods on his trial testimony is "true"; 2) it is "independently relative evidence because it shows, it is proof the motive of a killing ...  In other words, it is our position, as we argued to the Jury in our opening speech, the motive for the killing was this individual was going to be giving information concerning the JBM..."

89.     Defense counsel responded that the motive ran to other men, Bucky and Frog, and not either of the defendants, and added that Detective Bethea has no "statement" from Darryl Woods that can be considered.  The ADA responded that Commonwealth v. Brady permitted any manner of prior statement , whether recorded or verbatim or not,  to be admitted as substantive

evidence.

90.    Following these arguments, the Court ruled that the Detective was "permitted to testify concerning that which was told to him by Mr. Woods, as it relates to a possible motive for the instant shooting in this particular case"

m.    **ADDITIONAL COURT RULING, 4/16/90 AT 5-18**

91.    Soon after Detective Bethea was called to the witness stand, there were requests to see the judge at sidebar.  Nine questions later, the record shows that the "discussion" was moved to Chambers.

92.    In Chambers, there was much disagreement over the application of <u>Brady</u> to the Detective's reported conversations with Mr. Woods.  The principal objections were that it was not a "statement" and it was not "relevant."  When defense counsel claimed that he had received no notice or discovery of this witness's proposed testimony, the ADA responded:  "It is no surprise.  He has testified months ago on the record [in a prior proceeding, <u>not</u> this case].  <u>I stated in my opening speech what this witness would be testifying to</u>, this has been known to counsel for months... I think he knows everything that these people are going to testify to, this has been known by counsel for months and months."

93.    The trial court asked the Detective to come in Chambers, and instructed him regarding the "<u>limited nature</u>" of his testimony:

THE COURT: "...You're permitted to testify about the Court of the meeting and the fact that Mr. Woods told you that he wanted to give you information about the JBM activities and then you set up a second meeting for the 13th and that is exactly the date on which he got shot and that is the nature of it.  But the contents of your meeting with Mr. Woods is not

admissible..."

### n.    ADDITIONAL COURT RULING, 4/16/90 AT 21-26

94.     Things went smoothly for eight questions and then the ADA asked, "Now, at some subsequent date, I am referring specifically to August the 3rd..." Defense counsel requested another sidebar.

95.     At sidebar, the ADA explained that he now wished to have this witness describe a "wink" and a "thank you" exchange between co-defendant Bowman and Darryl Woods. They allegedly had this exchange at a preliminary hearing in this case. The ADA wanted the detective to explain "collusion" between Darryl Woods and at least one of the defendants. After "20 minutes" of sidebar argument, the judge ruled that "the fact of the 'wink' and the 'thank you' are admissible, the rest of it is not."

### o.    ADDITIONAL COURT RULING AT 4/16/90 49 -85

96.     Again, the entirety of the transcript memorializing the prosecutor's willfulmisconstruction of the "limited purpose" concept and the utter confusion on the part of the trial court is the most persuasive evidence of the fundamental unfairness of Petitioner's trial. For example, the following took place during the offer of proof in chambers of witness Kevin Brown on the issue of whether or not the proposed witness has personal knowledge of the defendants' respective membership in the JBM:

     MR. CAMPOLONGO: Referring to the first witness, that he didn't know anything from his own knowledge. It is just what he heard from the area. Now, when we call a

witness and he has personal knowledge and he indicates how he knows these things, from his personal knowledge, mainly the things that he heard the defendants themselves say and so –

      MR. SANTAGUIDA: What defendants?

      MR. CAMPOLONGO: Defendants –

      MR. SANTAGUIDA: What did he hear Bowman say?

      MR. CAMPLOLONGO: He saw Kevin Bowman on various occasions bring items to the man that he had worked for and I can't talk, Judge, if I am going to be interrupted.

      MR. SANTAGUIDA: You're trying to make a fool out of the judge.

      MR. CAMPOLONGO: On the one hand, counsel is saying that evidence should be excluded regarding the JBM unless there is personal knowledge and not personal knowledge that is admitted to but – we had present witness who was excluded, he had personal knowledge that was included in his statement, he denied this personal knowledge when he testified under oath. Your Honor did not permit us to Brady him, then the argument was that it had to be personal knowledge. Now, we have a witness that does not have personal knowledge, they are objecting to his personal knowledge. He's got this personal knowledge and is going to be perjudicail (sic). This is really ridiculous.

      THE COURT: Stop. Off the Record.

            (Whereupon, the discussion went off the record)

      MR. CAMPOLONGO: Because on the one hand they are saying we cannot present any evidence about the JBM because the man has no personal knowledge it can't come in. If he does have personal knowledge, it can't come in because the fact that he has personal knowledge maybe prejudicial. What kind of crazy insanity is that?

THE COURT: Stop.

MR. CAMPOLONGO: He has personal knowledge regarding certain facts which are relevant in this case.  If counsel feels like they don't want to bring out how he knows, they cannot do that.  They want to cross examine, they can do that.  The point is *I have a right* to bring it out.

THE COURT: Stop.  I got your point of view.  The point of view as I understand it, membership in the JBM because that contributes to the motive in our trial is admissible, that is what you are saying.

MR. CAMPOLONGO: Right.

THE COURT: But the details of how this witness knows he is in the JBM are not admissible.  If it includes other criminal acts because the other criminal activities cannot be introduced as substantive evidence in this trial.

MR. CAMPOLONGO: It is introduced **for the limited purpose** that he has direct knowledge and that he knows, it is not offered for the proof of showing that these are bad guys.

THE COURT: You don't need any more.  I am going to make my ruling.  The ruling is on the record that the witness may testify that he knows that both of these two defendants --

MR. SANTAGUIDA: Not both, he doesn't know from Kevin Bowman personally.

MR. CAMPOLONGO: No, he knows --

MR. SANTAGUIDA: He just said it, Judge.

MR. SEAY: I am going to have to move to have a mistrial, the jury can hear

-44-

everything.  I move for a mistrial.

        THE COURT: Motion denied.  We are three rooms away from the jury.

        (Whereupon, the witness was brought back into the room)

****

THE COURT: Thank you.  Step outside.

MR. CAMPOLONGO: One more question.

THE COURT: No.

MR. CAMPOLONGO: The witness is --

THE COURT: He can testify that Reid is a member of the JBM and he knows it, period.

        MR. CAMPOLONGO: What, the limitations are I may not call the witness.

        THE COURT: Okay.  That is the limitation of it.  The issue in this trial as to motive for this killing and wounding and therefore I will permit the witness to testify one of two people by his own omission (sic) is a member of the JBM.  That is the end of it.

        MR. CAMPOLONGO: Is he going to be permitted to testify as to how he knows?

THE COURT: No

MR.CAMPOLONGO: Is he going to be permitted as to Mr. Reid's position in the JBM?

THE COURT: No.

        MR. CAMPOLONGO: Well, virtually, Your Honor, has totally emasculated –

        The trial court again imagined it was making a ruling that  will "limit" the impact of the evidence of membership in the JBM.  The litigation process quoted above is instructive

-45-

regarding the way in which the prosecutor viewed the concept of "limited purpose."

    p.    **ADDITIONAL COURT RULING, 4/16/90 AT 86-115**

97.    While in chambers, the court entertained further argument as to the admissibility of the "other crime" evidence. Ms. Zucker reappeared for this argument; none of the parties submitted any memoranda.

98.    At the outset, the assigned ADA argued that during the Waters trial, Judge Sabo admitted the evidence of this crime. "So, that Judge Sabo has already decided in a sense on the admissibility of this issue."[13]

99    Ms. Zucker then cited three opinions for the proposition that the evidence from the "other crime" is "highly probative because it shows the opportunity, the access to the murder weapon and the identity of the defendant." In response, the trial court mused "In view of the Nolen language, I have a mind **now** to admit the evidence and if you want a limiting instruction...."

    q.    **ADDITIONAL COURT RULINGS, 4/16/90 AT 114-115**

100.    When witness McKay was called to the stand, Petitioner's counsel requested another sidebar so that this "witness be restricted in his testimony. One, that he was on the scene where he saw the Defendant, that some shots were fired from a vehicle, the rear, whatever and that is it. Not the reason for it. He can't testify to the reason for it."

    THE COURT: The details of the other crime are not admissible, only the fact of

---

[13]In its review of that trial court decision, the Pennsylvania Supreme Court makes clear that the evidence of the instant case was permitted in the Waters trial because it "tends to show the identity of the person who committed the murder." Commonwealth v. Reid, 626 A.2d at 120. The grounds and reasoning are distinct.

the other crime, not the facts...Not the details of the other crime, just the facts.  Okay.  It is **limited.**  Id. at 115.

        r.   **DIRECT EXAMINATION OF DANIEL MCKAY, 4/16/90**

       101..   Assistant District Attorney elicits "details" the first time.

      From the outset, the prosecutor ignored the above ruling.  The ADA began by eliciting the fact that only a couple little kids and one guy, maybe 17, were outside "The Store" when the shooting occurred.

      Q: When you say *little kids*–

      THE COURT: No, let's get back to square one.  The rule at sidebar was the details of the prior incident  are not admissible.  Members of the jury, we are trying this murder, what you are going into now is for a **limited** purpose, had nothing to do with what you just heard.  4/16/90 at 117.

     102.   Assistant District Attorney elicits "details" again:

      Q: Now, before you saw the boy get shot, did you see something happen on the street?

