IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY REID,                          :                    CIVIL ACTION
    *Petitioner,*                     :
                                 :
            v.                          :
                                 :
JEFFREY BEARD, et al.,                  :
    *Respondents.*                    :                    No. 04-CV-2924

RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

THOMAS W. DOLGENOS
Chief, Federal Litigation
JOSHUA S. GOLDWERT[*]
Assistant District Attorney
1421 Arch Street
Philadelphia, PA 19102
(215) 686-8000
*Counsel for Respondents*

---

[*] Admitted to practice only in New York and the District of Columbia.

TABLE OF CONTENTS

BACKGROUND ...............................................................................................................1

STANDARD OF REVIEW ...........................................................................................8

DISCUSSION ...............................................................................................................11

    I.   PROSECUTORIAL MISCONDUCT ..................................................................11
        A.   *Introduction*..............................................................................11
        B.   *Exhaustion*...............................................................................15
        C.   *Background law* ........................................................................17
        D.   *Claims*.....................................................................................20
            1.   Junior Black Mafia.......................................................20
            2.   Evidence of previous shooting ....................................23
            3.   Darryl Woods...............................................................24
            4.   Kevin Brown and Randall Lisby ................................26
            5.   Detective Bethea .........................................................26
            6.   Dan McKay...................................................................27
            7.   Impermissible vouching...............................................28
    II.   PRESUMPTION OF INNOCENCE ...............................................................30
    III.   JURY INSTRUCTIONS .............................................................................31
        A.   *Intent to kill* ............................................................................33
        B.   *Beyond a reasonable doubt*......................................................35
    IV.   INEFFECTIVE ASSISTANCE IN CROSS-EXAMINATION .............................37

CONCLUSION .............................................................................................................39

CERTIFICATE OF SERVICE .................................................................................41

# BACKGROUND

LYNNE ABRAHAM, District Attorney of Philadelphia, by Assistant District Attorneys THOMAS W. DOLGENOS and JOSHUA S. GOLDWERT, on behalf of Respondents, respectfully requests that the Petition for a Writ of Habeas Corpus be denied without a hearing and, in support of the request, states:

1.  A seriatim response is dispensed with in the interest of clarity.

2.  Petitioner was convicted in 1990 of first-degree murder, conspiracy, and possession of an instrument of crime after he and a codefendant shot and killed a teenaged victim named Neil Wilkinson and shot and gravely wounded a victim named Darryl Woods. He was subsequently sentenced to lifetime imprisonment.

3.  Petitioner is currently under two separate sentences of death in connection with two other, unrelated, murder convictions, both of which Petitioner is currently challenging in postconviction proceedings in Pennsylvania's state courts. *See Commonwealth v. Reid*, 642 A.2d 453 (Pa. 1994) (unanimously affirming Petitioner's conviction and death sentence for 1988 murder); *Commonwealth v. Reid*, 626 A.2d 118 (Pa. 1993) (unanimously affirming Petitioner's conviction and sentence for 1989 murder committed six days before murder of Neil Wilkinson). By "unrelated," Respondents mean simply that the two other murder convictions did not arise from the same shooting and murder that produced the convictions at issue in this Petition. They are related in the sense that they were motivated by Petitioner's membership and participation in a criminal organization known as the Junior Black Mafia. *See generally United States v. Thornton*, 1 F.3d 149, 152-54 (3d Cir. 1993) (discussing generally the Junior Black Mafia's illegal drug-distribution activities and the "violent tactics" used by gang members to "expand the organization's territory and to gain greater control of the drug-trafficking business in Philadelphia") (upholding decision by district court to allow anonymous jury in criminal prosecution of Junior Black Mafia members in light of, among other things, Junior Black Mafia's

"history of extreme violence" and apparent history of witness intimidation); *United States v. Cobb*, No. 91-CR-570, 2000 WL 876903, at *1 (E.D. Pa. June 19, 2000) (general discussion of Junior Black Mafia's activities during the late 1980s), *appeal dism'd*, 29 Fed. Appx. 102 (3d Cir. 2002) (non-precedential). They are also related in that, six days before Petitioner murdered Neil Wilkinson and shot Darryl Woods, Petitioner or a passenger in a car driven by him used the same ten-millimeter handgun Petitioner used to shoot Wilkinson and Woods in another lethal shooting.[1] Unless both of Petitioner's other murder convictions are invalidated, the only discernible practical significance of this collateral attack is to attempt to preclude or undermine the use of the convictions in this case as an aggravating factor for Petitioner's other sentences.

4.   Petitioner and his codefendant, both members of the Junior Black Mafia, drove the victims, both of whom were also Junior Black Mafia members, to a North Philadelphia housing project, ostensibly to collect on debts from people who lived there. (The time for the planned debt collection "visit" was approximately 3 a.m. on a Monday morning.)

5.   At the housing project, Woods knocked on the apartment door of the debtor on whom they were supposedly calling, but found no one home. Woods then heard the click of a shotgun from outside the door. Petitioner and his codefendant opened fire; Petitioner used a ten-millimeter pistol (although Woods evidently thought, and the police officer who would later take his statement would record that Woods said, that it was a .357 caliber pistol); his codefendant used the shotgun. Woods was shot repeatedly, both by Petitioner's codefendant and by Petitioner; he also saw Petitioner shoot Wilkinson with the pistol.

---

[1] The victim of the previous shooting was a sixteen year-old boy named Michael Waters. Petitioner had evidently undertaken to shoot one or more members of a group of boys that had been throwing snowballs at passing cars and had hit Petitioner's car with a snowball. *See Commonwealth v. Reid*, 626 A.2d 118 (Pa. 1993) (unanimously affirming Petitioner's conviction and death sentence). On page 2 of Petitioner's brief, Petitioner lists the date that Michael Waters was shot to death as March 7, 1988. This is a typographical error; he was shot to death on March 7, 1989—six days before the shooting and murder at issue in this case. The close proximity in time of the two murders is relevant for several reasons, including the fact that access to a gun on a given date suggests the likelihood of access to that same gun a week later.

6.   Wilkinson died from his wounds. Woods, who had played dead after being shot, was found by police, gravely wounded but alive, and hospitalized. Because doctors ordered a tube placed in Woods's throat, he was unable to speak with police until a week after the shooting (apart from giving his name and address to police, which he was able to do at the scene of the shooting). When Woods became able to speak with a police detective, he expressed fear and anxiety about his family's safety—but made an oral statement, which the detective recorded and Woods reviewed and approved, although he was unable to sign it. *See* 25 Phila. Co. Rptr. 141, 143-44 (Ct. Com. Pl. Phila. County Jan. 21, 1993) (trial court opinion) (attached as Exhibit A).

7.   The same detective, accompanied by another detective, spoke with Woods again shortly afterwards. Using their nicknames, "Tone" and "Black," Woods told the detectives that Petitioner and his codefendant were Junior Black Mafia members and were the men who had killed Wilkinson and shot him. Woods claimed that neither he nor Wilkinson had been Junior Black Mafia members—although he and Wilkinson lived with high-ranking Junior Black Mafia members Leroy Davis and Rodney Carson in a West Philadelphia house "built" and run by Davis—but admitted that he and Wilkinson had gone to the housing project with Petitioner and his codefendant at their request to collect on a debt, and that Wilkinson had brought the "house" shotgun and a pistol, both of which Wilkinson handed to Petitioner's codefendant on arrival.

8.   A week before Woods was shot, he had been arrested by Philadelphia police on weapons charges. Woods agreed to meet with Philadelphia police detective Ernest Bethea a week later. During the intervening week, Woods explained to the detectives from his hospital bed, he thought that his Junior Black Mafia housemates, Davis and Carson, were "acting funny" because they knew he had been arrested and suspected him of cooperating with the authorities, and they had expressed interest in what he had told the police. Woods was shot by Petitioner and his codefendant on the day of his scheduled meeting with Detective Bethea; Woods said that he believed that Petitioner and his codefendant had shot him and Wilkinson as an accommodation

to Davis and Carson because Davis and Carson suspected him of cooperating with the police. He identified photographs of Petitioner and his codefendant from an array of about 100 photographs. Notes of Woods's statement were subsequently typed, and Woods signed the typed version on each page. (Ex. A at 2; N.T. 4/6/90, at 176, 183-88; 4/9/90, at 5-6, 81-84; 4/10/90 (Vol. I), at 8.)

9.   At the preliminary hearing, and then again at trial, Woods attempted to recant, testifying that Petitioner and his codefendant had remained in the car outside the housing project when he and Wilkinson were shot and that he had no idea who had shot them, although it was not Petitioner and his codefendant. Woods denied having given a statement to the police detectives, although he did admit that he had spoken with Petitioner and his codefendant after being released from the hospital. (*See* Ex. A at 2-3; N.T. 4/6/90, at 102-05.) (Rather ominously, when Woods testified at the preliminary hearing, Petitioner's codefendant winked at Woods and mouthed the words "thank you." (*See* Ex. A at 7-8; N.T. 4/16/90, at 29.))

10. At trial, the prosecutor consequently sought and received permission to introduce the statement Woods had given to the police as a prior inconsistent statement. Woods acknowledged that the signature on one of the pages of the typewritten statement was his but testified that he was afraid of the police and was afraid that he would be locked up if he did not sign and, in any event, had not seen the other pages of the statement when he signed the page he acknowledged having signed. He denied that he had changed his testimony out of fear for his safety or that of his family. *See* Ex. A at 3.

11. In addition to Woods's statement (the jury evidently credited the statement and the police detectives' testimony regarding the circumstances under which it was made and discredited the attempted recantation) the prosecutor introduced evidence that the ten-millimeter gun was used six days earlier by Petitioner or a passenger in a car driven by him in another shooting. Ballistic evidence showed that the handgun shells at both crime scenes came from the same gun.