      A: A car getting hit with *snowballs.*

      MR SEAY: objection, your honor.  The details – he is violating the very order that the court made.

      THE COURT: Well, the question was so broad that the witness answered without regard to my ruling.  Now, members of the jury, disregard what you have heard up until now.  What you have now is on 3-7-89, it is p.m., this boy said he knew – saw somebody get shot.  Go from there.  Id. at 117.

-47-

103     <u>Assistant District Attorney elicits "details" again with the very next question</u>:

    Q: Before you saw somebody get shot, you said you saw a car getting hit by snowballs, is that right?<u>Id.</u> at 118.

104     <u>The next question</u>:

    Q: Now, could you see from where you were – could you see the boys who were throwing snowballs at the car:

    A: yes

    MR SEAY: this is objected to.

    THE COURT: Sustained.  It has nothing to do with the issue before this trial is possession of a gun. <u>Id.</u> at 118.

105.    <u>The next question</u>:

    Q: After you saw the boys throwing snowballs at this car –

    MR SEAY : This is objected to, move for a mistrial.

    THE COURT: Sustained.  The question incorporates facts that are not before this jury.  Whether there was snowballs or not doesn't matter. <u>Id.</u> at 119.

    Despite this ruling, the prosecutor succeeded in eliciting yet more details: that three men got out of the car and a man walked over to him; the words that the person he identified as Reid said to him; his description of the words said to him by Mr. Reid as "threatening;" that the incident  was about the kids and the snowballs; the witness's description of a gesture by the man he identified as Reid; and of the men getting back into the car; the witness's  claim that Reid was the driver of the car; and about the movements of the car that Reid was purported to be driving.  The witness described the shooting that he heard and observed:

-48-

"They started shooting...I just seen – I heard the shot and I just seen the light coming out of the car" Id. at 26.

106.   Assistant District Attorney restates his question and elicits more "detail":

Q: Okay.  No.  When you heard – saw this light in the car and heard these shots, did you see anything else?

A: Yes, I seen a little boy get hit and sliding in the snow and I ran..

Q: Okay.  The little boy that got hit, did you know him?

A: Yes.

MR SEAY: Objection

THE COURT: Sustained.  No bearing in this trial.  We are not trying that case. Members of the jury, we are trying this case and the evidence of a shooting of a victim at 29th and Tasker according to the Commonwealth's proffer will be **limited** to this case somehow and I am waiting to hear. Id. at 127.

107.   Assistant District Attorney presents Danny McKay with a chart:

MR SEAY: If your Honor pleases, this is objected to.  This is betyond what my understanding of the Court's ruling is.  I think that the Commonwealth has sufficient testimony for their purposes.

THE COURT: Hold it.  There is an objection.  I have to make a ruling.  I didn't ask for argument.  What is your objection?

MR.SEAY: My objection is this beyond what we had agreed upon with respect to the details of that matter.

THE COURT: Yes.  Members of the jury, that former incident that – former

-49-

shooting is not on trial in this courtroom.  I have said it three times and I will keep saying it, I am

limiting this testimony from this witness[ ]part where the Commonwealth claims is probative in

the trial and therefore the chart is not probative.  It would be probative if they start cross

examining about how far away were you, what was your ability to observe?  That is not

happening yet.

        After further argument before the jury, the court said, " No, No, No.  I am going to

say no forever.  I can yell as loud as you can, I have a mic.  The details of that crime are not

admissible in this trial. Period. Period.." <u>Id.</u> at 130.

      108.   Assistant District Attorney "objects" during the cross examination of Daniel
              Mckay:

        THE COURT: The witness said "yes".  <u>You're not supposed to interfere (sic) in

the middle of cross examination</u>.  You're out of order.  Please continue. Do it again--- <u>Id.</u> at 135.

            ****

        THE COURT: No, <u>I won't take a speech</u>.  You got a legal – whether the question

was improper he asked, I will listen to you.   <u>Id.</u> At 135.

            ****

        THE COURT: <u>Objection overruled</u>.  I already overruled you.  <u>Id.</u> at 136.

            ****

        THE COURT: <u>Objection overruled</u>.  That is not the proper way to do it.  Go

ahead. <u>Id.</u> at 137.

            ****

THE COURT: <u>Objection overruled</u>. <u>Id</u>. at 137

Despite these multiple rulings, the prosecutor contiued to interject himself and blatantly interfere in counsel's attempts to cross examine the witness:

Q: Did you ever say that?

A: I said he looked big, he had a big coat on and he looked big.

Q: And do you remember when –

MR CAMPOLONGO: Real big –

MR SEAY: –the detective interviewed you, do you remember telling the detective when they were asking you to describe the man, do you remember saying you had seen the man before?  Remember saying that?

A: Yes

Q: And remember saying that you had seen the man that you say was Anthony Reid in the Tasker Projects, that he lived there? Remember saying that?

MR CAMPOLONGO: Objection, there is no reference to him living there.  Where is that, sir?  That is not in the statement.

MR SEAY: Your Honor, this is Cross Examination

MR SANTAGUIDA : I ask for a mistrial...

THE COURT: <u>Objection overruled</u>...

THE COURT: <u>You can't dictate how cross examination is conducted</u>.

Overruled.. <u>Id</u> at 138

**** 

s.    **P**ROSECUTOR **S**UMMATION**, 4/18/90**

109.    The summation of the prosecutor is attached in its entirety as *Appendix E.*

110.    Objections were made on the following pages of transcript: 6, 9, 21, 23, 24, 25,28, 29, 29, 30, 30, 32, 34, 35, 36, 40, 55, 56, and 60.  Virtually every one of the objections was sustained.

111.    Instructions were doled out on the following pages of transcript: 10, 24, 28, 29, 30, 33, 34, 36, 40, 43, 55, 56, 64.

112    Motions for mistrial were made at 21, 33, 42, 44, 56, and 64.  The trial proceeded even after the motion made at page 56 is "sustained."

113    Further objections should have been made at 15, 18, 20-21, 27 and 51-52.  Of these instances, the one most notable is at page 27; for it was here that the ADA most clearly argued the impermissible evidence.

> You heard Mr. McKay testify, he pointed to Mr.Reid and he said I am certain he is the man that I saw walk over to me at a distance of five feet under the street lights, looking at me face to face, putting his hand in like that, saying I hope these kids who threw the snowballs are not your relatives.  What does that harken back to?  What does that echo back to?  Mr. Woods saying to the detectives I am afraid for my family, I am afraid for my relatives, they might be killed by these people...."

**4.    Instructions, curatives and mistrials**

114    In light of the frequency with which Petitioner's jury trial was interrupted by objections, sidebars, chamber and motions for mistrial, what follows is a quantitative breakdown of the instructions of note given to counsel in open court, curative instructions given to the jury and the motions for mistrial.

115     The breakdown is by date.  The totals are as follows:

**Principal instructions and curative instructions: 62**

 **Motions for Mistrial: 27.**

116.    **4/5/90: 5 total**

Three  motions for mistrial were made during the opening statement of the ADA at NT 4/5/90 at 77 and 78

Two  motions for mistrial were made during the first day of the direct examination of Darryl Woods.  Id. at 126 and 145

117     **4/6/90: 8 total**

All motions were made during the direct and redirect examination of Darryl Woods at NT 4/6/90 at 35, 51 (two),  53, 106, 108, 160.

118.    **4/9/90: 1 total**

The motion was made during the redirect examination of Detective McGlotten at NT 4/9/90 at 69.

119.    **4/11/90: 1 total**

The motion was made during the direct examination of P.O.Withers at NT 4/11/90 at  93.

120.    **4/17/90: 6 total**

Two  were made during the direct examination of Detective Bethea, both at NT 4/17/90 at 27.

One was made during the redirect examination of Detective Bethea.  Id.  at 49.

Three  were made during the direct examination of Daniel McKay.  Id.  at 80, 119 and 137.

121.    **4/18/90: 6 total**

All were made during the prosecutor's closing argument.

-53-

INSTRUCTIONS AND CURATIVES BY DAY

    122.   **4/5/90: 9 of note**

Four  curative instructions were required during the Assistant District Attorney's opening

statement

Five principal instructions and numerous "reminders" were required during the first day of the

direct examination of Darryl Woods.

*The grounds distribution for the curative instructions was as follows:*

    1) two during the opening statement to address the ADA's violation of the judge's ruling

that the fact of a witness having invoked his 5th Amendment rights at a prior proceeding was

inadmissible at NT 4/5/90 at 79;

    2) two during the opening statement to address the improper "testimony" of the ADA.  <u>Id</u>.

at 75 and 77;

    3) one during the direct of Darryl Woods for improperly treating a witness as "hostile." <u>Id</u>

at 126;

    4) one during the direct of Darryl Woods for invoking the witness's status vis-a-vis his

legal representation.  <u>Id</u>. at 140;

    5) one principal and many "reminders" to the jury that the questions of counsel "are not

evidence."  <u>Id</u>. at 157;

    6) one principal and several "reminders" to the jury to disregard the ADA's sarcastic

speculation with the witness.  <u>Id</u>. at 157;

    7) one principal and several "reminders" to the jury to disregard the ADA's questions that

include "facts not in evidence."  <u>Id</u>. at 158.