12. The jury convicted Petitioner and his codefendant of first-degree murder, conspiracy, and possession of instruments of crime (the guns).[2] After about a day's worth of deliberations as to the appropriate sentence, the jury reported to the court that it was deadlocked as between the death penalty and lifetime imprisonment. The judge then imposed sentences of lifetime imprisonment.

13. Represented by new counsel, Petitioner appealed, but the Superior Court of Pennsylvania rejected his appellate claims and affirmed the conviction for the reasons given by the trial court. *See* Ex. A (trial court opinion); No. 00399 Phila. 1993, 638 A.2d 270 (Pa. Super. Ct. 1993) (table) (Superior Court opinion) (attached as Exhibit B). The Supreme Court of Pennsylvania declined discretionary review on March 22, 1994. 644 A.2d 734 (Pa. 1994).

14. On December 12, 1996, Petitioner filed a *pro se* application for relief in the trial court under Pennsylvania's Post Conviction Relief Act, 42 Pa. C.S. §§ 9541-9546. The trial court appointed new counsel to represent Petitioner; counsel filed an amended application for relief on Petitioner's behalf. Counsel subsequently sought and received permission to withdraw from the case, apparently because of a possible conflict of interest, and new counsel filed a supplemental amended application on Petitioner's behalf, incorporating the claims raised by his predecessor and raising several additional claims. The trial court denied the application for relief, No. 8907-008-012 (Ct. Com. Pl. Phila. County May 30, 2002) (attached as Exhibit C); the Superior Court affirmed the denial on appeal, No. 689 EDA 2002, 832 A.2d 542 (Pa. Super. Ct. 2003) (table) (attached as Exhibit D); and, on March 4, 2004, the Supreme Court of Pennsylvania again denied discretionary review. 845 A.2d 817 (Pa. 2004).

---

[2] Remarkably, Petitioner asserts that "[t]he case against Petitioner was weak," and that "none of the state courts have suggested anything to the contrary." Br. at 70; *see also id.* at 71; *id.* at 78 (arguing that challenged prosecutorial conduct "must be considered as measured against a weak case"). Not true: the trial court—the same judge who presided over Petitioner's trial—remarked in the course of rejecting Petitioner's first application for state postconviction relief that the "evidence of [Petitioner's] guilt was overwhelming." Ex. C at 14; *see also id.* at 16 ("The evidence against [Petitioner] was overwhelming.").

15. Petitioner filed an ostensibly *pro se* application for a writ of habeas corpus on July 1, 2004. The Petition was assigned to Judge Robert Kelly, who appointed the Defender Association of Philadelphia as counsel. Following a number of extension requests, appointed counsel filed a brief on Petitioner's behalf on March 21, 2005.[3] Although Petitioner attached to his initial *pro se* Petition a fairly long outline of claims that he "wish[ed] to raise," in his counseled "Amended Petition for a Writ [of] Habeas Corpus . . . and Memorandum of Law," Petitioner has briefed only four and has evidently abandoned the remainder. *See, e.g.*, *Gary v. Schofield*, 336 F. Supp. 2d 1337, 1347 n.10 (M.D. Ga. 2004) (claims raised in petition but not briefed deemed abandoned); *Hulbert v. Iowa*, No. C 95-2032 MJM, 2001 U.S. Dist. LEXIS 10516, at *3, *17 n.8 (N.D. Iowa June 27, 2001) (same); *Caibaiosai v. Barrington*, 643 F. Supp. 1007, 1008 n.1 (W.D. Wis. 1986) (same).

---

[3] Notwithstanding his current bid for relief in federal court, Petitioner also filed a second *pro se* application for relief under Pennsylvania's Post Conviction Relief Act, accompanied by a 35-page brief, in April of 2004—almost immediately after the Supreme Court of Pennsylvania declined to review the denial of his first application for state postconviction relief. *See* Second Pet. for Habeas Corpus [sic] Relief Pursuant to Art. I, § 14 of Pa. Const. & 42 Pa. C.S. § 9542 et seq. & Consol. Mem. of Law, No. 8907-0008 1/1 (Ct. Com. Pl. Phila. County, dated Apr. 4, 2004). Petitioner's initial filing in this Court acknowledged the pendency of his second application for relief in state court. *See* Pet. at 7. The trial court, in any event, predictably denied the application as untimely. *See* No. 8907-0008 1/1 (Ct. Com. Pl. Phila. County July 18, 2005) (explaining reasons for dismissal) (attached as Exhibit E). Petitioner has appealed the dismissal; that remains pending. *See* "Petition for Allowance of Appeal" [sic], No. 8907-0008 1/1 (Ct. Com. Pl. Phila. County) (rec'd June 1, 2005) (attached as Exhibit F). Although state prisoners may seek collateral relief in state court and then—if unsuccessful—in federal court, when they pursue federal and state remedies simultaneously, it results in duplicative proceedings and strains the resources of the state. Indeed, were there any apparent realistic possibility of review on the merits in state court, this Court would be required to dismiss his application for a writ of habeas corpus without prejudice unless, perhaps, Petitioner could demonstrate that he satisfies the requirements for a stay of the federal litigation. *See Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002), *cert. denied*, 537 U.S. 1195 (2003); *Doctor v. Walters*, 96 F.3d 675, 681 (3d Cir. 1996); *Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993); *cf. Rhines v. Weber*, 125 S. Ct. 1528 (2005) (district court may stay pending petition for habeas corpus while Petitioner presents previously unexhausted claim to the state courts, but only if the petitioner can demonstrate good cause for the lack of exhaustion, that the claims are at least colorable, and that the petitioner is not engaging in dilatory tactics). Although Respondents believe that the simultaneous active pursuit of relief in state and federal court generally abuses the processes of both courts, Respondents do not believe that there is any realistic prospect that Petitioner will achieve review on the merits of his claims in state court, much less relief. Should Respondents' prediction prove wrong, they will of course notify this Court and request dismissal.

16. Petitioner has briefed claims of (i) prosecutorial misconduct; (ii) denial of the presumption of innocence (said to be the result of prosecutorial misconduct); (iii) ineffective assistance of counsel for failing to object to purportedly infirm jury instructions; and (iv) ineffective assistance of trial counsel for failing successfully to challenge the identification of Petitioner by a witness to one of Petitioner's other two murders as the driver of the car from which shots were fired—including from the gun Petitioner would use to shoot Darryl Woods and murder Neil Wilkinson six days later—and ineffective assistance of appellate counsel for failing to challenge counsel's effectiveness on direct appeal.

## STANDARD OF REVIEW

Habeas corpus relief in federal court is available only for federal claims that have been adjudicated by the state court in a manner:

> (1) contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) result[ing] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law, as determined by the Supreme Court of the United States" means "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). A petitioner "must identify the relevant 'clearly established Federal law' upon which his claim depends," which is to say that he "must identify the Supreme Court precedent that provides the foundation for his claim." *Henry v. Horn*, 218 F. Supp. 2d 671, 695 (E.D. Pa. 2002); *see also, e.g.*, *Loliscio v. Goord*, 263 F.3d 178, 191 (2d Cir. 2001) (petitioner must "identify a clearly established Supreme Court precedent that bears on his claim"); *Bocian v. Godinez*, 101 F.3d 465, 471 (7th Cir. 1996) (petitioners "must be able to point to an authoritative decision of the Supreme Court in order to secure a writ").

"Contrary to" means a state court's arrival at a conclusion opposite to one reached by the Supreme Court of the United States on a question of law or on facts materially indistinguishable from those of a relevant Supreme Court precedent. *See, e.g.*, *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). "Unreasonable application" means correct identification of the governing legal rule followed by an objectively unreasonable application of the rule to the facts of the case. *See, e.g.*, *Woodford v. Visciotti*, 537 U.S. 19, 25-26 (2002) (per curiam). For this highly deferential standard of review to apply, the state court need not have cited (or even known of) the relevant Supreme

Court decisions; all that is necessary is that the state court's decision not contradict them. *See, e.g., Early*, 537 U.S. at 8.

Respect for the state courts' primary role in the process of trying individuals accused of violating state laws requires respect for, and deference to, the state courts' implicit determinations, as well as those set forth explicitly in their written opinions. *See, e.g., La Vallee v. Delle Rose,* 410 U.S. 690, 692 (1973) (per curiam) (if it was clear that the trial court would have granted relief if it had credited the defendant's testimony, its failure to grant relief necessarily implied that it did not credit the defendant's testimony); *Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983) (same) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Campbell v. Vaughn*, 209 F.3d 280, 288-90 (3d Cir. 2000) (concluding that the state court "demonstrated—if in somewhat circumambulatory fashion—that it did not credit [the petitioner's] testimony" by rejecting his claim); *see also Lambert v. Blackwell*, 387 F.3d 210, 252 n.34 (3d Cir. 2004) (on habeas corpus review, district courts owe deference not only to the state courts' explicit findings but also their implicit findings), *cert. denied*, 125 S. Ct. 2516 (2005).

Moreover, any claim for which federal review is sought must have been "fairly presented" to the state courts, which means that the claim must have been raised and preserved at all opportunities afforded under the state's procedures. *See* 28 U.S.C. § 2254(c); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Keller v. Larkins*, 251 F.3d 408, 413-14 (3d Cir. 2001). Otherwise the claim is defaulted, and federal habeas corpus review is unavailable unless the petitioner can demonstrate cause and prejudice for the default or, perhaps, that a "miscarriage of justice" would occur if the federal court declined to disregard the default and address the merits of the claim.[4]

---

[4] Petitioner suggests in his brief that when a state court refuses, on state-law grounds, to entertain a federal claim that has not properly been presented to it in accordance with the state court's rules, review in federal court is *de novo*. Unless the state-law ground on which the state court relied was not "independent" or "adequate," e.g., the rule has been applied erratically or in an unpredictable manner, there is no review in federal court *at all*—unless the Petitioner can show cause and prejudice

Demonstrating that a "miscarriage of justice" would occur requires a showing of actual innocence, i.e., "new reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" that was not presented at trial, *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Hubbard v. Pinchak*, 378 F.3d 333, 339 (3d Cir. 2004), *cert. denied*, 125 S. Ct. 910 (2005), that would make it more likely than not that "no juror, acting reasonably, would have voted to find the Petitioner guilty beyond a reasonable doubt." *See Schlup*, 513 U.S. at 329.