123.    **4/6/90 : 5 of note**

Five  principal instructions and numerous "reminders" were required during the second day of

the direct examination of Darryl Woods

*The grounds distribution for the curative instructions was as follows:*

    1) the jury was instructed that questions are designed to elicit facts and are "not the form

of argumentation" on display here.  Id  at 25;

    2) the jury was told that the performance of all counsel was "disgraceful" and that does

not mean that there still can't be a fair trial.  Id.  at 52;

    3) the jury was told that the witness should never have been asked to differentiate

between signatures on a document.  Id at 59;

    4) the jury was told that they were to disregard the question to the witness by the ADA

regarding the assertion of his 5th Amendment rights and that whether or not the witness had ever

appeared before another judge is not relevant.  Id. at 110;

    5) the jury was told that they should not be mislead by the questioning regarding the

witness's prior testimony and alleged prior statements.  Id. at 151.

124.    **4/9/90 : 9 of note**

Two principal instructions and "reminders" were given during the cross examination of Detective

McGlotten.

Four principal instructions and "reminders" were given during the redirect examination of

Detective McGlotten.

One  principal instructions and "reminders" were given during the direct examination of

Detective Augustine.

Two principal instructions and "reminder" were given during the cross examination of Detective Augustine.

*The grounds distribution for the curative instructions was as follows:*

1) during the cross examination and in response to argument in front of the jury amongst counsel about witness's pursuit of purported JBM motive in the killing, the jury is told to disregard counsels' exchange. Id. at 23;

2) during cross examination and in response to objections by ADA in front of the jury that co-defendant counsel is "arguing" and is "unethical", the court instructs that "you're not supposed to argue to the jury in the form of a question. That is the rule." Id at 24;

3) following several objections by trial counsel as to the propriety of the redirect examination, the trial court says " ...That is called redirect examination which is intended to explain to the jury that which was covered on cross." Id. at 56;

4) following several objections that the ADA is leading the witness, the court says "You always put the answer in the question and ask the witness to adopt it. That is improper." at 58;

5) at sidebar, following repeated questions and objections, the court instructs counsel "...I advised counsel after listening to their explanation as to why the questions were being asked and the objections, I instructed that redirect is being restricted to those areas that were covered on cross examination period and I will constantly rule out of order if you keep it up." Id. at 66.

**What follows are nine objectionable questions asked in a row pertaining to sensitive areas of the examination**;

6) again, the court advises the jury that "questions are not evidence" and they are once again to disregard the information that has been invoked by the ADA and the Detective. Id. at

-56-

69;

7) following a question by the ADA of Detective Augustine, the jury is instructed that "the only people that are certified to give conclusions to a jury are experts in the field.  Since this witness is not offered for his expertise in judging human reactions, you're therefore instructed to disregard the conclusions.  You may accept any factual finding he wishes to express." Id. at 81;

8) in response to co- defendant's  counsel's questioning of Detective Augustine regarding whether the Detective gave Miranda warnings to Darryl Woods, the judge says "There is no obligation to warn a person unless he is a subject of a possible suspect." Id. at 91;

9) in response to the behavior of counsel, the court says, "This is supposed to be a trial, not an exercise of who can scream the loudest.  You're not impressing me. I don't know whether you are impressing the jury.  Let's start all over again.  You heard the word objection.  When you hear the word objection you're supposed to stop...." Id. at 94.

125.    **4/10/90: 12 of note**

Seven  principal instructions and "reminders" during the cross examination of Detective Mosely. Four  principal instructions and "reminders" during the redirect examination of Detective Mosely.

One event requiring the judge to hustle the attorneys out of the courtroom to "the back room" during the direct examination of P.O.Daise.

*The grounds distribution for the curative instructions was as follows:*

1) during the cross examination of Detective Marlena Mosely about her reasons for going back to Darryl Woods for a second statement, the witness explained that she wanted to "make sure he was telling me the truth, sir." After an objection and comments of counsel the judge said

"it is improper for a questioner to try to get a witness to ascertain the jury's function in deciding who is telling the truth.  A lay witness is not permitted to give her opinion as to truth or nontruth," at NT 4/10/90 at 37;

2) during the cross examination of Detective Mosely about her mistakes as to the date of statements, who was present, what other information she knew at the time and the fact that her handwritten notes were thrown away, the ADA objects to the "comment" by co-defendant counsel that the detective "better keep better notes."  The court said "Jury should disregard it." Id. at 52;

3) at this juncture, the trial court ordered the jury to be led out of the room after counsel approached at sidebar.  The court said "Stop typing.  Jury take a five minute break.  The lawyers began screaming at each other.  By order of the court, the typewritten context was ordered disregarded." Id. at 53;

4) following repeated questions, objections and interruptions of counsel, the court said " Let's stop right now.  Dialogue between attorneys is improper.  Let's get evidence from the witness stand under oath."  This was quickly followed by another court instruction: "Stop.  The proper procedure is that you are going to ask a witness to recall with vivid recollection as to exactly what he says on prior occasions, show her the document and ask her if that is what she said.  This back and forth business is not before the jury." Id. at 59-60;

5) during cross examination and impeachment of Detective Mosely by Petitioner's trial counsel, the ADA interjected that "I think the problem is —."  The court instructed "No testimony from counsel table." Id.  at 68;

6) during the cross examination by Petitioner's counsel as to the accuracy of the

-58-

statements alleged to come from Darryl Woods, the ADA repeatedly objected that "the statements speak for themselves."  The court said "The veracity of the person who took the statements – usually when a person writes down some information, it is permissible to cross examine as to the source of the information and her knowledge of what it means–I will permit the questioning." <u>Id</u>. at 85;

7) during the cross examination by Petitioner's counsel, ADA repeatedly objected that the questioning was "beyond the scope of examination unless we are talking about the context of what Mr. Woods said, which is sworn to in the statement."  The court instructed, "In context, Mr. Woods said he did not give these statements.  In context this witness says he did and therefore any context of the documents if it came from this source – it must be explored otherwise counsel is not effective.  Let him cross examine so the jury can hear it."  <u>Id</u>. at 85;

8) during redirect examination and after a sidebar conference to address the scope of the redirect, the judge asked the ADA, " <u>How come every single time we make a ruling, you attempt to get it before the jury anyway?</u>"  <u>Id</u>. at 88;

9) during redirect examination, the ADA asked Detective Mosely, "Did you make an honest mistake as to the dates?"  Defense counsel both objected on the grounds that "it is for the jury if it is an honest mistake or dishonest mistake or a lie."  The court instructed "Where there is conflicting evidence concerning a fact before the jury, the witness is entitled to explain the reason for the conflicting evidence..." <u>Id</u>.  at 92;

10) In exasperation after continued questions and objections regarding the scope and form of redirect questions by the ADA, the court asks " Why are you testifying? Why are you testifying?  I want her to testify." <u>Id</u>. at 101;

-59-

11) immediately following the instruction in No. 10, above, the ADA asked two more objectionable questions in sensitive areas.  The first was " And there was also indication by Mr. Woods that these two defendants were in the JBM?"  The second was " —is it possible that Tone had his own automatic?"  The court says " All right.  Members of the jury, please disregard that type of statement which implies facts that you have not yet heard from witnesses on the witness stand and under oath...." Id. at 102.

12) during the direct examination of P.O.Daise the judge was forced to move all counsel to the "back room" following an exchange that began at counsel table and shifted to sidebar.

MR. CAMPOLONGO: And you said that you went around and tried to get information about what had happened from other people.  While you were there on the scene, did these two defendants ever come up to you and give any information concerning anything that happened at that location?

MR SANTAGUIDA: Objection.

MR. SEAY: Objection.

THE COURT: What is the objection, it has no relevance in the case?

MR. CAMPOLONGO: May I explain the relevance, Your Honor?

MR. SANTAGUIDA: You can't do it here.

MR. CAMPOLONGO: I can do it here, sidebar, anywhere you want me to do it.

(Whereupon the following discussion was held on the record at sidebar)

MR. CAMPOLONGO: Summarize the relevance as follows, Your Honor.  The witness, Mr. Woods testified in his current testimony that he went with these two defendants whom he has known for years and they just went to visit a friend in the projects.

MR. SEAY: Say it so loud –

MR. CAMPOLONGO: And that –

MR. SEAY: I am going to object to his tone of voice, lower your voice.

MR. CAMPOLONGO: And that they did not do any shooting, they were just a couple of friends of his that were visiting at that location and there are going there to visit somebody.  That was his current testimony.  The testimony in his prior statement is that the two of them went over there –

MR. SANTAGUIDA: We know that testimony.  What is the relevance?

MR. CAMPOLONGO: If you will allow me, I will explain it to the Judge.  The relevance is this –

MR. SANTAGUIDA: Keep your mouth shut.

THE COURT: And you're within the hearing of the jury and I am asking you to keep it down.

MR. SANTAGUIDA: Intentionally.

MR. CAMPOLONGO: In his prior statements, he indicated –

MR. SEAY: This is ridiculous.  Go in the back room.

THE COURT: Go in the back room.  4/10/90 II at 22-24.

(Whereupon, the discussion continued in chambers)

126.   **4/11/90: 2 of note**

One  principal instruction and many "reminders" were given during the direct examination of P.O.Withers.

One principal instruction/decision and "reminders" were given during the redirect examination of

P.O.Withers.