To establish that trial or appellate counsel violated Petitioner's Sixth Amendment right to the effective assistance of counsel, Petitioner must demonstrate both that counsel's performance was so seriously and unreasonably deficient "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's deficient performance was so prejudicial "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's failure to raise or preserve a meritless argument or objection cannot be considered deficient or prejudicial. *See, e.g.*, *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999).[5]

---

to excuse the default or, if possible, that a "miscarriage of justice" would occur if the default were not disregarded.

[5] Rather audaciously, in the section of his brief discussing the standard of review, Petitioner offers several "general principles of exhaustion," including the proposition that it is appropriate to conduct evidentiary hearings to "supplement" the state court record. That proposition cannot be reconciled with the 1996 amendments to the habeas corpus statute, which, among other things, confirm that the time and place to develop the state court record is during the proceedings in state court, and not in federal court afterward. *See* 28 U.S.C. § 2254(e)(2); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (although Rule 7 of the Rules Governing Section 2254 Petitions in the United States District Courts permits expansion of the record, requests to expand the record cannot be granted without regard to the requirements of 28 U.S.C. § 2254(e)(2)); *Owens v. Frank*, 394 F.3d 490, 498 (7th Cir.) (same) ("petitioner must satisfy § 2254(e)(2)'s 'requirements before he may place new factual information before the federal court'"), *cert. denied*, 125 S. Ct. 2910 (2005). Under 28 U.S.C. § 2254(e)(2), claims for which the factual basis has not been developed in state court may not be the subject of an evidentiary hearing unless the applicant demonstrates either (i) that the claim relies on a new, and newly retroactive, constitutional rule, or (ii) that the factual predicate could not previously have been discovered earlier through the exercise of due diligence. The applicant must also demonstrate that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Petitioner's discussion of "general principles of exhaustion" cites only decisions predating the 1996 amendments. Those amendments apply to all applications for writs of habeas corpus that were filed after April 24, 1996,

## DISCUSSION

### I. Prosecutorial misconduct

#### A. Introduction

Petitioner has dedicated about 70 of the 91 pages of his unconventionally-organized brief to a claim of prosecutorial misconduct. From pages 8 to 78, the discussion largely takes the form of a stream-of-consciousness-style (and rather selective) recapitulation of transcript fragments in search of a legal theory.[6] Typifying this approach, Petitioner's brief includes references to remarks to which there was admittedly no objection, *see, e.g.*, Br. at 25 n.12; Br. at 52, and critiques of defense counsel's performance that appear not to have been preserved for review and in any event are not being asserted as claims in this habeas corpus proceeding. *See* Br. at 12.[7]

---

even for those—like Petitioner's—challenging convictions that were already final on direct review by then. *See, e.g.*, *Merritt v. Blaine*, 326 F.3d 157, 161 (3d Cir.), *cert. denied*, 540 U.S. 921 (2003).

[6] Oddly, Petitioner refers frequently to his tally of objections and motions for mistrial by defense counsel—as if objections and motions for mistrial themselves prove the impropriety of the comments to which they are addressed or, even when improper, the ineffectuality of curative instructions by the court. Petitioner's preferred methodology, of course, would reward counsel for obstructing trial proceedings by bombarding the court with objections and motions for mistrial, regardless of merit. On Petitioner's apparent theory, the number of objections and motions would themselves be at least circumstantial proof of their merit. That sort of encouragement would be perverse, *cf.* Ex. A at 8 (trial court criticizing defense counsel in this case for "disgraceful performance"), and certainly not required by due process. Petitioner's tally of objections sustained by the trial judge would be considerably more impressive if Petitioner's trial had been a day or two in length, rather than three weeks long.

[7] For example, Petitioner's appointed counsel rebuke trial counsel for making "no efforts to challenge the nexus between the ballistics" in the shooting of Darryl Woods and murder of Neil Wilkinson and the shooting of Michael Waters, six days earlier, in the course of arguing that the ballistics evidence in the murder of Michael Waters "showed that the casings found there could have been there for as long as twenty-four hours before they were found." *See Br.* at 12 & n.8. Putting to one side the fact that Petitioner appears not to have preserved, and is not now asserting, a claim of ineffective assistance of counsel on these grounds, this is precisely the type of second-guessing that has consistently been held to have no legitimate place in reviewing the constitutional adequacy of counsel's performance. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998) (review is highly deferential and does not entail second-guessing); *see also, e.g.*, *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) (proper scope of review does not include playing "Monday morning quarterback"). Suffice it to say that trial counsel had ample reason to worry about damaging his credibility by trying to get the jury to take seriously the possibility that the presence of shells from a gun fired by Petitioner or a passenger in a car driven by him at the scene of a murder—a week before the shooting of Darryl Woods and murder of Neil Wilkinson—was simply a remarkable and unfortunate coincidence.

Petitioner's principal complaints appear to relate to (i) references by the prosecutor to Petitioner's membership and participation in the Junior Black Mafia; (ii) references by the prosecutor to Petitioner's role in a shooting, six days before the shooting of Darryl Woods and murder of Neil Wilkinson, in which the same ten-millimeter gun was used either by Petitioner or by a passenger in a car driven by him; (iii) allegedly improper questioning by the prosecutor of Darryl Woods; (iv) supposedly improper offers of proof, made outside the presence of the jury, regarding the proposed testimony of Randall Lisby and Kevin Brown, neither of whom testified, (v) supposedly improper questioning of Philadelphia Police detective Ernest Bethea; (vi) allegedly improper questioning of Commonwealth witness Dan McKay, who identified Petitioner as having been involved in the earlier shooting in which the same pistol used to shoot Woods and Wilkinson was used; and (vii) allegedly improper vouching by the prosecutor for one or more police witnesses.

Petitioner acknowledges only with reluctance the state courts' determination that Petitioner was not denied a fundamentally fair trial—a determination that can be disturbed by a federal court only if it was an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if it resulted "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

He also makes only a token attempt to grapple with the curative instructions given by the trial judge although, as discussed more fully below, jurors are almost invariably presumed to be capable of understanding and complying with judicial instructions, *see, e.g.*, *Greer v. Miller*, 483 U.S. 756, 765-67 & n.8 (1987), and corrective instructions and admonitions to counsel are typically understood to demonstrate that the judge *is* properly exercising control over his or her courtroom. Petitioner simply brushes the curative instructions aside as "frequently so hard to understand," "imprecise," and "garrulous," that they "likely further misled and confused the jury." Br. at 10. Yet Petitioner seldom identifies the supposedly deficient instructions, much less explains how they

12

were misleadingly or confusingly "hard to understand," "imprecise," or "garrulous"—or why the state courts' determination that they were not was unreasonable.

Instead, Petitioner attempts largely to sidestep the state courts' determination that Petitioner was not denied a fundamentally fair trial by arguing that the use of the phrase "unavoidable effect" in Pennsylvania decisions' discussions of alleged prosecutorial misconduct demonstrates inconsistency with "established federal law," Br. at 74-75, which is nonsense. Although not mentioned in Petitioner's brief, opinions by judges of this Court have consistently recognized that the language used by Pennsylvania courts when evaluating claims of prosecutorial misconduct, i.e., "unavoidable effect," is perfectly consistent with "established federal law." *See, e.g., Holmes v. Patrick*, No. 04-CV-2625, 2004 U.S. Dist. LEXIS 21600, at *29-31 (E.D. Pa. Oct. 19, 2004) (concluding that the "Superior Court's consideration of Petitioner's [prosecutorial misconduct] argument [including "unavoidable effect" language] was consistent with clearly established federal law as set forth by the United States Supreme Court," including *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *Green v. Wolfe*, No. 03-CV-6879, 2004 U.S. Dist. LEXIS 15748, at *60-61 (E.D. Pa. Aug. 3, 2004) (observing that "this Pennsylvania standard 'places great emphasis on the effect that improper prosecutorial remarks have on the fairness of the verdict,' which 'is also the central concern of *Darden* [*v. Wainwright*, 477 U.S. 168 (1986)],'") (citation omitted) (citing cases for the proposition that the "Pennsylvania standard has been held to be consistent with federal law and not 'contrary to' or an 'unreasonable application' of controlling Supreme Court precedent"), *approved and adopted*, 2004 U.S. Dist. LEXIS 19035 (E.D. Pa. Sept. 1, 2004); *Henry v. Horn*, 218 F. Supp. 2d 671, 704-05 (E.D. Pa. 2002) (concluding, in a case in which the Defender Association was counsel, that the Supreme Court of Pennsylvania's formulation of the standard, including the "unavoidable effect" language, was not "contrary to" Supreme Court precedents, and that the "proper inquiry was whether the Pennsylvania Supreme Court unreasonably applied" that authority to the petitioner's case); *cf. Alexander v. Shannon*, No. 03-

13

CV-3514, 2005 U.S. Dist. LEXIS 1626, at *25-26 (E.D. Pa. Feb. 2, 2005) (suggesting in dicta that the Superior Court "employ[ed] the incorrect test" but concluding that this was "immaterial," because neither the reasoning nor the result of the Superior Court's decision contradicted the pertinent Supreme Court precedents).