*The grounds distribution for the curative instructions was as follows:*

    1) during the time when the ADA was qualifying P.O.Withers of the Firearms

Identification Unit, the ADA asked the witness, " You indicated approximately how many times

you have testified and rendered your opinion in ballistics matters in Court such as this Court and

your testimony was accepted by the Judge and by the jury in those cases?"  The witness

responded "That is correct."  Then, following an objection and motion for mistrial by defense

counsel he added "He absolutely had no right to do this, it was despicable."  The ADA replied "

You're the one that is despicalbe (sic).  What are you talking about."  The court instructed the

jury

        Jurors, disregard this.  Let's go back on the record now.  It is my turn.  Members
of the jury, ordinarily a witness is only entitled to tell you what he saw or heard, if
it is admissible under the hearsay rules but an expert witness is one who by special
qualifications, training or educational background is permitted not only to tell you
what he or she saw but also to give you an opinion as to how that thing came into
being or exists.  So the background of a person is **limited** to his knowledge,
education and experience because you're going to have to decide whether to
accept an opinion from a person who is allegedly an expert, you can reject his
expertise and say his training isn't sufficient to let him offer an opinion or you can
accept his background and say, yes, I will accept his opinion.  That is a judgment
on the credibility of an expert witness.  Now, the question that counsel just asked,
did you testify in other cases.  Whether or not another jury said as true this
witness's opinion has no bearing on his background or expertise.  It is for you to
judge individually in this case and not be swayed by what some other jury may or
may not have heard.  So that much you should absolutely disregard when it comes
to the qualifications of this witness.  Now, you may proceed.

    Immediately afterwards, the trial court ruled that "he is qualified to give an opinion."

Whereupon, the ADA commented "Fine.  I didn't ask for any of this." NT 4/11/90 at 93-94;

    2) during the redirect examination of P.O.Withers, the ADA tried to ask the Firearms

-62-

examiner a hypothetical question about the position of the body and the barrel of the shot gun.

He asked " [w]ell, suppose Mr. Woods was shot in the leg and he fell down the steps with his leg

dangling?"  There was an objection by defense counsel, a bitter discourse among court and

counsel from counsel table and another rancorous sidebar.  The ADA said, " I want to make a

statement for the record.  With all due respect to the court, I believe the court is incorrect on the

law.  The law is that an expert maybe (sic) asked a hypothetical question based upon facts in

evidence.  It has been testified in this case that Mr. Woods gave a statement and I am reading

directly from Mr. Woods's statement."  And he read the purported statement of March 21st.  The

court ruled, " You don't have to repeat it.  Permission to ask a hypothetical question on those

lines is denied because it incorporates facts that are not of record." Id. at 132-135.

     127.   **4/12/90: 6 of note**

Five principal instructions and innumerable "reminders" were given during the direct

examination of P.O.Withers

One principal instruction and many rulings on objections were given during the redirect

examination of the medical examiner.

*The grounds distribution for the curative instructions was as follows:*

     1) during the direct examination of P.O.Withers, who had been recalled as a witness after

having been excused the day before the ADA reformulated his "hypothetical question" to be put

to the officer.  He asked " I would like to ask you a hypothetical question based upon facts in

evidence in this case....?"  Defense counsel objected that " the facts are what the jury finds them

to be."  The judge instructed that a "hypothetical question is a question asked of an expert

witness which assumes a set of facts in order to reach a conclusion.  Whether or not the facts are

-63-

true or not is your discretion.  So, just because they are incorporated by way of reference in a hypothetical does not meant that they are in fact true.  Please." 4/12/90 at 37-38;

2) the ADA immediately asked " Assume the following facts for the purposes of giving an expert opinion, that Mr. Woods heard the click of the shotgun, was shot in his left knee, that he fell down some distance of steps and tried to get up"  The court instructed, "Stop. Stop.  Start over again.  Start with a hypothetical that you propose..." Id. at 38;

3) the ADA responded with another improper question:  " So, if he had his foot on the last step or of he was up on the first step, it might still be said he was at the bottom of the steps?"  The court instructed " Yes, argumentative.  It's not the proper form of a hypothetical question."  Id. at 40;

4) the ADA then asked " So, if a person – if a person were shot in the leg and fell down with his leg dangling and if by being at the bottom of the steps it meant that someone was – had the foot on the first step pointing upward with a shotgun, that would easily fall within your parameters?"  The judge instructed, after an objection was interposed, " You have to ask the opinion." Id. at 40-41;

5) then the ADA asked, " This is my abdomen in front here.  I presume if he's the shooter, he's holding the gun and his front is showing, unless he's pointing around his back from this range, four to six feet in a lighted hallway, do you think there would be any difficulty seeing and recognizing the face of the person shooting you?"  The judge did not rule on the objections that followed but said " No side bar comments in front of the jury." Id. at 42;

6) during the redirect examination of the medical examiner, the ADA asked "did you not state in response to Mr. Seay's question it would be consistent if a person were down if he were

-64-

behind him with the shotgun that would be brought, the head here, that would produce an upward angle, he's laying down."

       MR. SANTAGUIDA: Impossible.  What is he doing?

       MR. COMPOLONGO(sic): The man is down.

       THE COURT: No more histrionics.  I'm not permitting the question.  <u>We were off the record while you were screaming at each other</u> and we'll go back on the record...."

       MR. COMPOLONGO (sic): If a man is down...."

       THE COURT: I'm not going to permit speculation... Do not ask this doctor to do the argument for you."  <u>Id</u>. at 81.

    128.   **4/16/90: 5 of note**

Two of the noted instructions were given during the examinations of Detective Bethea.

Three of the noted instructions and many "reminders" were given regarding the testimony of Daniel McKay, an eyewitness in the "other crimes" case.

*The grounds distribution for the curative instructions was as follows:*

    1) during the direct examination of Detective Bethea and following a 20 minute argument regarding the scope of the next portion of the Detective's testimony ("wink" and "thank you"), the ADA asked " When Mr. Woods testified at the preliminary hearing, did he claim to not know who shot him?"  After an objection wassustained, the ADA asked " What if anything did Mr. Woods say regarding whether or not he knew who shot him at that particular preliminary hearing on August 3rd 1989?"  Following an objection and motion for mistrial the following exchange took place:

       THE COURT: No. Objection sustained.  The notes of testimony that you showed

me at sidebar are different from what you're implying.

> MR. CAMPOLONGO: I think the notes of testimony are in the quarter sessions file.

> THE COURT: I don't want the contents of the testimony, we are not redoing the preliminary hearing.  I gave you the parameters about which this witness can testify, I will not permit you to go beyond that.

> MR. CAMOLONGO: Very well.  I will call the clerk of quarter sessions to introduce the notes of evidence in this hearing, they are part of the file.  NT 4/16/90 at 28;

2) following the cross examination of Detective Bethea by Petitioner's counsel the following exchange and resultant "instruction" to the jury took place.

> MR. SEAY: Thank you, Detective Bethea, I have no further questions.

> THE WITNESS: You're quite welcome, Sir.

> MR. SANTAGUIDA: Do you think this is funny?

> MR. CAMPOLONGO: Objection to the comments of counsel.

> THE COURT: The demeanor of a witness on the witness stand may or may not be a measure of – part of the measurement of credibility of this witness, the appropriate time is with the jury.

> MR. CAMPOLONGO: That comment is unethical as all of the comments have been through most of this.  Id. at 39;

3)   following a motion *in limine* in chambers regarding the admissibility of the "other crimes" evidence, the trial court instructed the jury that "two people are on trial here.  You're going to hear evidence now wherein one of the two people is mentioned and not the other one.

The evidence that is coming in now should be considered by you only against the person named and not against anybody else..." <u>Id.</u> at 113;

4) following a series of questions and objections during the direct examination of Daniel McKay, the court instructed as follow: "Members of the jury, we are trying this case and the evidence of a shooting of a victim at 29th and Tasker according to the Commonwealth's proffer will be **limited** to this case somehow and I am waiting to hear." <u>Id.</u> at 127;

5) following another series of questions and objections and the presentation of a police chart to Danny McKay the court instructed the jury, " Members of the jury, that former incident that – former shooting is not on trial in this courtroom.  I have said it three times and I will keep saying it, I am limiting this testimony from this witness[ ]part where the Commonwealth claims is probative in the trial and therefore the chart is not probative.  It would be probative if they start cross examining about how far away were you , what was your ability to observe?  That is not happening yet." <u>Id.</u> at 129.

129.   **4/17/90: 1 of note[14]**

1) during the redirect of P.O.Finor of the Firearm Identification Unit, the ADA asked " So what you're saying is we have two people firing out of the car, one with a 10 millimeter..."  An objection is sustained.  The prosecutor continued to question the witness by asking him.  "Okay.  And we had testimony that five or six shots were heard to be fired so we have got four ten milimeters (sic) and you got two .38s, right?"  More objections were sustained and the court said, " This material about the 3-7 event comes in for a **limited purpose** only.  I

_____

[14]There were only two witnesses presented this day, thirty one pages of transcript.  The instruction and reminders came during the redirect examination of P.O.Finor.

will fully explain to the jury, all other matters are extraneous... For a **limited reason** this evidence came in.  I will explain it to you at the end." NT 4/17/90 at 31.