Petitioner, of course, has good reason to prefer to focus selectively on matters other than the substantive question of whether the jury was actually presented with evidence that it could not properly consider. As Magistrate Judge Rueter concluded, in rejecting parallel prosecutorial misconduct claims asserted by Petitioner's codefendant in his own bid for a writ of habeas corpus:

- "[t]he prosecutor's reliance on [evidence of the involvement of Petitioner and his codefendant in the Junior Black Mafia] was certainly proper" and his references to the Junior Black Mafia were not only "fair, honest, and limited in scope to Woods's statements to the police" but "within the context of the trial as a whole" were "appropriate and did not constitute misconduct";

- the prosecutor additionally made a point of conceding explicitly to the jury that Woods's statement to the police (which Woods later denied making, although of course the jury was entitled to disbelieve the recantation) was the only source of evidence presented to it about the involvement of Petitioner and his codefendant in the Junior Black Mafia;

- the trial judge, "significant[ly]," and "rather cautiously," took pains to instruct the jury that the Junior Black Mafia was *not* on trial, that Petitioner and his codefendant were *not* on trial for being members of the Junior Black Mafia, and that even if the jury were persuaded that Petitioner and his codefendant were Junior Black Mafia members, that was *not* a sufficient basis to find them guilty of the specific crimes for which they were being tried;

- the prosecutor's defense of his police witnesses "cannot be considered inappropriate in light of defense counsel's repeated attacks upon the police witnesses' credibility," and thus was not misconduct, and, in any event, the prosecutor demonstrated their credibility "by relying on evidence that corroborated their testimony" rather than impermissibly attempting personally to vouch for it;

- even if one disagreed and thought that occasional remarks by the prosecutor regarding the Junior Black Mafia or the veracity of the police witnesses were on the wrong side of the line of appropriate

> advocacy, it was clear "within the context of the trial as a whole"
> that "the prosecutor's behavior did not constitute misconduct" and
> did not cause the denial of a fundamentally fair trial, as would be
> required to find a violation of due process.

*See Bowman v. Dragovich*, No. 99-CV-4652, 2000 U.S. Dist. LEXIS 21867, at *12-23 (E.D. Pa. Oct. 23, 2000) (attached as Exhibit G), *approved and adopted*, 2001 U.S. Dist. LEXIS 355 (E.D. Pa. Jan. 18, 2001) (attached as Exhibit H), *motion denied*, No. 01-1298 (3d Cir. Apr. 11, 2002) (unpublished order denying certificate of appealability), *reh'g denied*, No. 01-1298 (3d Cir. July 8, 2002) (unpublished order denying rehearing en banc), *cert. denied*, 539 U.S. 919 (2003).

B.  Exhaustion

Federal habeas corpus review contemplates an assessment of the state courts' handling of claims that were fairly presented to them, not claims that could have been presented to them. Fair presentation of a claim to the state courts means that the claim sought to be asserted in federal court must be at least the "substantial equivalent" of the claim that was presented to the state courts. *See, e.g., Lambert v. Blackwell*, 134 F.3d 506, 512-13 (3d Cir. 1997); *Sims v. Patrick*, No. 04-CV-0887, 2004 U.S. Dist. LEXIS 20072, at *14-15 (E.D. Pa. Sept. 28, 2004), *approved and adopted*, 2005 U.S. Dist. LEXIS 7639 (E.D. Pa. Apr. 29, 2005). Both the facts and law sought to be presented in federal court must have been presented to the state courts, and the state courts must have had available to them "the same method of legal analysis as that to be employed in federal court." *Lambert*, 134 F.3d at 513. The petitioner bears the burden of "proving exhaustion of all available state remedies." *Id.* Exhaustion of all available state remedies ordinarily means having preserved any claim for which federal relief is sought by presenting it in a request for discretionary review by the state's court of last resort. Although the Supreme Court of Pennsylvania declared in 2000 that prisoners need not seek discretionary review to be deemed to have exhausted all available state remedies for purposes of habeas corpus review, that rule applies only prospectively, and not retroactively. *See, e.g., Sims*, 2004 U.S. Dist. LEXIS 20072, at *15 n.3.

It is not at all clear that the prosecutorial misconduct claim Petitioner seeks to assert has been fairly presented to Pennsylvania's state courts. The section of Petitioner's brief on direct appeal addressed to his claim of prosecutorial misconduct was approximately three and a half single-spaced pages long, of which about half of one page was devoted to discussion of the standard of review. (A copy of the pertinent pages of Petitioner's appellate brief are attached as Exhibit I.)

In Petitioner's brief on direct appeal, Petitioner appears to have argued that the prosecutor committed misconduct by (i) referring improperly to evidence of Petitioner's involvement in a shooting involving the same ten-millimeter gun as the one used to shoot Darryl Woods and murder Neil Wilkinson (although the brief does not acknowledge the trial court's ruling that evidence of Petitioner's connection to the prior shooting was relevant insofar as it was evidence of Petitioner's access to the gun six days later); (ii) improperly questioning Woods (although most of the examples of misconduct claimed by Petitioner in this Court are absent from Petitioner's brief on direct appeal); (iii) asking a police detective a question about his knowledge of the Junior Black Mafia (to which an objection was sustained on the basis of form, apparently because the question was leading) and attempting to ask a police detective about the significance of the fact that the allegations in a warrant had been sworn to before a judge; and (iv) making improper comments during his closing remarks, including (1) an "argument with the Court over the missing witness rule," (2) references to details of the shooting of Michael Waters and Petitioner's identification as having participated in it (including Petitioner's apparently new habit of wearing eyeglasses, although there was no objection to this remark at trial); (3) references to the fact that counsel for Petitioner's codefendant represented and was being paid by Petitioner's codefendant (to which the Court issued a cautionary instruction); and (4) a description of the murder in this case as a

16

"cold-blooded execution," to which the trial court sustained an objection, although the comment actually appears to have been proper.[8]

Petitioner has not remotely sustained his burden of demonstrating that he is presenting the same claim, or at least the "substantial equivalent" of the same claim, that he presented to Pennsylvania's state courts. This appears to be consistent with his suggestion that "the facts presented in support of the claim" in the state courts "may be supplemented in federal court" with facts and allegations not presented to them, *see* Br. at 3, notwithstanding the requirements of 28 U.S.C. § 2254(e)(2). (The relationship of 28 U.S.C. § 2254(e)(2) and Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts is discussed more fully at page 10, n. 5, above.)

C.  Background law

Although prosecutors are indeed expected to adhere to higher standards than their defense counsel counterparts, even on direct appellate review federal judges "have no general power to set aside convictions merely to punish prosecutors." *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir. 1986) (Posner, J.). Purportedly improper prosecutorial argument is not a basis to overturn a conviction unless the defendant can demonstrate prejudice sufficient to show that the comments deprived him of a fair trial. *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 765-67 & n.8 (1987) (challenged statements, "'in the context of the entire trial,'" must have "'so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process'" to furnish a basis for relief) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643 (1974)).

This principle is illustrated by *Hennon v. Cooper*, 109 F.3d 330 (7th Cir. 1997) (Posner, C.J.), a case decided under pre-1996 habeas corpus law and cited by Petitioner at page 9 of his brief. In *Hennon*, the Seventh Circuit opined that a number of the prosecutor's remarks had exceeded the

---

[8] Respondents do not have a copy of Petitioner's application for discretionary review by the Supreme Court of Pennsylvania and consequently are uncertain whether and to what extent Petitioner's prosecutorial misconduct challenge was presented to that Court. As noted above, however, it is the petitioner's obligation to prove exhaustion of all available state remedies.

boundaries of appropriate prosecutorial argument. The Seventh Circuit, however, went on to conclude that the petitioner was not entitled to a writ of habeas corpus—even under the more permissive legal standard that prevailed before 1996—because the prosecutor's remarks were not likely to have affected the verdict, particularly in light of the strength of the prosecution's case and the judge's rulings sustaining "many objections to the prosecutor's [remarks]" and "repeated[] reminde[rs to] the jury that they must decide the case in the case in accordance with the instructions that he, the judge, would be giving it." *Hennon*, 109 F.3d at 333; *see also Mazzone*, 782 F.2d at 764 (observing that behavior that provokes criticism from the bench may well harm the prosecutor's case by reducing the stature of the admonished prosecutor in the eyes of the jury). It is also well-established that there is no unfair prejudice even from otherwise-objectionable prosecutorial argument that is invited by and proportional to argument by defense counsel. *See, e.g., Werts v. Vaughn*, 228 F.3d 178, 199 (3d Cir. 2000). This is not because it is proper for prosecutors to attempt to fight fire with fire, but rather because it is likely that the net effect on the jury's deliberations will be reduced or nonexistent when the prosecutor is responding to objectionable conduct by defense counsel, and because due process does not require punishing society by overturning the conviction of a defendant who is not reasonably likely to have been harmed by the remarks of which he is complaining. *See Mazzone*, 782 F.2d at 763.