### C.        The Due Process Violations

130     The prosecution's proper role "is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).  As part of this duty to see that justice is done, the prosecutor must avoid improper statements to the jury.  Because of the prosecutor's prominent courtroom role as representative of the Commonwealth -- and the mantle of respect and authority this creates in the eyes of the jury -- jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.") (citing Berger).  "For this reason, misconduct by the prosecutor ... must be scrutinized carefully." Drake, 762 F.2d at 1459 (citing Berger).  For this reason, misconduct by the prosecutor beyond the summation is to be even more carefully scrutinized.  The "impact of the misconduct [that] distracts the trier of facts" can be the most apparent during the portions of the trial when the jury is receiving the evidence. See Marshall v. Hendricks, 307 F.3d 36, 67 (3d Cir.  2002)

131.     Where the trial court fails to take action sufficient to correct the prosecutor's improper arguments, "the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law." Mann v. Dugger,

844 F.2d 1446, 1457 (11th Cir. 1988) (citing <u>Tucker v. Kemp</u>, 802 F.2d 1293, 1295 (11th

Cir.1986) (en banc)); <u>accord</u> <u>Lesko v.Lehman</u>, 925 F.2d 1527, 1546-1547 (3d Cir. 1991).

  132. Longstanding United States Supreme Court precedent makes clear that a

conviction must be reversed when the prosecutor's misconduct "so infect[s] the trial with

unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v.</u>

<u>DeChristoforo</u>, 416 U.S. 637, 643 (1974).  This is the paradigmatic case of a trial that was

incurably "infected ... with unfairness" as the result of the prosecutor's actions. [15] As set forth

above, the prosecutor's opening statement and closing argument were replete with improprieties,

and at many times during the trial the proceedings degenerated into screaming matches that took

place within eye- and earshot of the jurors.  Even worse were the prosecutor's consistent and

ultimately successful attempts to undo every one of the trial court's attempts to limit the purposes

for which highly prejudicial – and at best marginally admissible – evidence was admitted.

Equally damaging was the "evidence," both from witnesses and from the prosecutor's own

mouth, that Petitioner was a top official in what was purportedly a violent and dangerous

criminal organization known as the Junior Black Mafia. Because the prosecutor did this over and

over again, the trial court's occasional admonitions and "curative" instructions – which, as

---

  [15]It is a disagreeable and important task to have to catalogue the conduct of the Assistant
District Attorney during this trial which undermined any confidence to be had in the verdict.  A
turn through the cases revealed two reported decisions centering on this same lawyer's damaging
and disappointing performance in the courtroom.  Those cases are <u>Commonwealth v. Kelly</u>, 797
A.2d 925 (Pa. Super 2002) and <u>Commonwealth v. Scher</u>, No. 4778 PHL 1997 (filed March 26,
2004, Pa. Super).  The cases are attached as Appendix D.  In the former case, a mistrial was
declared *sua sponte* by the trial court because of the "bombastic" and uncontrollable behavior of
the prosecutor who was at that time working for the Office of the Pennsylvania Attorney General.
In the latter case, also prosecuted by the Office of the Pa. Attorney General, the court reversed a
murder conviction on other grounds and then devoted the next 15 pages to a review of the claim
of prosecutorial misconduct.  <u>Scher</u> at 19-33.

shown above, were immediately violated by the prosecutor – did nothing to remove the prejudicial taint of the prosecutor's actions.  Indeed, the net effect was to convey extremely powerfully to the jury that Petitioner had killed before, and that they should presume him to be guilty on that basis.

133.    Of course, no court would permit the introduction of evidence for the stated purpose of showing that the defendant had the propensity to kill, or allow evidence of membership in an organization as proof that the defendant had committed a crime.  The prosecutor's conduct here, however, did that just as effectively and just as improperly as such an explicit use of propensity evidence.  This was not a passing remark thrown out in the heat of battle.  Rather, it was a premeditated and deliberately exercised strategy that was prominent throughout the trial, overshadowing the actual evidence concerning Petitioner's alleged participation in the charged offenses.  The effect was to divert and distract the jury from its constitutional role to speculation about purported other misdeeds and crimes.  The resulting conviction is too infected with unfairness to be countenanced by the due process clause.

134    The case against Petitioner was weak; none of the state courts have suggested anything to the contrary.  The Third Circuit has made clear that this is an appropriate consideration in deciding whether prosecutorial misconduct violates due process:

> [T]he reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant. There are "some occurrences at trial [that] may be too clearly prejudicial for ... a curative instruction to mitigate their effect."  In making this determination, Supreme Court precedent requires the reviewing court to weigh the prosecutor's conduct, the effect of the curative instructions and the strength of the evidence.

Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001) (quoting Donnelly, 416 U.S. at 644) (footnote

and citations omitted).

135.    All of these factors demonstrate the seriousness of the constitutional violation in this case.  The prosecutor's misconduct was severe, repeated and consistent; the "curative" instructions were ineffective to remedy the misconduct, particularly since the prosecutor repeatedly flouted the trial court's rulings; and the evidence was weak.  Here, as in <u>Moore</u>, the prosecutor's serious and repeated misconduct, in light of a weak case for the prosecution, resulted in a prejudicial violation of the due process clause.

136    Among the many critical areas of the trial wherein the prosecutor worked way out of bounds, three in particular are representative and sufficient to demonstrate that the error was prejudicial.   The first is the opening statement by the prosecutor.  The second is the presentation of Daniel McKay, the eye witness to the "other crime".   The third is the closing argument  by the prosecutor.

137    While there are several ways of formulating  the proper parameters for an opening statement, there is no formulation that permits an attorney to argue conclusions of fact and law as though evidence had already been admitted in the case or to "testify" in the voice of the witnesses who have yet to be called to the stand or to "open" in  a way that  is a flagrant violation of a pre-trial ruling.  In Petitioner's case, the prosecutor did all of these things and would not be corrected.

138    During his presentation of witness Daniel McKay, the prosecutor elicited and repeated the "details" that the court tried to exclude, presumeably because certain facts that did not relate to the "limited purpose" of "access to a weapon," while legally irrelevant, were highly likely to prejudice the jury.  For example, the testimony that the "other took place at a scene

where "young kids" and teenagers were throwing snowballs; the statements attributed to

Petitioner and testimony about where the "boy went down and blood was sliding on the snow"

were irrelevant, but highly damaging.  The prosecutor's determination to disregard the rulings of

the court eventually wore down the court's resistance.

139     The prosecutorial misconduct that  plagued the trial up until this point  now pales

in comparison with the constant misconduct at closing.  Exploiting "limited purpose" rulings was

child's play compared with the opportunity to contort the meaning of reasonable and logical

inference beyond all recognition and to discuss evidence that he had not event *tried* to present at

trial.  <u>See</u>, eg,  NT 41/18/90 at 21, 24, 25, 27, 28, 29, 30, 31, 32, 33, 34, 56, and 64.  Petitioner is

entitled to habeas relief.


### D.  **The State Court Opinions**

140     On direct appeal, counsel for Petitioner raised the claim that "[t]he activities of

this [prosecutor] were totally inconsistent with his obligations to obey the basic tenets of due

process" Appellant Brief at 20.

141     In its four page opinion, the Superior Court accurately identifies one of the claims

presented to it as "IV. Prosecutorial Misconduct denied both defendants a fair trial."  <u>Reid I</u> at 4.

The sum of the Superior Court's decision and analysis of this claim was as follows:

After a thorough review of the briefs submitted by the parties and the trial record, we
conclude that Judge Poserina's opinion adequately and comprehensively disposed of each of the
issues raised in the instant appeal.  Moreover, the issues raised in Reid's first and second
arguments (I. The trial court erred in allowing as substantive evidence prior inconsistent
statements of Darryl Woods; and II. The trial court erred in allowing evidence of an unrelated
murder that occurred eight days before the present offense.  <u>Reid</u> I at 4.)  were resolved by our
Supreme Court in <u>Commonwealth v. Anthony Reid</u>, ___ Pa. _____, _____. A2d. _____(No. 200

-72-

E.D. Appeal Docket 1990, filed May 27, 1993), a death penalty appeal involving Reid's murder of a sixteen year old boy.  In Reid, our Supreme Court held that the same inconsistent statements made by Woods were properly admissible as substantive evidence.  The Supreme Court also found that evidence of the instant shooting with the 10-millimeter weapon was admissible to prove Reid's identity as the killer in the Tasker Street murder.  Accordingly, we affirm and adopt the trial court's comprehensive opinion for the purposes of allocatur."  Reid I at 4.

142.     Judge Poserina took up the issue of "Prosecutorial Misconduct" during Part II of his opinion. TCO at 11.  At the outset, the trial court announced that the standard by which he would determine whether the trial was fair or not was that prosecutorial misconduct "will never occasion relief unless the jury is unavoidably prejudiced against the defendant thereby." TCO at 11, citing,  Commonwealth v. Johnson, 516 Pa. 527, 523-33, 533 A.2d. 994 (Pa. 1987) "unavoidable prejudice required for relief.)

143.     Noting certain examples of alleged misconduct, the court found there was no error by the prosecutor and that he made no error.  TCO at 13.   As to the claim of misconduct relating to the "other crime evidence" the court found that because "[t]his court ruled Reid's prior act, and the circumstances surrounding it admissible" (emphasis in the original) there was no error. The trial court added that he "limited the use of this evidence to proof of Reid's access to the same gun" in his final instruction[16], and further added that "[s]uch evidence was admissible not

---

[16]The court's instruction was "Now, the testimony of a person who is called to testify about another incident, Danny McKay, regarding another incident was not offered to prove any other prior criminal conduct.  It was offered to prove prior access to and circumstantially, and whether or not you believe that evidence permitted you should infer that he had access to or possession of a specific firearm.  You are not to believe that because of the prior incident may have occurred that therefore the Defendant Anthony Reid, is guilty of the offenses for which he is on trial here.  In other words, the limitation about the first incident came strictly for whether or not you believe that it showed by circumstantial evidence access to or possession of a specific firearm...Now, the testimony from the young man Dan McKay, was not designed to put any of that shooting on trial here.  It was admissible as possible circumstantial evidence for you to consider in the case for a limited purpose...But is you believe the testimony of all of these

merely to show that Reid had access to the gun, but also as <u>circumstantial evidence of guilt.</u>"
TCO at 11. (emphasis in the original).