Reviewing courts have thus consistently refused to disturb convictions on the basis of prosecutorial argument that, even if inappropriate, did not "in the context of the entire trial" result in a fundamentally unfair trial by irretrievably poisoning the jury's ability to consider the evidence fairly. *See, e.g., United States v. Love*, 336 F.3d 643 (7th Cir. 2003) (no reversal despite argument that defense counsel used "lawyer's trick" when cross-examining codefendant); *United States v. Bates*, 46 Fed. Appx. 104 (3d Cir.) (non-precedential) (no reversal despite explicit argument that declining to convict police officer defendants would send the wrong message to other police officers and would adversely affect the police department and public safety, in view of

curative instruction), *cert. denied*, 537 U.S. 962 (2002); *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985) (no reversal despite argument that, among other things "[m]y job is to bring out the truth"); *United States v. Shackelford*, 709 F.2d 911 (5th Cir. 1983) (no reversal despite argument that the jury was to be "tricked" by defense counsel); *Roznofsky v. Estelle*, 546 F.2d 1185 (5th Cir. 1977) (affirming denial of writ of habeas corpus despite prosecutor's disparaging comments and inflammatory side-bar remarks); *United States ex rel. Clark v. Fike*, 538 F.2d 750 (7th Cir. 1976) (no reversal despite prosecutor's argument that "I work for you as well as the defendant"); *Thomas v. Scully*, 854 F. Supp. 944 (E.D.N.Y. 1994) (denying writ of habeas corpus notwithstanding inaccurate summary of witness's testimony in view of judge's admonition to the jury that its recollection of the evidence controlled); *State v. Hagen*, 512 N.W.2d 180 (Wis. Ct. App. 1994) (no reversal despite argument that defendant and his attorney were pulling "tricks" out of their "sleazy bag" and were engaging in "unethical behavior" in view of curative instruction from the court); *State v. Darrian*, 605 A.2d 716 (N.J. Super. Ct. 1992) (no reversal despite argument that defense counsel was attempting to misdirect jury from the truth and "trip up" honest witnesses in view of absence of objection and judicial instruction that arguments by counsel were not evidence).

Finally, when the judge gives a corrective instruction or a limiting instruction explaining that certain evidence can legitimately be considered only for some purposes but not others, there is an extremely strong presumption that jurors can and will follow the instruction. *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 765-67 & n.8 (1987) (juries assumed capable of disregarding matter ruled out of bounds unless "there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant") (citations and internal quotations omitted); *United States v. Bonner*, 302 F.3d 776, 782 (7th Cir. 2002) (even on direct appeal, there is a "very strong presumption that a jury has understood and followed the trial court's limiting instruction, erasing

the improper influence that might have been caused by the stricken statement"); *United States v. Thornton*, 1 F.3d 149, 157 (3d Cir. 1993) (applying principle to claim of cumulative errors in direct appeal by other Junior Black Mafia members).

    D.  Claims

        1.  Junior Black Mafia

The prosecutor introduced evidence that Petitioner was a member of the Junior Black Mafia and that his membership and participation in the Junior Black Mafia was his motive for the crimes for which he was being tried. Those crimes, once again, arose from the murder of one Junior Black Mafia member and the shooting of another by two other Junior Black Mafia members, committed because other, high-ranking, Junior Black Mafia members suspected the victims of disloyalty to them and to the Junior Black Mafia. Evidence that a defendant is a member of a violent drug gang is, of course, properly admitted to show motive if there is evidence that his membership was his motive for the crime. *See, e.g.*, *United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir. 1991) (cash found on defendant at arrest properly admitted to show he was a drug dealer with a motive to murder a cooperating witness); *Jameson v. Wainwright*, 719 F.2d 1125, 1127 (11th Cir. 1983) (per curiam) ("The evidence of Jameson's involvement with the sale of drugs to the victim was clearly relevant to his motive, plan, and intent to murder Sutton and was admissible under Florida law."); *Nguyen v. Woodford*, No. C 03-00676 CRB, 2005 U.S. Dist. LEXIS 961, at *23-24 (N.D. Cal. Jan. 7, 2005) (denying petition for habeas corpus) (state court reasonably concluded that evidence of gang membership was relevant to petitioner's possible gang-related motive for shootings); *United States ex rel. Williams v. Cowan*, No. 98 C 3204, 2001 U.S. Dist. LEXIS 7475, at *20-21 (N.D. Ill. June 1, 2001); *Briggs v. Makowski*, No. 00-70704-DT, 2000 U.S. Dist. LEXIS 13029, at *10 (E.D. Mich. Aug. 18, 2000) ("Where evidence of gang membership is relevant to a common motive and plot, habeas relief is not appropriate."); *see also, e.g.*, *United States v. Braasch*, 505 F.2d 139, 149 (7th Cir. 1974) (Clark, J.).

Petitioner contends that evidence of his membership in the Junior Black Mafia was prejudicial, which of course it was. All incriminating evidence is prejudicial. *See, e.g., United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972) (rejecting claim of unfair prejudice because even though "the testimony may very likely have worked to prejudice the appellant, it did so because the evidence was damning, not because its introduction was error"); *United States v. Abegg*, No. 92-CR-0103, 1993 U.S. Dist. LEXIS 7658, at *31 (E.D. Pa. June 10, 1993) (noting distinction between "unfairly prejudicial" and "damning"); *see also, e.g., United States v. Compagna*, 146 F.2d 524, 530 (2d Cir. 1944) (L. Hand, C.J.) (observing that if the evidence "'prejudiced' [the defendant], that was precisely its entirely laudable purpose.").

What is *unfairly* prejudicial is evidence that, in relation to its probative value, presents an unreasonable risk that it will lead the jury to convict the defendant for reasons other than persuasion beyond a reasonable doubt that he actually committed the crimes at issue, e.g., because the jury is persuaded simply that the defendant has a propensity to commit crimes or will likely commit crimes in the future if not incapacitated. But evidence of Petitioner's membership and participation in the Junior Black Mafia was evidence the jury could legitimately find made it more likely that Petitioner committed the crimes at issue in *this* case, and not simply because it suggested that Petitioner was the kind of person who would murder someone. It is not as if Petitioner had been charged with bankruptcy fraud and the prosecutor introduced evidence that, incidentally, Petitioner was a member of a violent drug gang. Moreover, given the extensive references to the Junior Black Mafia and the trade in illegal drugs by both defense attorneys during jury selection, it is not easy to understand how anything the prosecutor said on the subject had any effect on the outcome of Petitioner's trial. *See* Ex. A at 11 (noting "persistent, repeated, and unprompted reference[s]" by defense counsel during voir dire to drugs and the Junior Black Mafia and the questioning by defense counsel of "virtually every potential juror by informing them that drugs and the [Junior Black Mafia] were in issue"). (If Petitioner is suggesting that counsel for

Petitioner's codefendant was the only defense attorney who was making those "persistent, repeated, and unprompted reference[s]" to the Junior Black Mafia, and that his own attorney was trying to avoid the subject, *see* Br. at 13, the suggestion is incorrect. *See, e.g.*, N.T. 3/28/90, at 86-87 ("If you are selected in a juror in this case there may be testimony or at least allegations made by the Commonwealth and Commonwealth witnesses, those witnesses being police officers, cops, that these defendants are in an organization—an alleged organization known as the Junior Black Mafia.") ("I will make it very simple. Somebody is going to get up there and say these guys are in the Junior Black Mafia. Do you understand that?"); 3/29/90, at 119-20 (similar), 138 ("If you are chosen to sit on this jury you will hear testimony . . . that this killing may or may not have been drug related. . . . If you are chosen, there may also be testimony in this case regarding an alleged organization known as the Junior Black Mafia. Have you ever heard of that organization?"))

In any event, as Magistrate Judge Rueter concluded in rejecting the same claim by Petitioner's codefendant, the prosecutor's reliance on evidence of the involvement of Petitioner and his codefendant in the Junior Black Mafia was "certainly proper," and his references to the Junior Black Mafia were "fair, honest, and limited in scope to Woods's statements to the police" and "within the context of the trial as a whole" were "appropriate and did not constitute misconduct." *See* Ex. G at 8-9.

The state courts' determination that the prosecutor's references to Petitioner's membership and involvement in the Junior Black Mafia did not deny or contribute to the denial to Petitioner of a fundamentally fair trial cannot be considered irreconcilable with Supreme Court precedent or otherwise unreasonable.

    2.   Evidence of previous shooting

The trial court also rejected Petitioner's argument that the prosecutor committed misconduct by referring to, and producing evidence of, the use by Petitioner or a passenger in a car driven by him of the same ten-millimeter pistol used to shoot Woods and murder Neil Wilkinson during another shooting, six days earlier. As the trial court noted, that evidence was admissible—and properly so—to demonstrate the likelihood that Petitioner had access to the same gun six days later. *See* Ex. A at 7. Petitioner appears to be arguing that the trial judge impermissibly altered his ruling (although trial judges may modify their own interlocutory evidentiary rulings) by also referring to the evidence as "circumstantial evidence of guilt," Br. at 74 & n.17, as if evidence of access to the murder weapon—or evidence of motive or identity—is something different than "circumstantial evidence of guilt."

This argument is nonsensical. Evidence that tended to make it more likely that Petitioner had access to the gun used to shoot Darryl Woods and Neil Wilkinson (or that tended to show motive for shooting them, and so on) was relevant because it *was* "circumstantial evidence of guilt." *See, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 639 (1993) (constitutional error was harmless because, among other things, "other circumstantial evidence, including the motive proffered by the State, also pointed to petitioner's guilt"); *United States v. Cross*, 308 F.3d 308, 322-23 (3d Cir. 2002) ("The existence of an overarching scheme can provide circumstantial evidence of a defendant's guilt by explaining his motive in committing the alleged offense."); *United States v. Weller*, 238 F.3d 1215, 1221 (10th Cir. 2001) (evidence of defendant's unauthorized presence in bank vault, and later possession of large amount of cash with no other obvious source, along with apparent subsequent significant change in financial circumstances, was strong circumstantial evidence of defendant's guilt of embezzlement). This is true even if a jury would not have been justified in concluding *solely* on the basis of Petitioner's access to the gun that Petitioner used it to shoot Woods and Wilkinson six days later. It is still evidence that the jury could find tended to make it

more likely that Petitioner shot them. That is why it was relevant. *See*, *e.g.*, *Commonwealth v. Wayne*, 720 A.2d 456, 467-68 (Pa. 1998) (testimony of jewelry store saleswoman that gold teeth caps can be easily put on and removed relevant because it tended to make it more likely that eyewitnesses who identified defendant as having a gold tooth cap were not mistaken); *Commonwealth v. Shoatz*, 366 A.2d 1216, 1225-26 (Pa. 1976) (defendant's possession of large amounts of sophisticated and generally unavailable weaponry relevant because it tended to make more likely that defendant had been associated with armed militant group); *see also* Fed. R. Evid. 401 (defining relevance). The argument that a jury might make an item of relevant evidence carry more weight than it can legitimately bear (e.g., because Petitioner participated in a shooting using the same gun six days earlier, he therefore and for that reason alone must have shot Wilkinson and Woods six days later) is simply an argument for a limiting instruction, which the trial court gave.