144.    As is set forth above, the record does not contain any mention or ruling regarding the admission of the "other crime" as "circumstantial evidence of guilt."  Indeed, as confused as the court and counsel were and as poorly as counsel behaved, there was at least a passing acknowledgment that it would have been inappropriate to admit the evidence for this purpose.[17] Nevertheless, the reasoning stated in the trial court's opinion may explain why the court allowed the prosecutor to flount his express ruling so repeatedly.

145.    The standard for analyzing the  claim of prosecutorial misconduct in <u>Commonwealth v. Johnson</u>, supra, is inconsistent with the established federal law.  In assessing the "impact of prejudice in closing arguments," the court said that " our rule...is the 'unavoidable prejudice test."  <u>Johnson</u> 533 A.  2d at 997.

146     The state court's reliance on a standard that will find error only where there is "unavoidable prejudice" stemming from closing argument is contrary to the clearly established federal law at the time the decision became final.  The correct standard is whether the

_____

witnesses, that is the circumstances surrounding the findings of the shells, the testimony of Mr. McKay, the ballistics expert that compared them, if you believe all the testimony of all the witnesses along these lines, then you have to examine the facts that as to what was testified to and decide if you are convinced that the circumstantial evidence of the events of the shooting on 3-7-89 led you to infer that either Mr.Reid did possess or had access to the ten-milimeter gun which may have been used on 3-13-89 in this case before you....If you are convinced beyond a reasonable doubt that Defendant Reid possessed or had access to that ten-milimeter pistol on the 7th of March, then you must then decide if he also had possession of the same ten-milimeter gun on the 13th of March at the scene of the Ogden Place murder." NT 4/18/90 at 92-95.

[17]Nowhere in the record is there any mention or ruling regarding the admission of the "other crime" as "circumstantial evidence of guilt".

prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" Donnelly v. DeChrisitoforo, 416 U.S. at 643. The Donnelly standard asks the reviewing court to assess the interplay between conduct, substance, strength of the admissible evidence of guilt or innocence, duration of the trial, persistence of the problems, and efficacy of any corrective measures that were taken by the judge. The "unavoidable prejudice" standard, in contrast, is both amorphous and unduly burdensome. The state court's Johnson standard for a fair trial applied in this case is far too subjective and is contrary to prevailing federal constitutional law, as set forth in Donnelly and its progeny.

147     Even if this Court were erroneously to construe the state court formulation of the legal standard as consistent with federal law, relief is mandated because the state court's determination was an unreasonable application of established federal law.

148     Petitioner's claim of prosecutorial misconduct based on the record detailed above has been[18] and remains a claim that challenges the court to review the improper conduct throughout the entire trial and determine whether the trier of fact would have been so "distracted" by that conduct as to "raise doubts as to the fairness of the trial." Marshall 307 F.3d at 67.

149     The state courts, however, failed to consider all of the evidence that Donnelly required them to consider. Because the state courts failed to take into account all of the

---

[18]On direct appeal the issue was raised as "[t]he activities of the trial attorney were totally inconsistent with his obligation to obey the basic tenets of due process. In a case such as this where the only evidence is the prior inconsistent statement of a reluctant witness who has been declared a liar by the Commonwealth, this prosecutorial misconduct alone requires a new trial. This conduct clearly violates the prosecutor's duty to see that justice is done" Appellant Brief at 20.

misconduct presented in the record of this case, their determination that there was no due process violation was an unreasonable application of Donnelly.   For instance, when presented with the claim that the prosecutor abused the court's ruling that the "other crime" evidence could be received only for a limited purpose, the trial court summarily concluded that the prosecutor could not commit misconduct related to its treatment of the "other crime" evidence and the "JBM" evidence because he had admitted the "other crime"  evidence for "limited" use.  TCO at 11. Likewise, the claim that the prosecutor mistreated the limited grounds of admissibility for any of the JBM evidence, was met with a summary conclusion that evidence of "defendant's standing in the JBM" was ruled "relevant and admissible."   Thus, the trial court ignored the profound evidence of misconduct that touched on these evidentiary rulings.

150     To refuse to review the prosecutorial  misconduct in the record because of an evidentiary ruling is an unreasonable application of Donnelly    While Donnelly examined the claim of prosecutorial misconduct as it related to a "few brief sentences in the prosecutor's long and expectably hortatory closing argument," the court articulates that due process claims must necessarily be viewed and evaluated with an eye to the entire trial.  " ...[A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." Donnelly 416 U.S.at 644.

151     In this case, due to the belief that the admission of evidence for a "limited purpose" somehow insulated the prosecutor from being held accountable for his misuse and abuse of the court's ruling the state court's  "determination" was an unreasonable application of the federal standard.  Even the trial court did make reference to a witness examination wherein

"the prosecutor went beyond what this court in its discretion considered the permissible limits of cross examination," (TCO at 12), it made no effort whatsoever to evaluate the "disgraceful" conduct's impact on the fairness of the trial.

152     All that the state court did was express its own effort "to guarantee a fair trial" by sustaining nearly every objection that was made to "virtually every question" and report in its opinion that it "instructed the jury to disregard the question." TCO at 12. Even without the mountain of other examples of serious misconduct, the trial court's rationale itself makes the point that there is a serious doubt as to the fairness of this trial. The impact that the airing of all sensitive matters in front of the jury and the effect of the rancor and frantic behavior on the part of the Assistant District Attorney concerning the "limits" on the evidence he wanted to use the most likewise shows the unfairness of the trial. The court acknowledged that there was misconduct in Petitioner's trial and that it was "continuous contumacious conduct." The state court's failure to analyze the impact of the acknowledged misconduct was an unreasonable application of the established federal law. Petitioner is entitled to habeas relief.

153.    The record demonstrates that the prosecutor had an agenda that would not countenance the "interference" of the rules of evidence, trial advocacy norms, rulings and instructions by the court or even good manners. The record is laden with examples. The jury could not have failed to be distracted by these circus-like proceedings. The judge had no control over the lawyers, the evidence was idiosyncratically managed and the jury saw and heard it all. The fray was most often joined on the evidence purportedly to have been admitted for a "limited purpose." The case against Petitioner without the prosecutorial misconduct was a weak case. Essentially, the case consisted of Darryl Woods and his prior statements and the "limited"

evidence of the Petitioner's presence and gesture at a place where casings from the same weapon were recovered. Thus, the objectionable, repetitive, gratuitous, unrelenting commentary by the prosecutor must be considered as measured against a weak case. The state court determination that there was no error is unreasonable because the state court did not assess the impact of the misconduct on the fairness of the trial. The misconduct in this case is of constitutional proportions; Petitioner is entitled to habeas relief.

**D.    Conclusion**

154   During the trial, the prosecutor made improper statements and arguments that were designed to and did divert the jury from fairly considering the evidence and to instead base its decision on improper matters. The prosecutor repeatedly asked leading, suggestive questions of his own witnesses; repeatedly echoed testimony that was harmful to Petitioner and the credibility of the defense witnesses; deliberately injected impermissible and gratuitous considerations into the trial; overreached with every witness about Petitioner's association with unsavory people; overreached with critical witnesses despite prior adverse rulings by the court; commented adversely and in violation of a court order concerning a witness's prior assertion of his 5th Amendment privilege; and vouched for the credibility of his witnesses.

155    Comparatively, considering the facts of <u>any</u> of the examples cited during any part of the pendency of this case or this *Petition*, the trial in Courtroom 253 from March 28, 1990 through April 18, 1990 occupies a point beyond the outer limits of due process. This trial ceased to bear the hallmarks of a proceeding that can reliably test the guilt or innocence of the accused. Petitioner should be granted a new, fair trial.

-78-

**CLAIM 2      THE PROSECUTORIAL MISCONDUCT VIOLATED PETITIONER'S RIGHT TO BE PRESUMED INNOCENT IN VIOLATION OF HIS RIGHTS UNDER SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

156.      Many of the prosecutor's statements were designed to and did prejudice a <u>specific</u> constitutional right:  the presumption of innocence and requirement of proof beyond a reasonable doubt, as guaranteed by the Sixth and Fourteenth Amendments to the federal constitution.[19] While Petitioner is entitled to relief on this claim  under the <u>Donnelly</u> standard, Petitioner is also entitled to relief because the misconduct implicated a specific constitutional right.  <u>Eg.</u> ,  <u>Griffiin v. California</u>, 380 U.S. 609 (1965);  <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976).

157.      In <u>Marshall v. Hendricks</u>, the Third Circuit made clear that, just as there is a "presumptive due process violation where a prosecutor misused a defendant's exercise of his Fifth Amendment right to remain silent as evidence of guilt ... we think it clear that the same presumption applies when other enumerated rights are implicated." <u>Marshall</u> 307 F.3d at 70-71.