     3.  Darryl Woods

    As noted above, during trial, prosecution witness and shooting victim Darryl Woods denied having given statements to the police while he was hospitalized after being shot. (Also as noted above, when Woods gave the same denials during his preliminary hearing testimony, he "apparently perjured himself . . . receiving a wink and a mouthed 'thank you'" from Petitioner's codefendant. Ex. A at 7-8.) It should suffice to say that the circumstances could reasonably be interpreted as suggesting the possibility of fear of retaliation, if not deliberate witness tampering.

    Petitioner argues that the manner in which the prosecutor challenged Woods's disavowal of his prior statements, e.g., by asking him about the substance of the statements even though he had not authenticated them as having been made by him, and by asking him whether the statements were fabrications by the police if not made by him, violated his constitutional right to due process. Although the trial judge thought that the prosecutor's questioning "at times went beyond what this Court in its discretion considered the permissible limits" of witness examination (the judge also castigated the "disgraceful performance by the Defense Counsel," Ex. A at 8), the judge also

correctly noted that it sustained objections to what it deemed inappropriate and instructed the jury to disregard it. Jurors, again, are presumed to be capable of following judicial instructions.

Even more germanely, the trial judge—who actually had the opportunity to see counsel's performance first-hand and assess its likely effect on the jury—considered whether, notwithstanding the objections and curative remarks, the prosecutor's comments were likely to have affected the outcome of Petitioner's trial by compromising the jury's ability to decide the case based on the evidence. The trial judge determined, and the Superior Court agreed, that they were not.

That conclusion was correct, and in any event clearly reasonable. If, based on the police officers' later testimony about Woods's prior statements, the jury was highly likely to credit the prior statements and not Woods's later disavowal of them even if the prosecutor had simply stopped asking questions as soon as Woods denied giving statement to the police, and proceeded immediately to the examination of the police officers who testified about what Woods had told them, there would be no reasonable probability that the prosecutor's questioning affected the outcome of Petitioner's trial. The trial court necessarily determined that, even disregarding the material it found inadmissible, there was no reasonable probability that the prosecutor's questioning of Woods affected the verdict. That determination was clearly reasonable.

Petitioner also appears to be contending that the prosecutor "commented adversely and in violation of a court order concerning [Woods's] prior assertion of his [Fifth] Amendment privilege," Br. at 78, when he attempted to refuse to testify during pretrial proceedings. The question went unanswered because of defense counsel's objection, and the trial judge gave a curative instruction. In any event, Petitioner offers no explanation for how Petitioner was prejudiced by the prosecutor's impeachment of his own witness.

25

4. Kevin Brown and Randall Lisby

Petitioner, oddly, also complains about the prosecutor's "willful misconstruction" of the concept of admissibility for limited purposes and the trial judge's "utter confusion on the subject" in the context of the proposed testimony of Kevin Brown, a proposed witness who in fact did not testify. Br. at 42-46. The exchange between counsel and the court cited by Petitioner occurred during an offer of proof conducted in chambers, and not in the courtroom—as if colloquy between the court and counsel in chambers, outside the presence of the jury, has anything to do with the jury's ability to consider fairly the evidence presented to it. (To be sure, trial counsel moved, once again, for a mistrial on the asserted basis that the colloquy was so loud that even from within chambers, the jury could hear it. The trial judge rejected the motion out of hand, observing that they were "three rooms away from the jury." Br. at 45.) In any event, Brown never testified, and there is obviously no explanation for how testimony that Brown never gave caused or contributed to the denial to Petitioner of a fair trial.

Likewise with the proposed testimony of Randall Lisby, the brother of Mark Lisby—one of the two people besides Neil Wilkinson that Petitioner murdered. The trial court concluded that Lisby did not have probative, nonhearsay evidence to offer regarding the roles of Petitioner and his codefendant in the Junior Black Mafia. As a consequence, Lisby did not testify either.

5. Detective Bethea

Petitioner also complains about the testimony of Philadelphia Police Detective Ernest Bethea. *See* Br. at 39-42. The court permitted Detective Bethea to testify that Woods had agreed to meet with him on March 13, 1989 to discuss what Woods knew about the Junior Black Mafia's activities, but that Woods was shot that day. Petitioner appears to concede that "[t]hings went smoothly," Br. at 42, but then complains that the prosecutor asked Detective Bethea to testify about an exchange that he had personally witnessed: Petitioner's codefendant winking at Woods during Woods's preliminary hearing testimony and mouthing the words "thank you" after Woods

26

denied giving statements to police. Petitioner has not explained the source of his claim of constitutional infirmity and, for good reason, does not argue that it is improper to introduce evidence from which one could reasonably find that a defendant has attempted to influence the testimony of a witness.

6.  Dan McKay

Petitioner also complains about the prosecutor's conduct in connection with the direct examination and cross-examination of Commonwealth witness Dan McKay. McKay had identified Petitioner as the driver of the car from which the shots were fired in the murder of Michael Waters, six days before the murder of Wilkinson and shooting of Woods. The fact that one of the guns used in the shooting of Wilkinson and Woods had been used by Petitioner or a passenger in a car driven by him six days earlier was, of course, properly admitted as circumstantial evidence that Petitioner had access to the same gun six days later. (Consider Woods's statement that Wilkinson had brought a shared "house" shotgun with him on the ride to the supposed debt collection visit, but that when they arrived at the housing project, Wilkinson gave it to Petitioner's codefendant at the codefendant's request.) McKay's testimony about the circumstances under which he saw Petitioner was relevant insofar as it tended to make it more likely that McKay had in fact seen and would be able to remember what he testified he saw, and that his identification of Petitioner was not mistaken. In any event, the trial court gave a limiting instruction regarding the permissible use of this evidence. (*See* Ex. A at 7; N.T. 4/18/90 (Vol. II), at 92-95.) Petitioner has not remotely shown that there was an overwhelming probability that the jury was unable to comply with the judge's instructions or a strong likelihood that the effect of the evidence was devastating to the defendant's ability to be tried fairly for committing the murder for which he was on trial, much less that the state courts' determination to the contrary was unreasonable.

7.   Impermissible vouching

Petitioner also contends that the prosecutor vouched improperly for the credibility of his witnesses. He is apparently referring to a portion of the prosecutor's closing argument in which the prosecutor responded to defense counsel's insinuation that a police detective witness was lying. (As the trial court noted, "Defense Counsel's *very first question*" to the detective consisted of "an accusation that she was a liar." Ex. A at 9 (emphasis in slip opinion released by chambers). The prosecutor responded by suggesting that police officers are human and fallible but generally "do the best job they can, they don't get up there and lie." *Id.* (quoting N.T. 4/18/90, (vol. II), at 15). Additionally, the prosecutor suggested that if the detective really had been attempting to lie, it would be reasonable to expect her to have fabricated testimony that did not contain inconsistencies with known facts, e.g., she would have attributed to Woods a statement that the handgun Petitioner used to shoot him and Wilkinson was the ten-millimeter pistol that the police already knew from their investigation had been used, rather than a .357 caliber pistol, as Woods evidently (and mistakenly) had thought. The trial court rejected the claim of improper vouching, concluding that the prosecutor had not personally assured the jury of the detective's veracity, but "merely argu[ed] based upon evidence, inferences, and common sense" that there were reasons to believe that she was not lying. Ex. A at 10.

Even in a federal criminal case on direct appellate review, which this is not, improper vouching means an explicit or implicit suggestion that the prosecutor has personal knowledge or other information outside the record to believe the witness. *See United States v. Brennan*, 326 F.3d 176, 186 (3d Cir.) (prosecutor's brief comment that the government does not make charges without proof not improper vouching in absence of explicit or implicit suggestion that the prosecutor had personal knowledge or possessed other information not contained in the record), *cert. denied*, 540 U.S. 898 (2003); *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998) (for finding of improper vouching, defendant must be able to identify as the basis for the prosecutor's comment

on witness credibility "explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record"). Indeed, in a recent habeas corpus case, Magistrate Judge Rapoport rejected a challenge of improper vouching to a closing argument that included the following remarks: "If the Commonwealth was trying to frame somebody we'd pull a whole lot of stuff, have people make up stuff. These people were just honest, telling you what they remembered, well I was there, I was scared, I was on the floor, I could identify this guy, I signed my name, this is what happened, this is what I heard and they give you descriptions of how the person is dressed." *Wilkins v. Wilson*, No. 04-CV-5413, 2005 WL 984213, at *10-13 (E.D. Pa. Apr. 26, 2005), *approved and adopted*, No. 04-CV-5413 (E.D. Pa. May 18, 2005). Magistrate Judge Rapoport rejected the claim of improper vouching on the basis that "the contested statements by the prosecutor were based on evidence which had been presented," and not based on an explicit or implicit suggestion that the prosecutor knew of other reasons why the witnesses should be credited. *Wilkins*, 2005 WL 984213, at *13.