158.      The misuse and abuse of the evidence that had been admitted for a "limited purpose" implicates Petitioner's right to be presumed innocent by his jury.  The evidence of the "other crime" admitted for a "limited purpose" was so grossly manipulated by the prosecutor throughout the course of the trial that he truly went overboard at closing argument.  There, he argued as follows:

> Our legal system considers the line up a crucial stage in the proceedings wherein counsel must be present under law, that is what our law is" Objection sustained.  At any rate, in the line-up —everybody is the same, they either all have box haircuts or nobody has got box haircuts. [Objection sustained]   At any rate, you had testimony there was a line up.  Line up doesn't mean one person, it means that a whole bunch of people lined up and you got to pick out the right one and nobody tells you or gives you any clues or anything, you got to pick them out.  It is not like

---

[19]Cool v. United States, 409 U.S. 100, 104 (1972) (referring to the "constitutionally rooted presumption of innocence").

they parared (sic) him in there all by himself.  He looked at them as they were lined up.  He didn't look for haircuts, he didn't look for weight, glasses, he looked at the face and the quality 4/18/90 at 29-30, <u>see also  id</u>  at 30-34.

159.     There was no evidence presented about the conduct of the line up; no testimony as to the results by the Detective who ran the line up or the Detective who witnessed it.  Nothing.  The presumption of innocence is implicated when the ADA argues that "you got to pick out the right one"... and you did.  In the context of the intended purpose for the "other crime" evidence, when the prosecutor convicted Petitioner in that case, the "limited use"of the evidence in this case became nothing more than a propensity

160.     As another strong example of the prosecutor's implication of Petitioner's right to be presumed innocent by his jury, the ADA invoked the "other crime" evidence to bolster the credibility of Mr. Woods's prior inconsistent statements.: "Ladies and Gentlemen, the evidence regarding the Tasker Street incident is evidence which tells us something, it gives us insight, says to us Mr. Woods when he gave his original statement to the police knew what he was talking about."  NT 4/18/90 at 41-42.  Again, the exploited "proof" of the "other crime" can now do the work of relieving the Commonwealth of its burden to demonstrate the persuasiveness of its assertion that Woods' prior statements are the best account of what happened on March 13, 1988.  Due to the flagrant undermining of Petitioner's presumption of innocence as demonstrated by this example, among many, Petitioner is entitled to habeas relief.  The trial was unfair and a mockery of the process due a criminal defendant in the United States.

161.     During the prosecutor's closing, he commented on the testimony of Detective Marlena Mosely.  It was Detective Mosely who was responsible for authenticating the unsigned statements of the witness Darryl Woods.  The challenge to the quality of her work and her

veracity as to how the work got done was part of the cross examination.  There was no invitation for the kind of response that was offered by the prosecutor, however. "When we had Detective Mosely testify, she admitted she made a lot of mistakes, she was a detective for only a month. This was only her second case, she admitted that, that things perhaps she could have done differently.  Look at that woman.  Mr. Santaguida called her every name in the book.  She is a liar, he called her a liar six times, called her a liar over and over and over.  Look at that woman, you know maybe she isn't the sharpest detective in the world, does she look like the kind of woman that is going to brow beat a sick man, falsify a statement, put something down that isn't true?  You know, I resent that.  Alright.  Maybe she is not the sharpest detective in the world, maybe she made some mistakes but who is this man to call her a liar?  She is a decent ..."  Here too, the credibility of the detective was argued based on evidence that was not admitted at trial. [20]

162.    The trial was unfair and a mockery of the process due a criminal defendant in the United States.   The prosecutor's misconduct implicated the fundamental right to be presumed innocent and to have the government meet the standard of proof of guilt beyond a reasonable doubt with evidence properly before the jury.  Due to the flagrant undermining of Petitioner's presumption of innocence as demonstrated by these examples, among many, Petitioner is entitled to habeas relief.

---

[20]E.g., Lesko v. Lehman, 925 F.2d 1527, 1546 (3d Cir. 1991) (court must consider cumulative effect of prosecutor's remarks); Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense violated due process); Davis v. Zant, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process).

CLAIM THREE                THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY AS TO THE
                           DEFINITION OF REASONABLE DOUBT AND ACCOMPLICE LIABILITY
                           VIOLATING PETITIONER'S RIGHTS UNDER THE FOURTEENTH
                           AMENDMENT TO THE FEDERAL CONSTITUTION;  PETITIONER'S TRIAL
                           COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT[21]

A.     Due Process Principles.

        163.    Due process requires the Commonwealth to prove beyond a reasonable doubt

every element of the offense.  Winship at 364.  Jury instructions that eliminate or lessen this

burden for any element violate due process.[22]

        164.    In Pennsylvania, specific intent to kill is the key element of first-degree murder.

While a defendant may be convicted of first-degree murder as an accomplice or co-conspirator,

even without proof that he was the actual killer, the defendant's own specific intent always

remains an element of the offense.  The Commonwealth must prove beyond a reasonable doubt

that the defendant had the specific intent to kill.[23]  Jury instructions that allow co-conspirator or

accomplice liability for first-degree murder without also requiring a finding beyond a reasonable

doubt that the defendant actually had a specific intent to kill violate due process.[24]

---

        [21]Petitioner raised both of these claims in the PCRA proceedings.  See Reid II at 8-9.

        [22] Cage v. Louisiana, 498 U.S. 39 (1990); Osborne v. Ohio, 495 U.S. 103, 122-23 (1990);
Carella v. California, 491 U.S. 263, 265 (1989); Francis v. Franklin, 471 U.S. 307, 313 (1985);
Sandstrom v. Montana, 442 U.S. 510 (1979); Smith v. Horn, 120 F.3d 400, 414-15 (3d Cir.
1997) (due process violation and habeas relief in Pennsylvania case where accomplice liability
instructions relieved Commonwealth of burden of proving defendant's specific intent to kill
beyond reasonable doubt).

        [23]18 Pa.C.S. §§ 306(d), 2502; Smith, 120 F.3d at 410; Everett v. Beard, 290 F.3d 500,
509-11 (3d Cir. 2002); Commonwealth v Huffman, 638 A.2d 961, 962-64 (Pa. 1994).

        [24] Smith v. Horn; Everett; Huffman; Clark v. Jago, 676 F.2d 1099, 1100-06 (6th Cir.
1982) (habeas relief where accomplice liability instructions relieved state of burden of proving

165.   Regarding challenges to the constitutionality of jury instructions, Supreme Court of the United States has held that the Court's analysis "must focus initially on the specific language challenged."  Francis v. Franklin, 471 U.S. 307, 315 (1985).  Then, the Court considers the allegedly constitutionally infirm language in the context of the jury charge as a whole.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The key inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

**B.     Ineffective Assistance of Counsel Principles.**

166.   Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984).  Petitioner must show:  (A) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (B) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694.  Petitioner has established both prongs of Strickland.

167.   Strickland "prejudice" analysis is not an outcome-determinative test.  Strickland, 466 U.S. at 693-94.  The question is not whether representation by effective counsel would have actually changed the outcome at either the guilt-innocence or sentencing phase, nor even whether representation by effective counsel would "more likely than not" have changed the outcome.  Id.  Instead, prejudice is established when confidence in the outcome is undermined because of

--------

"purpose to kill," an element of aggravated murder under state law); Gray v. Lynn, 6 F.3d 265 (5th Cir. 1993) (habeas relief where instruction allowed jury to convict for attempted murder if defendant had intent to kill or inflict serious bodily injury, where intent to kill was element of offense).

counsel's deficiencies.  Id. at 694.  "This standard is not a stringent one.  It is less demanding than the preponderance standard."  Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing Nix v. Whiteside, 475 U.S. 157, 175 (1986); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)); accord United States v. Day, 969 F.2d 39, 45 n.8 (3d Cir. 1992) (Strickland "does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case").

### 1.      Accomplice Liability

168      The jury instructions relieved the Commonwealth of its burden of proving beyond a reasonable doubt the crucial element of first-degree murder – specific intent to kill.  The jury was instructed that Reid could actually be found guilty of first degree murder as an accomplice if he " is an accomplice of another person who does commit that crime.  He is an accomplice if with the intent of promoting or facilitating the commission of a crime he either solicits, commands, encourages, requests the other person to commit it or aids or agrees to aid or attempts to aid the other person in planning or committing the crime." NT 4/18/90, 97.  The instruction was confusing when it relegated the proof of specific intent to kill– an element of first degree murder - to proof of "a crime" or "the crime".   The instructions thus violated In re Winship, 397 U.S. 358 (1970) and its progeny.  Because of this due process violation, Petitioner is entitled to relief.

169      In this case, there is a reasonable likelihood that the jury applied the court's instructions in a way that relieved the prosecution of establishing beyond a reasonable doubt that

Reid individually harbored the specific intent to kill.  During the charge, the judge instructed the jury on four substantive crimes: 1) first degree murder; 2) third degree murder; 3) voluntary manslaughter; and 4) conspiracy.  NT 4/18/90 at 91-98.  To loosen the accomplice charge so that it applies to "a crime" or "that crime" or "the crime" is to make it more confusing for the jury to sort through what evidence it could regarding the alleged intentional killing of Neil Wilkinson. The evidence presented was that Mr.Wilkinson was killed by a bullet that came from a 10 millimeter gun.  The only eyewitness testimony as to any weapon that Petitioner may have had is contained in the prior statements of Darryl Woods.  In that statement, Woods said that Petitioner was armed with a .357 gun.  "And each time he told you there was a .357 Magnum and a shotgun, is that right? A: Yes." NT 4/10/90  at 70.   The jury had to decide if either of the defendants on trial had the murder weapon.  If either one did, then they would have to decide whether the killing was first degree or third degree murder,or manslaughter.  Only then could the jury consider the role, if any, of the other defendant in the homicide.  By failing to instruct the jury that the other defendant must also have a specific intent to kill in order to be an accomplice to first degree murder, the court denied Petitioner due process of law.  The constitutional error is not harmless and Petitioner is entitled to habeas relief.