Similarly, the prosecutor's statements in this case did not suggest that the prosecutor was aware of reasons outside the record to believe the detective. An argument by the prosecutor that it would reasonable to conclude that, if the witness had really been attempting to lie, she probably would have made up a better lie is a common example of an argument that asks jurors to weigh credibility based on evidence, inferences drawn from evidence, and the jurors' common sense— and not on the basis of an explicit or implied assurance that there are specific reasons outside the record to believe the witness. It is not misconduct. *See also* Ex. G at 9-10 (rejecting identical claim of improper vouching by Petitioner's codefendant).

II.  Presumption of innocence

Petitioner also argues that the prosecutor's conduct entitles him to relief not only because it violated his general due process right not to be convicted as the result of a trial that was fundamentally unfair, but also because "the misconduct implicated a specific constitutional right," Br. at 79, the right to be presumed innocent. If this is actually a different claim than his prosecutorial misconduct claim, it appears not to have been raised in the state courts, and it is thus apparently defaulted. Unlike with his first and third claims, Petitioner has not attempted to explain when and how this claim was presented to the federal courts. No cause and prejudice to excuse the default is suggested.

In any event, there is no separate, free-standing, "denial of presumption of innocence" claim resulting from purportedly improper prosecutorial conduct and remarks of the type alleged by Petitioner. Certain types of prosecutorial misconduct are, as Petitioner suggests, considered particularly likely to be harmful to defendants and are treated accordingly by the courts, *see*, *e.g.*, *Griffin v. California*, 380 U.S. 609 (1965) (comment on failure to testify); *Doyle v. Ohio*, 426 U.S. 610 (1976) (comment on defendant's postarrest silence following reading of *Miranda* warnings). Petitioner, however, has not identified a single case finding a free-standing "denial of the presumption of innocence" claim arising from prosecutorial remarks not addressed to specific constitutional rights such as the right of defendants not to be compelled to testify or to remain silent after arrest. *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991), and *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990), on which Petitioner relies, were both cases in which the prosecutor's remarks were held to be impermissible comments on the defendant's failure to testify. *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994), on which Petitioner also relies, was a case involving a claim of prosecutorial misconduct that the Eleventh Circuit analyzed as a claim alleging denial of the general right to due process under the familiar standard of *Donnelly v. DeChristoforo. Compare Mahorney v. Wallman*, 917 F.2d 469, 471 (10th Cir. 1990) (prosecutorial misconduct was

addressed to specific constitutional right when prosecutor explicitly argued to jury that the legal presumption of innocence had been removed and that the defendant "is standing before you now guilty" and judge overruled objection by defense counsel), *with Yarrington v. Davies*, 992 F.2d 1077 (10th Cir. 1993) (distinguishing *Mahoney*) (regular due process "fundamental fairness" standard applied to claim of prosecutorial misconduct because prosecutor's misstatements were not addressed to specific constitutional right).

In summary, to the extent Petitioner is attempting to assert a new claim, it appears to be defaulted. Because it is clear that none of the remarks identified by Petitioner are addressed to specific constitutional rights, such as Petitioner's right not to testify and his right not to comment after being arrested, it appears in any event that his claim that he was denied his "right to be presumed innocent" is not a cognizable separate claim, and is simply duplicative of his claim that the prosecutor's comments and conduct violated his right to due process by denying him a fundamentally fair trial.

III. Jury instructions

Petitioner also contends that counsel was constitutionally ineffective for failing to object to the judge's jury instructions, which Petitioner now contends were deficient in two respects. He argues (i) that the trial judge's jury instructions permitted the jury to convict Petitioner of first-degree murder even if it entertained a reasonable doubt that Petitioner personally had the intent to kill; and (ii) that the judge's instruction on the concept of reasonable doubt was "confusing" because the judge instructed that "beyond a reasonable doubt" was more than "mere suspicion of guilt" but did not also instruct that it was more than "preponderance of the evidence" and "clear and convincing evidence."

The time to complain about the trial judge's jury instructions is at trial. If this were a federal criminal case on direct appeal, the absence of an objection in the trial court would forfeit appellate review altogether, unless the error was "plain," Fed. R. Crim. P. 52(b), which is to say an

error that was "clear" or "obvious" and that affected "substantial rights," typically by affecting the outcome of the trial. Even then, whether to entertain the claim of plain error would be left to the appellate court's discretion unless there were a showing that the defendant is actually innocent or unless the error, notwithstanding the lack of objection, otherwise "seriously affects the fairness, integrity or public reputation of [the] judicial proceedings." *See United States v. Olano*, 507 U.S. 725, 731-34 (1993); *Virgin Islands v. Rosa*, 399 F.3d 283, 293-94 (3d Cir. 2005). Because this is *not* a federal case on direct appellate review, a showing beyond "plain error" is required. *See United States v. Frady*, 456 U.S. 152, 164 (1982) ("plain error" standard is "out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal"); *see also Whitney v. Horn*, 280 F.3d 240, 260-61 (3d Cir. 2002) (rejecting claim of ineffective assistance and reversing judgment granting writ of habeas corpus) (although trial judge obviously should have instructed that defendant could be guilty of first degree murder only if he "was *not* so intoxicated" that he could not have formed intent to kill, there was no reasonable likelihood that the jury entertained a reasonable doubt as to whether the defendant was too intoxicated to form intent to kill), *cert. denied*, 537 U.S. 1195 (2003). For the reasons set forth below, Petitioner has not remotely shown that the trial court's rulings were erroneous, much less "plainly erroneous," let alone an appropriate basis for a writ of habeas corpus in the absence of an objection. In the absence of any showing that the instructions were erroneous, counsel cannot be considered ineffective for failing to object to them and Petitioner cannot be considered to have been prejudiced as a result.

A.  Intent to kill

Petitioner claims that the trial judge "confus[ed]" the jury by instructing it that one can be guilty of a crime as an accomplice of "another person who does commit *that crime*," and that one is an accomplice if one "with the intent of promoting or facilitating the commission of *a* crime" either "solicits, commands, encourages, or requests the other person to commit it or aids or agrees to aid or attempts to aid the other person in planning or committing *the crime*." He argues that there is a "reasonable likelihood" that the jury convicted Petitioner on a legally impermissible theory. Petitioner is thus contending that there is a "reasonable probability" that the jury convicted Petitioner because it found that (i) Petitioner was guilty of first-degree murder only as his codefendant's accomplice and not as a principal, and that (ii) Petitioner intended to promote or facilitate his codefendant's commission of some crime or crimes (but not a killing), and solicited, commanded, encouraged, or requested his codefendant to commit some crime or crimes (but not a killing), or aided or agreed to aid or attempted to aid his codefendant in planning or committing some crime or crimes (but not a killing).

This contention is absurd. What other crime could the jury possibly have thought that Petitioner intended to help his codefendant commit? Petitioner's reliance on *Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002), *cert. denied*, 537 U.S. 1107 (2003), and *Smith v. Horn*, 120 F.3d 400, 414-15 (3d Cir. 1997), is completely misplaced. *Everett* involved the getaway driver in the robbery of a grocery store in which the robbers murdered two people during the robbery. Although "[n]o one allege[d] that Everett intended that anyone would be shot," the trial judge nevertheless instructed the jury "over and over again that Everett could be found guilty of intentional murder if *his accomplice* intended to cause the death of the victim," *Everett*, 290 F.3d at 503, and of course it was not only possible but fairly likely that the jury thought the getaway driver had intended to help his accomplices carry out a robbery but not a murder. *Smith* was another robbery-homicide case in which a divided Third Circuit panel concluded that the instructions given by the judge in

that case made it reasonably probable that the jury convicted the defendant of first-degree murder despite finding only that he was an "accomplice in the robbery" but not an "accomplice in the killing." *Smith*, 120 F.3d at 412; *see also* Ex. G at 14-15 (rejecting identical challenge by Petitioner's codefendant to jury instruction, specifically distinguishing *Smith*).

In this case, Petitioner and his codefendant took Darryl Woods and Neil Wilkinson to the housing project for the specific purpose of ambushing them and shooting them to death. Wilkinson actually was shot to death; Woods was shot, gravely wounded, and left for dead. Unlike *Everett* and *Smith*, this was not a case with an odd-man-out defendant who did not shoot anyone and thus plausibly may have intended to assist only in the commission of some crime other than killing someone. Indeed, Petitioner appears to concede the existence of evidence that he was armed, Br. at 85, and he must concede that there was evidence that Petitioner shot Wilkinson as well as Woods, *see* Ex. D at 1-3, even though he suggests that the bullet that actually killed Wilkinson may have been fired by Petitioner's codefendant.

There is no reasonable probability that the jury convicted Petitioner without finding that he had the intent to kill. In fact, there is no chance that the jury convicted Petitioner without finding that he had the intent to kill—period. As Magistrate Judge Rueter observed, because the jury also convicted Petitioner and his codefendant of conspiracy, and because the trial judge clearly instructed the jury that it had to find an agreement between Petitioner and his codefendant to convict them of conspiracy, it is "inconceivable that the same jury who decided that the defendants agreed to commit first degree murder might conclude that these defendants did not share the same intent to kill." *See* Ex. G at 14.

In short, the Superior Court of Pennsylvania found it "abundantly clear," based on the jury instruction and the facts of the case, that a reasonable juror would not have thought it possible to find that Petitioner was an accomplice in Wilkinson's murder without finding that he had the intent to kill. *See* Ex. D at 9. That conclusion was plainly not irreconcilable with Supreme Court

precedent or otherwise unreasonable. *See* Ex. G at 14-15 (rejecting identical challenge by Petitioner's codefendant to jury instruction) (concluding the instructions "were unambiguous and accurately defined the law" and finding it "highly unlikely that the jury understood 'intent' to mean anything other than 'intent to kill'"). Moreover, for the reasons given by Magistrate Judge Rueter in his opinion rejecting the identical challenge to the jury instruction by Petitioner's codefendant, given the conspiracy convictions, there is no chance—and thus no possible prejudice—that the jury failed to find that Petitioner and his codefendant shared the intent to kill.