170     Trial counsel was ineffective for failing to object to this instruction.  Competent counsel would have taken the opportunity provided by the court  when the judge asked "counsel at sidebar whether they have any additional points of charge" to point out that there now exists the distinct possibility that one of the defendants could be convicted of first degree murder without a finding that he had a specific intent to kill.  Indeed, when co-defendant trial counsel appeared to ask why the judge gave the charge at all, NT 4/18/90 at 100, the court further

-85-

revealed its error and yet Petitioner's counsel still remained mute on the subject.  "I gave it because we are not proceeding on any of the evidence about the wounding of Mr. Woods.  What we have here – I don't know if – whether the jury knows whether the shotgun caused the death or the pistol caused the death.  Now, <u>it doesn't matter under accomplice which one caused the death</u>, as long as they were all trying to do that...." 4/18/90 at 101.  Counsel's failure to take up the matter of correcting the charge with the court was deficient performance under the <u>Strickland</u> standard.

171     As a result of counsel's deficient performance, confidence in the outcome of the original trial is undermined.  The unremarked upon comments "at sidebar" by the trial court above are strong evidence of precisely the way in which it is probable that the jury would understand the instruction and, thus, misapply the law.  It most certainly <u>does</u> "matter under accomplice which one caused the death" because the jury must make a considered decision as to whether the other defendant shared the "specific intent to kill" which is the key element of first degree murder.

2.     <u>Beyond a Reasonable Doubt</u>

172     The trial court's enunciation of the burden of proof to be applied by the jury in Petitioner's trial was confusing and weakened the stringent burden that is "proof beyond a reasonable doubt."

"What is a reasonable doubt?  Although the Commonwealth has the burden of proof that the defendant is guilty, this does not mean that the Commonwelath must prove the case beyond all doubt or to a mathematical certainty not must the Commonwealth demonstrate the complete impossibility of innocence.  A reasonable doubt is the doubt that will cause the reasonable and careful and sensible person to pause, hesitate or refrain from acting upon a matter of highest important (sic) in his own personal affairs or in his or her own interest.  A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with

respect to some element of each crime charged.  A reasonable doubt must be a real doubt, it may not be an imagined one nor may it be a doubt that is manufactured just to avoid an unpleasant duty.  To summarize those principals, you may not find defendant guilty based on mere suspicion of guilt.  The Commonwealth has the burden [of] proving defendant guilty beyond a reasonable doubt.  If the Commonwealth has met that burden, then defendant is no longer presumed to be innocent and you should find him guilty.  On the other hand, if the Commonwealth has not met its burden, then you must find him not guilty."  4/18/90 at 71-72.

173     The charge as given is unclear because the court utilized the lowest level of proof to demonstrate the quantum of evidence that would be unacceptable; i.e. mere suspicion of guilt. If the court is inclined to offer the jury a comparative measure for realizing what is "beyond a reasonable doubt", the clear  instruction would draw the distinctions between "beyond a reasonable doubt"  to "preponderance of the evidence" and "clear and convincing evidence." These juxtapositions would make clear that the burden of proving guilt "beyond a reasonable doubt" is the highest level of proof that can be required in the legal system.  The court's summary during the charge to Petitioner's jury was an invitation to convict on evidence that is simply something more than a "mere suspicion."  The error of the instruction is not harmless and Petitioner is entitled to habeas relief.

174     Trial counsel was ineffective for failing to object to this instruction.  Competent counsel would have taken the opportunity provided by the court  when the judge asked "counsel at sidebar whether they have any additional points of charge" to point out that the judge was wrong and did not adequately and fairly and clearly present the law to the jury.  Instead, counsel asked that the court stress the application of the burden of proof instruction as it stood to the jury's consideration of "circumstantial evidence." NT 4/18/90 at 102.

175     As a result of counsel's deficient performance, confidence in the outcome of the original trial is undermined.  By the time the jury gets the case for deliberation, their evaluation

of the considerable "circumstantial evidence" in the case was guided by a standard possibly twice removed from what it should be.  As a result of counsel's objectively poor performance, confidence in the outcome of this trial is undermined.  Petitioner can and has demonstrated prejudice and he is entitled to habeas relief.

176.    For the reasons stated above, the instructions violated due process; trial counsel's failure to object constituted prejudicially deficient performance.  The state court's failure even to seriously consider this claim was an unreasonable application of clearly established United States Supreme Court precedent.

177.    The Superior Court's <u>Reid II</u> opinion ruled on of both the due process and ineffectiveness aspects of Petitioner's claims as to the instructions that were given to the jury.  As to both claims of instructional error the state court stated, "Appellant's co-defendant, Bowman, raised this identical claim before this court." Looking to the <u>Bowman</u> opinion, the court stated that, with regard to the accomplice liability charge, "we found it meritless because it was 'abundantly clear" ; with respect to the burden of proof charge, "this instruction is clear and unambiguous." <u>Reid</u> II at 9.  Petitioner raised the ineffectiveness of this appellate counsel in failing to raise trial counsel's ineffectiveness with the PCRA trial court with regard to both claims of instructional error and appealed same when the PCRA was dismissed.   Thus, the state courts have determined both aspects (due process and ineffectiveness) of Petitioner's claims challenging the two jury instructions.

**CLAIM FOUR   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO QUESTION THE WITNESS TO THE "OTHER CRIME" ABOUT HIS PRIOR IDENTIFICATIONS OF ANOTHER MAN AS THE PERSON WHO SPOKE TO HIM AND MADE A GESTURE; PETITIONER'S APPELLANT COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE ON DIRECT APPEAL, IN VIOLATION OF PETITIONER'S SIXTH**

AMENDMENT RIGHTS UNDER THE CONSTITUTION.

178     Petitioner raised this claim in his PCRA petition to the trial court.  The trial court

wrote,  "Defendant did not show any evidence as to whether McKay tentatively identified

defendant or picked someone else."  TCO, 5/30/2002 at 15.  This is incorrect.  See *Appendix F,*

attached.  That is the filing in the PCRA trial court wherein the evidence of the identification by

Daniel McKay of someone other than Petitioner was submitted to the court.  The PCRA petition

was dismissed without a hearing.

179.    The claim was appealed to the Superior Court and the Superior Court made the

following finding "...as the trial court also makes clear, appellant's trial counsel made a strategic

decision to limit his cross examination of McKay due to the Commonwealth's strong rebuttal

evidence."  Reid II at 14.

180.    Trial counsel during the instant matter was also the trial counsel at the first trial in

the case wherein Daniel McKay was the eyewitness and, furthermore, it is a matter of record that

he had McKay's statements at the time of this trial.  See NT4/5/90 at 98.  A review of that record

reveals nothing like the finding of fact interpolated by the Pennsylvania Superior Court.  That

court's speculation about a "strategic decision" of trial counsel in the face of the circumstances of

this case is unsupported by the record.  The  prosecutor in this case exploited the "limited

purpose" of "other crime" evidence when he insisted that the lack of challenge to the

identification in the "other case" proved Petitioner's guilt in this case.[25]  Trial counsel was

---

[25]Indeed, the prosecutor argued at closing " What I am trying to say to you, ladies and
gentlemen, is that the identification of Mr.McKay was rock solid, as good as gold.  You can take
it to the bank, there has been no evidence offered, just things taken out of thin air, speculation, no
evidence offered of any kind to show that his identification is anything other than rock solid

deficient in his performance when he ignored the pertinent statements of Daniel McKay.

181.    As a result of trial counsel's objectively unreasonable decision and performance, confidence in the result of the original proceeding is undermined.    Appellate counsel was ineffective for failing to raise this claim on direct appeal.  Petitioner has established both prongs of <u>Strickland</u>.  The state courts' decisions were unreasonable applications of Strickland and/or unreasonable in light of the state court record.

---

certain today, certain on the day of the line-up, certain from the time he saw him.  Certain when he testified on direct examination, certain when he testified on cross examination, certain when he testified on redirect examination and pointed right to that man, there is no doubt in his mind. You may take it as fact."  4/18/90 at 32

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, all prior proceedings and all submissions,

Petitioner respectfully prays that the Court grant him the following relief:

A)      That Petitioner be granted such discovery that is necessary for full and fair resolution of the claims contained in this Petition;

B)      That leave to amend this Petition, if necessary, be granted;

C)      That Petitioner be provided an opportunity to supplement this Petition with additional briefing;

D)      That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

E)      That Respondents be ordered to respond to this Petition; and

F)      That Petitioner's convictions and sentences, including his sentence of life in prison be vacated.

Respectfully Submitted,

MATTHEW LAWRY
CRISTI CHARPENTIER
Defender Association of Philadelphia
Federal Court Division
Capital Habeas Corpus Unit
437 Chestnut Street, Suite 510
Philadelphia, PA 19106
(215) 928-0520