B.  Beyond a reasonable doubt

Petitioner also argues that counsel was constitutionally ineffective for failing to object to the court's instruction on "beyond a reasonable doubt."

That argument borders on the frivolous. Constitutional due process "does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Trial courts, in fact, need not try to define the term "beyond a reasonable doubt" at all. *See id.*; *cf., e.g.*, *United States v. Najjar*, 300 F.3d 466, 486 (4th Cir.) (reiterating directive to district judges within Fourth Circuit not to attempt to define "reasonable doubt"), *cert. denied*, 537 U.S. 1094 (2002). With one notable exception, the Supreme Court of the United States has never found a trial court's attempt to define "beyond a reasonable doubt" to be constitutionally infirm. That exception, *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), involved the uniquely incomprehensible instruction that a "reasonable doubt" is "one that is founded upon a real tangible substantial basis" that would "give rise to a grave uncertainty," and would be an "an actual substantial doubt . . . a doubt that a reasonable man can seriously entertain," sufficient to eliminate "moral certainty" of the defendant's guilt, even if not "absolute or mathematical certainty." *Cage*, 498 U.S. at 40. Unsurprisingly, the Supreme Court concluded that this language would "suggest[] a higher degree of doubt than is required for acquittal under the

reasonable-doubt standard" to a reasonable modern-day jury, assuming that a reasonable jury could understand it at all. *Id.*

Conversely, Petitioner argues simply that by instructing the jury that "beyond a reasonable doubt" was more than "mere suspicion," the judge implied that it may not be much more, because the trial judge did not add that it is also more than "preponderance of the evidence" and "clear and convincing evidence." Even in federal criminal cases on direct appeal, similar jury instructions are routinely upheld. *See, e.g., United States v. Burnette*, 375 F.3d 10, 20-21 (1st Cir. 2004) (district court did not commit error, let alone plain error, by declining to define "reasonable doubt," although the district court had advised that "mere suspicion, conjecture or guess" was not enough to sustain guilty verdict), *vacated in part on other grounds,* 125 S. Ct. 1406 (2005) (vacating and remanding for reconsideration of sentencing issues in light of *United States v. Booker*, 125 S. Ct. 738 (2005)); *see also Blackwell v. Larkins*, No. 97-CV-1999, 1998 U.S. Dist. LEXIS 9891, at *42-44 (E.D. Pa. July 7, 1998) (denying application for writ of habeas corpus) (rejecting similar challenge to materially identical "not . . . on the mere suspicion of guilt" instruction).

In short, the state courts determined that the judge's jury instruction was "clear," "unambiguous," and "accurat[e]," and that counsel was consequently not ineffective for failing to object to it. That determination was clearly not irreconcilable with Supreme Court precedent or otherwise unreasonable. *See* Ex. G at 13-14 (rejecting identical challenge by Petitioner's codefendant) (observing that the challenged instruction, which was taken directly from Pennsylvania's suggested standard jury instructions, "has been approved by this very court").

## IV. Ineffective assistance in cross-examination

Petitioner appears to be contending, once again, that Daniel McKay—an eyewitness to the murder of Michael Waters, committed six days before the shooting of Darryl Woods and murder of Neil Wilkinson with one of the same guns—had in fact identified someone other than Petitioner when shown a photographic array, and that trial counsel was constitutionally ineffective for failing to challenge the supposed misidentification. He argues that trial counsel, who also represented Petitioner in connection with the murder of Michael Waters, should have known about the misidentification, and that appellate counsel was ineffective for failing to preserve the issue on appeal.

The short answer is that McKay did not identify someone other Petitioner. What McKay testified at Petitioner's trial for the murder of Michael Waters was that he had identified a picture of a person who he thought looked "something like" Petitioner but rejected it because it was not the person he saw. (*See* N.T. 8/6/90, at 686 ("I said he looked something like the man, but it wasn't him")) (A copy of the pertinent transcript pages is attached as Exhibit J.) Petitioner's counsel was wise to limit his cross-examination of McKay. Challenging his recollection and ability to recognize Petitioner, and inviting further examination about the circumstances under which he encountered Petitioner, would have been foolish.

At Petitioner's trial for murdering Michael Waters, McKay identified Petitioner in court unequivocally and explained for the jury how he came to be capable of identifying him: Petitioner, after his car was hit by a snowball, got out of his car and crossed the street and, from a distance of roughly five to ten feet, asked McKay whether he was with the boys who were throwing snowballs. When McKay answered no, Petitioner told McKay that he "better hope none was your family," and then—reaching inside his coat—told the other passengers in his car "Let's get one of them anyway." (N.T. 8/6/90, at 660.) Petitioner then got back into his car and drove after the boys.

Gunfire soon erupted from the car—McKay recalled five or six shots—and Michael Waters, struck by a bullet, fell to the snow, fatally wounded. *Id.* at 662.

In much of the seventy-plus pages devoted to his claims of prosecutorial misconduct, Petitioner appears to be arguing that the details of Michael Waters's murder were so outrageous that hearing evidence of Petitioner's role in it would deprive any jury of the ability to try Petitioner fairly for murdering Neil Wilkinson and shooting Darryl Woods six days later, no matter what the judge instructed. Now Petitioner is arguing that trial counsel was unreasonably deficient for not courting *even more* testimony by McKay about Petitioner's role in Michael Waters's exceptionally senseless murder. Any reasonable defense attorney would have feared further testimony by McKay about the genesis of his ability to recognize and identify Petitioner.

In short, the trial court concluded that "[a]ny further cross-examination on McKay's identification would have certainly opened [the] door to the Commonwealth eliciting additional damaging details on redirect," including McKay's identification of Petitioner at a preliminary hearing, and that it was consequently a sound "strategic decision for counsel to limit his cross-examination" of McKay. Ex. C at 15-16. The trial court also concluded that there was no reasonable probability that additional cross-examination of McKay would have changed the verdict. *Id.* at 16. Those conclusions were correct and, in any event, clearly reasonable.

CONCLUSION

It is difficult to discern from Petitioner's unconventionally-organized brief what the precise bases of Petitioner's prosecutorial misconduct claim are. He has not shown, however, that he has presented the prosecutorial misconduct claim he is attempting to present to this Court, or its "substantial equivalent," to Pennsylvania's state courts.

In any event, the state courts determined that Petitioner was not denied a fundamentally fair trial and Petitioner has not remotely shown that this determination was irreconcilable with Supreme Court precedent or otherwise unreasonable. Evidence of Petitioner's membership and participation in the Junior Black Mafia was relevant because it was evidence of his motive to shoot Darryl Woods and murder Neil Wilkinson, and not simply because it suggested that Petitioner was the kind of person who would murder someone. His participation in another shooting, six days before he shot Woods and murdered Wilkinson, in which he or someone in a car driven by him used the same gun later used to shoot Woods and Wilkinson was properly admitted as evidence that he had access to the gun—which *is* circumstantial evidence of guilt. The trial judge, who witnessed first-hand the prosecutor's examination of Darryl Woods, sustained objections to questions he deemed objectionable and concluded that the prosecutor's conduct of that examination did not affect the outcome of the trial; Petitioner has not remotely shown that conclusion to have been unreasonable. Kevin Brown and Randall Lisby were not called as witnesses and there is no explanation for how anything the prosecutor said about their proposed testimony outside the presence of the jury had anything to do with the jury's ability to consider the evidence that actually was presented to it. There is no apparent explanation for why it was improper to ask Detective Bethea about the episode in which Petitioner's codefendant winked at Woods in open court during the preliminary hearing and appeared to thank Woods for recanting his statement incriminating Petitioner and him. Petitioner has not remotely shown that the jury could not accept and comply with the judge's instructions on the proper uses of Dan McKay's

testimony identifying Petitioner in connection with the earlier shooting in which the same pistol used to shoot Darryl Woods and murder Neil Wilkinson was used by Petitioner or a passenger in a car driven by him. The determination of the state courts that the prosecutor was not personally vouching for the police witnesses assailed by defense counsel as liars was correct, and in any event clearly reasonable.

To the extent that Petitioner's "presumption of innocence" claim is actually intended as a separate claim, it appears to have been defaulted. In any event, there is no separate "presumption of innocence claim," in addition to a general due process claim, when there is no explicit reference to one or more of the defendant's specific constitutional rights, e.g., the right not to testify.

Petitioner's challenges to the jury instructions border on the frivolous. His contention that trial counsel was constitutionally ineffective for not courting *even more* testimony by Dan McKay about how he could identify Petitioner is plainly meritless. The state court's determination that doing so would have opened the door to additional, very damaging, testimony was correct and in any event clearly reasonable.

The Petition should be denied without a hearing.


                                        Respectfully submitted,


                                        s/_____
                                        THOMAS W. DOLGENOS
                                        Chief, Federal Litigation


                                        JOSHUA S. GOLDWERT[*]
                                        Assistant District Attorney

_____

[*] Admitted to practice only in New York and the District of Columbia.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY REID, | : | CIVIL ACTION |
| *Petitioner,* | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY BEARD, et al., | : | |
| *Respondents.* | : | No. 04-CV-2924 |

CERTIFICATE OF SERVICE

I, Joshua S. Goldwert, hereby certify that on July 21, 2005, a copy of the Response to the Petition for a Writ of Habeas Corpus was filed with the Court and made available for viewing and downloading via the Court's electronic filing system, and that an additional copy was sent to Petitioner's counsel via first-class United States Mail, postage prepaid, addressed to:

Cristi Charpentier, Esq.
Defender Association of Philadelphia
The Curtis Center-Suite 545 West
601 Walnut Street
Philadelphia, PA 19106

s/ _____

Joshua S. Goldwert
District Attorney's Office
1421 Arch Street
Philadelphia, PA 19102